# EXHIBIT J

BRACEWELL

**GUARANTOR DEMAND LETTER**

July 17, 2026

Rossano De Cotiis
c/o Onni Group
5055 N 32nd St, Ste 200
Phoenix, AZ 85018

***VIA FEDEX NO. 8745 3153 7876 AND VIA FIRST CLASS CERTIFIED MAIL, POSTAGE PREPAID, RETURN RECEIPT REQUESTED NO. 9402 8118 9876 5523 5201 26***

Rossano De Cotiis
c/o Onni Group
200-1010 Seymour Street
Vancouver, BC V6B 3M6

***AND VIA FEDEX NO. 8745 3168 5458 AND VIA FIRST CLASS INTERNATIONAL REGISTERED MAIL, POSTAGE PREPAID, RETURN RECEIPT REQUESTED***

Panni Holdings Ltd
c/o Onni Group
5055 N 32nd St, Ste 200
Phoenix, AZ 85018
Attn: Sam Parrotta

***VIA EMAIL (sparrotta@onni.com) AND VIA FEDEX NO. 8745 3185 9846 AND VIA FIRST CLASS CERTIFIED MAIL, POSTAGE PREPAID, RETURN RECEIPT REQUESTED NO. 9402 8118 9876 5523 5267 15***

Panni Holdings Ltd.
c/o Onni Group
200-1010 Seymour Street
Vancouver, BC V6B 3M6
Attn: Sam Parrotta

***VIA EMAIL (sparrotta@onni.com) AND VIA FEDEX NO. 8745 3177 5232 AND VIA FIRST CLASS INTERNATIONAL REGISTERED MAIL, POSTAGE PREPAID, RETURN RECEIPT REQUESTED***

| | | |
|---|---|---|
| ***Re:*** | ***Securitization:*** | ***NCMS Trust 2019-MILE*** |
| | ***Loan Nos.:*** | ***030503020, 30503208, 30503209, 30503210, 30503211, 30503212, and 30503213*** |
| | ***Borrower:*** | ***Onni Wilshire Courtyard LLC*** |
| | ***Property:*** | ***5700 & 5750 Wilshire Boulevard, Los Angeles, California 90036*** |

Dear Sir or Madam:

Bracewell LLP is legal counsel to Noteholder[1] in connection with the Loan.[2]

---

[1] "**Noteholder**" means Wells Fargo Bank, National Association, as Trustee for the benefit of the Registered Holders of Natixis Commercial Mortgage Securities Trust 2019-MILE, Commercial Mortgage Pass-Through Certificates, Series 2019-MILE, acting by and through the Special Servicer (defined below).

"**Special Servicer**" means Trimont LLC, a Georgia limited liability company, not individually but solely in its authorized capacity as special servicer pursuant to that certain Trust and Servicing Agreement, dated December 23, 2019.

[2] "**Loan**" means the debt evidenced by the Note (defined below).

"**Note**" means, collectively, the notes listed on **Exhibit B**, attached hereto and incorporated herein by reference.

"**Borrower**" means Onni Wilshire Courtyard LLC, a Delaware limited liability company.

"**Original Noteholder**" means Natixis, New York Branch, predecessor-in-interest to Noteholder.

**Sam Murphy**
Partner
T: +1.214.758.1077 F: 800.404.3970
1445 Ross Avenue, Suite 3800, Dallas, Texas 75202
Sam.Murphy@bracewell.com bracewell.com

Pursuant to certain assignments, endorsements, and/or transfers of the Loan Documents,[3] Noteholder is the current owner and holder of the Loan Documents. This Letter[4] supersedes any prior correspondence from Noteholder and/or its respective agents and representatives. All defined terms used herein but not defined shall have the meanings assigned to them in the Loan Documents.

On July 10, 2026, Bracewell LLP delivered to Borrower (with a copy to Guarantors) the Demand Letter,[5] which (i) notified Borrower of Borrower's default and/or Event of Default under the Loan Documents for failing to pay all amounts due pursuant to the Loan Documents, including but not limited to when the Note matured on July 9, 2026 (Thursday) , and (ii) demanded that Borrower cure such default and/or Event of Default on or before 12:00 p.m. (Dallas, Texas time) on July 17, 2026. Borrower failed to timely and properly cure the default and/or Event of Default.

Noteholder formally demands payment of the following amounts that you, as guarantors of Borrower's obligations under the Loan Documents, are required to pay to Noteholder:

---

[3] "**Loan Documents**" means, collectively, the Loan Agreement (defined below), the Note, the Deed of Trust (defined below), the Guaranty (defined below) and any and all other documents executed in connection therewith and/or relating in any way thereto.

"**Loan Agreement**" means that certain Loan Agreement, dated June 17, 2019, entered into by and between Borrower and Original Noteholder, as amended by (i) that certain First Amendment to Loan Agreement and Payment Guaranty dated as of October 31, 2019, (ii) that certain Second Amendment to Loan Agreement and Reaffirmation of Loan Documents, executed on November 10, 2022 and effective as of July 9, 2022, (iii) that certain Third Amendment to Loan Agreement and Reaffirmation of Loan Documents, executed on January 12, 2022 and effective as of November 10, 2022, (iv) that certain Fourth Amendment to Loan Agreement (and Corrective Amendment to Payment Guaranty) and Reaffirmation of Loan Documents, executed as of May 4, 2023 and effective as of November 10, 2022, and (v) that certain Loan Modification and Extension Agreement, effective as of July 7, 2023.

"**Deed of Trust**" means that certain Fee and Leasehold Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated effective June 17, 2019, executed and delivered by Borrower, as grantor, to First American Title Insurance Company, as trustee for the benefit of Original Noteholder, as beneficiary, recorded as Instrument No. 20190573948 in the Real Property Records in Los Angeles County, California, covering, among other things, the Property, as amended by that certain First Amendment to Fee and Leasehold Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated effective November 10, 2022, and recorded as Instrument No. 22-1066889 in the Real Property Records in Los Angeles County, California, each covering, among other things, the Property (defined below).

"**Property**" means that certain real property, personal property, and general intangibles described in the Deed of Trust.

"**Guaranty**" means, collectively, (i) that certain Guaranty of Recourse Obligations, dated June 17, 2019, executed by Guarantors (defined below) for the benefit of Original Noteholder, (ii) the Payment Guaranty (defined below), and (iii) the Additional Payment Guaranty (defined below), a copy of each of which is attached hereto as **Exhibit A** and incorporated herein by reference.

"**Payment Guaranty**" means that certain Payment Guaranty, dated June 17, 2019, executed by Guarantors for the benefit of Original Noteholder, as amended.

"**Additional Payment Guaranty**" means certain Additional Payment Guaranty, dated June 17, 2019, executed by Guarantors for the benefit of Original Noteholder, as amended.

"**Guarantors**" means, collectively, Rossano De Cotiis, an individual, and Panni Holdings Ltd., a British Columbia corporation.

[4] "**Letter**" means this Guarantor Demand Letter.

[5] "**Demand Letter**" means that certain Notice of Maturity / Demand for Payment Letter dated July 10, 2026, prepared by Bracewell LLP, addressed to Borrower.

Payment Guaranty. Pursuant to Section 2 of the Payment Guaranty, as amended, Guarantors are unconditionally and irrevocably guaranteed to Noteholder the payment of Borrower's obligations under the Loan Documents up to the Maximum Guaranteed Obligations Amount.

Additional Payment Guaranty. Pursuant to Section 2 of the Additional Payment Guaranty, Guarantors are unconditionally and irrevocably guaranteed to Noteholder the payment of Borrower's obligations under the Loan Documents up to the Additional Payment Guaranty Amount.

Default Interest. Beginning on July 10, 2026, and continuing thereafter until all amounts due and owing pursuant to the Loan Documents are paid-in-full, interest on the outstanding principal balance of the Note has been accruing and shall continue to accrue at the Default Rate (as defined in the Loan Agreement).

Noteholder formally demands that Guarantors pay to Noteholder all amounts set forth above in the aggregate amount of at least $52,149,922.43[6] on or before 12:00 p.m. (Dallas, Texas time) on July 24, 2026 (Friday). You may contact Josh Kjoelen, Director, Credit Solutions with Special Servicer, at (469) 801-6000 or josh.kjoelen@trimont.com to coordinate payment of such amounts.

Noteholder reserves the right to exercise, in such order as Noteholder elects, any one or more of the remedies available to Noteholder pursuant to the Loan Documents, at law, and/or in equity, and nothing contained in this letter shall constitute a waiver of any rights of Noteholder to pursue such rights and remedies. Guarantors are hereby advised that negotiations, if any, between or among Guarantors, Noteholder, Special Servicer or this firm shall not constitute a waiver of Noteholder's right to exercise its rights and remedies under the Loan Documents at law, and/or in equity, including, but not limited to, those described in this letter. Any such waiver shall not be effective unless set forth in writing and duly executed by an authorized representative of Noteholder. Guarantors shall not be entitled to rely upon any verbal statements made or purported to be made by or on behalf of Noteholder in connection with any alleged agreement by or on behalf of Noteholder to refrain from exercising any of its rights under the Loan Documents, at law, and/or in equity.

Neither this Letter nor any statement by or on behalf of Noteholder as to the amount due and owing under the Loan Documents shall constitute a waiver of any rights of Noteholder to collect any additional amounts to which Noteholder may be lawfully entitled pursuant to the terms of the Loan Documents, at law, and/or in equity. The specific enumeration of default(s) contained in this Letter shall not constitute a waiver of any other default(s) which may now or hereafter exist under the Loan Documents.

***THIS FIRM, SPECIAL SERVICER, AND NOTEHOLDER ARE ATTEMPTING TO COLLECT THE INDEBTEDNESS EVIDENCED BY THE LOAN DOCUMENTS AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE*.**

If your obligations have been discharged, dismissed, or are subject to an automatic stay of a bankruptcy order under Title 11 of the United States Code, then this notice is for compliance and informational purposes only and does not constitute a demand for payment or any attempt to collect any such obligation. This notice is given pursuant to 11 U.S.C. Section 362(b)11, if applicable.

---

6 The total amount of the obligations under the Additional Payment Guaranty will continue to increase until the occurrence of the Outside Date. Accordingly, please contact the Special Servicer to determine all amounts owed.

***To assert and protect your rights as a member of the armed forces of the United States, if you are or your spouse is serving on active military duty, including active military duty as a member of the Texas National Guard or the National Guard of another state or as a member of a reserve component of the armed forces of the United States, then please send written notice of the active duty military service to the sender of this notice immediately***.

Finally, Noteholder prefers to resolve the issues outlined in this letter without resorting to expensive and time-consuming litigation. Nevertheless, if full payment of these amounts is not made on or before 12:00 p.m. (Dallas, Texas time) on July 24, 2026, then Noteholder may pursue all available remedies, which may include seeking attorneys' fees and costs in addition to all amounts owed pursuant to the Loan Documents.

Sincerely,

Sam Murphy

**EXHIBIT A**
to
Guarantor Demand Letter

Guaranty

[attached]

**GUARANTY OF RECOURSE OBLIGATIONS**

made by

**ROSSANO DE COTIIS** and **PANNI HOLDINGS LTD.**,
collectively, as Guarantor,

in favor of

**NATIXIS, NEW YORK BRANCH**,
as Lender

Dated as of June 17, 2019

# GUARANTY OF RECOURSE OBLIGATIONS

This **GUARANTY OF RECOURSE OBLIGATIONS** (this "***Guaranty***"), dated as of June 17, 2019, is made by **ROSSANO DE COTIIS**, a natural person, having an address at c/o Onni Group, 200-1010 Seymour Street, Vancouver, British Columbia V6B 3M6 ("***De Cotiis Guarantor***"), and **PANNI HOLDINGS LTD.**, a British Columbia corporation, having an address at 200-1010 Seymour Street, Vancouver, British Columbia, V6B 3M6 ("***Panni Guarantor***"; together with De Cotiis Guarantor, individually or collectively, as the context may require, "***Guarantor***"), in favor of **NATIXIS, NEW YORK BRANCH**, having an address at 1251 Avenue of the Americas, New York, New York 10020 (together with its successors and assigns, "***Lender***").

## R E C I T A L S:

WHEREAS, pursuant to that certain Loan Agreement, dated as of the date hereof (as the same may be amended, modified, supplemented, restated or replaced from time to time, the "***Loan Agreement***"), between ONNI WILSHIRE COURTYARD LLC, a Delaware limited liability company ("***Borrower***"), and Lender, Lender has agreed to make a loan (the "***Loan***") to Borrower in an original principal amount of $470,202,594.00, subject to the terms and conditions of the Loan Agreement; and

WHEREAS, as a condition to Lender's making the Loan, Lender is requiring that Guarantor execute and deliver to Lender this Guaranty; and

WHEREAS, Guarantor hereby acknowledges that (i) De Cotiis Guarantor owns direct or indirect ownership interests in Borrower and (ii) Borrower and Panni Guarantor have common legal and beneficial ownership and are under common Control (within the meaning of clause (ii) of the definition of "Control"), and, accordingly, each Guarantor will materially benefit from Lender's agreeing to make the Loan.

NOW, THEREFORE, in consideration of the premises set forth herein and as an inducement for and in consideration of the agreement of Lender to make the Loan pursuant to the Loan Agreement, Guarantor hereby agrees, covenants, represents and warrants to Lender as follows:

**1. Definitions.**

(a) All capitalized terms used and not defined herein shall have the respective meanings given such terms in the Loan Agreement.

(b) The term "***Guaranteed Obligations***" means (i) Borrower's Recourse Liabilities, (ii) from and after the date that any Springing Recourse Event occurs, payment of all of the Debt, (iii) payment of any Shortfall Reserve Rebalancing Deposit required pursuant to the Loan Agreement and (iv) payment of all amounts paid by Lender in connection with any transfer or assignment fees payable in connection with the Ground Lease (including, without limitation, any Transfer Fee).

**2. Guaranty.**

(a) Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Lender the full, prompt and complete payment when due of the Guaranteed Obligations.

(b) All sums payable to Lender under this Guaranty shall be payable on demand and without reduction for any offset, claim, counterclaim or defense.

(c) Guarantor hereby agrees to indemnify, defend and save harmless Lender from and against any and all actual costs, actual losses, liabilities, claims, causes of action, actual expenses and damages, including reasonable attorneys' fees and disbursements, which Lender may suffer or which otherwise may arise in connection with the enforcement by Lender of the Loan Documents and/or by reason of Borrower's failure to pay any of the Guaranteed Obligations when due, irrespective of whether such costs, losses, liabilities, claims, causes of action, expenses or damages are incurred by Lender prior or subsequent to (i) Lender's declaring the Principal, interest and other sums evidenced or secured by the Loan Documents to be due and payable, (ii) the commencement or completion of a judicial or non-judicial foreclosure of the Security Instrument or (iii) the conveyance of all or any portion of the Property by deed-in-lieu of foreclosure.

(d) Guarantor agrees that no portion of any sums applied (other than sums received from Guarantor in full or partial satisfaction of its obligations hereunder), from time to time, in reduction of the Debt shall be deemed to have been applied in reduction of the Guaranteed Obligations until such time as the Debt has been paid in full, or Guarantor shall have made the full payment required hereunder, it being the intention hereof that the Guaranteed Obligations shall be the last portion of the Debt to be deemed satisfied.

(e) Notwithstanding anything to the contrary contained herein, Guarantor shall not be liable hereunder for any Guaranteed Obligations arising under clause (a) of the definition of Springing Recourse Event (as set forth in the Loan Agreement) solely because a third party (including, without limitation, any Mezzanine Lender) who or which is not Guarantor, an Affiliate of Guarantor or a Person acting on behalf of any of the foregoing acquires all of the direct or indirect membership interests in Borrower pledged by Mezzanine Borrower to Mezzanine Lender pursuant to a Mezzanine Loan Realization (a "***Mezzanine Transfer Event***"), *provided* that (i) such Mezzanine Transfer Event has not occurred pursuant to a conveyance in lieu (or similar consensual Transfer) of the direct or indirect interests in Borrower and (ii) neither Borrower, Guarantor nor any Affiliate of Borrower or Guarantor has colluded with any Mezzanine Lender in connection with such Mezzanine Transfer Event.

(f) Notwithstanding anything to the contrary contained herein, Guarantor shall not be liable hereunder for any Guaranteed Obligations arising under clause (c) of the definition of Borrower's Recourse Liabilities (as set forth in the Loan Agreement) if and to the extent a court of competent jurisdiction has found (it being acknowledged and agreed that Guarantor shall bear the burden of proof of such matters in such court) that such Guaranteed Obligations (A) arose and accrued solely as a result of any circumstance, condition, action, omission or event with respect to the Property, Guarantor or Borrower first occurring and arising (or Hazardous Substances that were first introduced to the Property) after the date on which a Mezzanine Transfer Event shall have occurred, and (B) were not (1) caused by an affirmative act or omission of Guarantor, any Affiliate of Guarantor or a Person acting on behalf of any of the foregoing or (2) the result of Hazardous Substances in existence on, under or above the Property prior to the date on which such Mezzanine Transfer Event occurred; so long as either (x) a replacement guaranty in compliance with the terms and provisions of the Intercreditor Agreement has been delivered to Lender and is in full force and effect or (y) if a replacement guaranty in compliance with the terms and provisions of the Intercreditor Agreement has not been delivered to Lender or is not in full force and effect, then (I) such Mezzanine Transfer Event has not occurred pursuant to a conveyance in lieu (or similar consensual Transfer) of the direct or indirect interests in Borrower and (II) neither Borrower, Guarantor nor any Affiliate of Borrower or Guarantor has colluded with any Mezzanine Lender in connection with such Mezzanine Transfer Event. It is hereby expressly acknowledged and agreed by Guarantor that, notwithstanding anything to the contrary contained herein, Guarantor shall remain fully liable hereunder with respect to any circumstance, condition, action, omission or event that has occurred or arose on or after the date that the related Mezzanine Transfer Event is cancelled,

terminated, nullified, unwound, revoked, rescinded, void or declared invalid (including any Hazardous Substances introduced to the Property after such date).

(g) Guarantor acknowledges that, notwithstanding any other provision of this Guaranty or any of the other Loan Documents to the contrary (including without limitation any non-recourse provision under the Loan Documents), the obligations of Guarantor under this Guaranty are unlimited personal obligations of Guarantor which are not secured by the Security Instrument or any other security instrument.

3. **Representations and Warranties.** Guarantor hereby represents and warrants to Lender as follows (which representations and warranties shall be given as of the date hereof and shall survive the execution and delivery of this Guaranty):

(a) Execution. This Guaranty has been duly executed and delivered by Guarantor.

(b) Enforceability. This Guaranty constitutes a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally.

(c) No Violation. The execution, delivery and performance by Guarantor of its obligations under this Guaranty does not and will not violate any law, regulation, order, writ, injunction or decree of any court or governmental body, agency or other instrumentality applicable to Guarantor, or result in a breach of any of the terms, conditions or provisions of, or constitute a default under, or result in the creation or imposition of any mortgage, lien, charge or encumbrance of any nature whatsoever upon any of the assets of Guarantor pursuant to the terms of any mortgage, indenture, agreement or instrument to which Guarantor is a party or by which it or any of its properties is bound. Guarantor is not in default under any other guaranty which it has provided to Lender.

(d) No Litigation. Except as otherwise may have been previously disclosed to Lender in writing, there are no actions, suits or proceedings at law or in equity, pending or, to Guarantor's actual knowledge, threatened in writing against or affecting Guarantor or which involve or might involve the validity or enforceability of this Guaranty or which would be reasonably expected to materially adversely affect the financial condition of Guarantor or the ability of Guarantor to perform any of its obligations under this Guaranty. Guarantor is not in default beyond any applicable grace or cure period with respect to any order, writ, injunction, decree or demand of any Governmental Authority which would be reasonably expected to materially adversely affect the financial condition of Guarantor or the ability of Guarantor to perform any of its obligations under this Guaranty.

(e) Consents. All consents, approvals, orders or authorizations of, or registrations, declarations or filings with, all Governmental Authorities (collectively, the "***Consents***") that are required in connection with the valid execution, delivery and performance by Guarantor of this Guaranty have been obtained and Guarantor agrees that all Consents required in connection with the carrying out or performance of any of Guarantor's obligations under this Guaranty will be obtained when required.

(f) Financial Statements and Other Information. All financial statements of Guarantor heretofore delivered to Lender are true and correct in all material respects and fairly present the financial condition of Guarantor as of the respective dates thereof, and no materially adverse change has occurred in the financial conditions reflected therein since the respective dates thereof. None of the aforesaid financial statements or any certificate or statement furnished to Lender by or on behalf of Guarantor in connection with the transactions contemplated hereby, and none of the representations and warranties in

this Guaranty contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein or herein not materially misleading. Guarantor is not insolvent within the meaning of the United States Bankruptcy Code or any other applicable law, code or regulation and the execution, delivery and performance of this Guaranty will not render Guarantor insolvent.

(g) Consideration. De Cotiis Guarantor is the owner, directly or indirectly, of legal and beneficial ownership interests in Borrower. Borrower and Panni Guarantor have common legal and beneficial ownership and are under common Control (within the meaning of clause (ii) of the definition of "Control").

4. **Financial Statements.**

(a) De Cotiis Guarantor shall deliver to Lender, (i) within one hundred fifty (150) days after the end of each calendar year, a complete copy of De Cotiis Guarantor's annual financial statements, together with a certification by De Cotiis Guarantor that such statements are true, correct, complete and accurate in all material respects and present fairly the financial condition of De Cotiis Guarantor and has have been prepared in accordance with GAAP or any other accounting method, consistently applied (*provided* that, if such statements are in the same form as the financial statements delivered to Lender in connection with the closing of the Loan, such statements shall be deemed acceptable as to form), and (ii) within forty-five (45) days after request by Lender, such other financial information with respect to De Cotiis Guarantor as Lender may reasonably request.

(b) Panni Guarantor shall deliver to Lender, (i) within one hundred fifty (150) days after the end of each fiscal year of Panni Guarantor, a complete copy of Panni Guarantor's annual financial statements audited by a "big four" accounting firm or another independent certified public accountant reasonably acceptable to Lender, and (ii) within forty-five (45) days after request by Lender, such other financial information with respect to Panni Guarantor as Lender may reasonably request.

5. **Unconditional Character of Obligations of Guarantor.**

(a) The obligations of Guarantor hereunder shall be irrevocable, absolute and unconditional, irrespective of the validity, regularity or enforceability, in whole or in part, of the other Loan Documents or any provision thereof, or the absence of any action to enforce the same, any waiver or consent with respect to any provision thereof, the recovery of any judgment against Borrower, Guarantor or any other Person or any action to enforce the same, any failure or delay in the enforcement of the obligations of Borrower under the other Loan Documents or Guarantor under this Guaranty, or any setoff or counterclaim, and irrespective of any other circumstances which might otherwise limit recourse against Guarantor by Lender or constitute a legal or equitable discharge or defense of a guarantor or surety. Lender may enforce the obligations of Guarantor under this Guaranty by a proceeding at law, in equity or otherwise, independent of any loan foreclosure or similar proceeding or any deficiency action against Borrower or any other Person at any time, either before or after an action against the Property or any part thereof, Borrower or any other Person. **This Guaranty is a guaranty of payment and performance and not merely a guaranty of collection.** Guarantor waives diligence, notice of acceptance of this Guaranty, filing of claims with any court, any proceeding to enforce any provision of any other Loan Document against Guarantor, Borrower or any other Person, any right to require a proceeding first against Borrower or any other Person, or to exhaust any security (including, without limitation, the Property) for the performance of the Guaranteed Obligations or any other obligations of Borrower or any other Person, or any protest, presentment, notice of default or other notice or demand whatsoever (except to the extent expressly provided to the contrary in this Guaranty).

(b) The obligations of Guarantor under this Guaranty, and the rights of Lender to enforce the same by proceedings, whether by action at law, suit in equity or otherwise, shall not be in any way affected by any of the following:

(i) any insolvency, bankruptcy, liquidation, reorganization, readjustment, composition, dissolution, receivership, conservatorship, winding up or other similar proceeding involving or affecting Borrower, the Property or any part thereof, Guarantor or any other Person;

(ii) any failure by Lender or any other Person, whether or not without fault on its part, to perform or comply with any of the terms of the Loan Agreement, or any other Loan Documents, the Mezzanine Loan Documents or any document or instrument relating to any of the foregoing;

(iii) the sale, transfer or conveyance of the Property or any interest therein to any Person, whether now or hereafter having or acquiring an interest in the Property or any part thereof and whether or not pursuant to any foreclosure, trustee sale or similar proceeding against Borrower or the Property or any interest therein;

(iv) the conveyance to Lender, any Affiliate of Lender or Lender's nominee of the Property or any interest therein by a deed-in-lieu of foreclosure;

(v) the release of Borrower or any other Person from the performance or observance of any of the agreements, covenants, terms or conditions contained in any of the Loan Documents by operation of law or otherwise; or

(vi) the release in whole or in part of any collateral for any or all Guaranteed Obligations or for the Loan or any portion thereof.

(c) Except as otherwise specifically provided in this Guaranty, Guarantor hereby expressly and irrevocably waives all defenses in an action brought by Lender to enforce this Guaranty based on claims of waiver, release, surrender, alteration or compromise and all setoffs, reductions, or impairments, whether arising hereunder or otherwise.

(d) Lender may deal with Borrower and Affiliates of Borrower in the same manner and as freely as if this Guaranty did not exist and shall be entitled, among other things, to grant Borrower or any other Person such extension or extensions of time to perform any act or acts as may be deemed advisable by Lender, at any time and from time to time, without terminating, affecting or impairing the validity of this Guaranty or the obligations of Guarantor hereunder.

(e) No compromise, alteration, amendment, modification, extension, renewal, release or other change of, or waiver, consent, delay, omission, failure to act or other action with respect to, any liability or obligation under or with respect to, or of any of the terms, covenants or conditions of, the Loan Documents shall in any way alter, impair or affect any of the obligations of Guarantor hereunder, and Guarantor agrees that if any Loan Document is modified with Lender's consent, the Guaranteed Obligations shall automatically be deemed modified to include such modifications.

(f) Lender may proceed to protect and enforce any or all of its rights under this Guaranty by suit in equity or action at law, whether for the specific performance of any covenants or agreements contained in this Guaranty or otherwise, or to take any action authorized or permitted under applicable law, and shall be entitled to require and enforce the performance of all acts and things required to be

performed hereunder by Guarantor. Each and every remedy of Lender shall, to the extent permitted by law, be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity.

(g) No waiver shall be deemed to have been made by Lender of any rights hereunder unless the same shall be in writing and signed by Lender, and any such waiver shall be a waiver only with respect to the specific matter involved and shall in no way impair the rights of Lender or the obligations of Guarantor to Lender in any other respect or at any other time.

(h) At the option of Lender, Guarantor may be joined in any action or proceeding commenced by Lender against Borrower in connection with or based upon any other Loan Documents and recovery may be had against Guarantor in such action or proceeding or in any independent action or proceeding against Guarantor to the extent of Guarantor's liability hereunder, without any requirement that Lender first assert, prosecute or exhaust any remedy or claim against Borrower or any other Person, or any security for the obligations of Borrower or any other Person.

(i) Guarantor agrees that this Guaranty shall continue to be effective or shall be reinstated, as the case may be, if at any time any payment is made by Borrower or Guarantor to Lender and such payment is rescinded or must otherwise be returned by Lender (as determined by Lender in its sole and absolute discretion) upon insolvency, bankruptcy, liquidation, reorganization, readjustment, composition, dissolution, receivership, conservatorship, winding up or other similar proceeding involving or affecting Borrower or Guarantor, all as though such payment had not been made.

(j) In the event that Guarantor shall advance or become obligated to pay any sums under this Guaranty or in connection with the Guaranteed Obligations or in the event that for any reason whatsoever Borrower or any subsequent owner of the Property or any part thereof is now, or shall hereafter become, indebted to Guarantor, Guarantor agrees that (i) the amount of such sums and of such indebtedness and all interest thereon shall at all times be subordinate as to lien, the time of payment and in all other respects to all sums, including principal and interest and other amounts, at any time owed to Lender under the Loan Documents, and (ii) Guarantor shall not be entitled to enforce or receive payment thereof until the Debt has been indefeasibly paid in full. Nothing herein contained is intended or shall be construed to give Guarantor any right of subrogation in or under the Loan Documents or any right to participate in any way therein, or in the right, title or interest of Lender in or to any collateral for the Loan, notwithstanding any payments made by Guarantor under this Guaranty, until the actual and irrevocable receipt by Lender of payment in full of all of the Debt. If any amount shall be paid to Guarantor on account of such subrogation rights at any time when any such sums due and owing to Lender shall not have been fully paid, such amount shall be paid by Guarantor to Lender for credit and application against such sums due and owing to Lender.

(k) Guarantor's obligations hereunder shall survive a foreclosure, deed-in-lieu of foreclosure or similar proceeding involving the Property and the exercise by Lender of any or all of its remedies pursuant to the Loan Documents.

**6. <u>Covenants</u>.**

(a) As used in this <u>Section 6</u>, the following terms shall have the respective meanings set forth below:

(i) "***GAAP***" shall mean generally accepted accounting principles, consistently applied.

(ii) "***Liquid Assets***" shall mean the liquid assets of Guarantor in the form of cash, readily marketable securities traded on a national exchange or on the National Association of Securities Dealers Automatic Quotations (NASDAQ), obligations of the United States of America or Canada, or guaranteed by the United States of America or Canada, corporate debt securities traded on a national exchange, Guarantor's cash in partnerships in which Guarantor is a partner (but only to the extent that such cash is available for distribution to Guarantor and unencumbered), the undrawn amount of funds available to be directly borrowed by Guarantor under a line of credit or other credit facility then in effect and provided by a commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia or under the laws of Canada having combined capital and surplus of not less than $1,000,000,000.00, which commercial bank has a rating of at least "AA" or such comparable rating from S&P or Moody's, respectively, and with respect to which no default or other event or circumstance exists that would cause Guarantor not to be able to borrow such funds on not more five (5) Business Days' notice, and such other investments as may be acceptable to Lender in its sole discretion.

(iii) "***Net Worth***" shall mean, as of a given date, (x) the total assets of Guarantor (excluding the value of Guarantor's direct and indirect interests in Borrower and the Property) as of such date less (y) Guarantor's total liabilities as of such date, determined in accordance with GAAP.

(b) Until all of the Guaranteed Obligations have been paid in full, Guarantor (i) shall maintain an aggregate Net Worth in excess of $225,000,000.00 (the "***Net Worth Covenant***") and shall maintain, in the aggregate, Liquid Assets in excess of $30,000,000.00 (the "***Liquidity Covenant***"; and, collectively with the Net Worth Covenant, the "***Guarantor Financial Covenants***"), and (ii) shall not sell, pledge, mortgage or otherwise transfer any of its assets, or any interest therein, on terms materially less favorable than would be obtained in an arms-length transaction.

(c) Guarantor shall not, at any time while a default in the payment of the Guaranteed Obligations has occurred and is continuing beyond the expiration of any applicable notice and cure periods, either (i) enter into or effectuate any transaction with any Affiliate which would reduce the Net Worth of Guarantor or (ii) sell, pledge, mortgage or otherwise transfer to any Person any of Guarantor's assets, or any interest therein; *provided* that, Guarantor shall be permitted to enter into transactions described in this subclause (ii) for so long as each such transaction (x) is conducted in the ordinary course of Guarantor's business and is on an arms-length basis with a person that is not Affiliated with Guarantor, (y) would not reduce Guarantor's Net Worth or Liquid Assets below the thresholds required pursuant to the Guarantor Financial Covenants, and (z) would not be reasonably expected to have a material adverse effect on Guarantor's ability to satisfy the Guaranteed Obligations.

**7. Entire Agreement/Amendments.** This instrument represents the entire agreement between the parties with respect to the subject matter hereof. The terms of this Guaranty shall not be waived, altered, modified, amended, supplemented or terminated in any manner whatsoever except by written instrument signed by Lender and Guarantor.

**8. Successors and Assigns.** This Guaranty shall be binding upon Guarantor, and Guarantor's estate, heirs, personal representatives, successors and assigns, may not be assigned or delegated by Guarantor and shall inure to the benefit of Lender and its successors and assigns.

9. **Applicable Law and Consent to Jurisdiction.** This Guaranty shall be governed by, and construed and enforced in accordance with, the substantive laws of the State of New York. Guarantor irrevocably (a) agrees that any suit, action or other legal proceeding arising out of or relating to this Guaranty may be brought in a court of record in the City and County of New York or in the Courts of the United States of America located in the Southern District of New York, (b) consents to the jurisdiction of each such court in any such suit, action or proceeding and (c) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in any of such courts and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. Guarantor irrevocably consents to the service of any and all process in any such suit, action or proceeding by service of copies of such process to Guarantor at its address provided in Section 14 hereof. Nothing in this Section 9, however, shall affect the right of Lender to serve legal process in any other manner permitted by law or affect the right of Lender to bring any suit, action or proceeding against Guarantor or its property in the courts of any other jurisdictions.

10. **Section Headings.** The headings of the sections and paragraphs of this Guaranty have been inserted for convenience of reference only and shall in no way define, modify, limit or amplify any of the terms or provisions hereof.

11. **Severability.** Any provision of this Guaranty which may be determined by any competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, Guarantor hereby waives any provision of law which renders any provision hereof prohibited or unenforceable in any respect.

12. **WAIVER OF TRIAL BY JURY.** GUARANTOR HEREBY WAIVES THE RIGHT OF TRIAL BY JURY IN ANY LITIGATION, ACTION OR PROCEEDING ARISING HEREUNDER OR IN CONNECTION HEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR, AND IS INTENDED TO ENCOMPASS EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER OF TRIAL BY JURY BY GUARANTOR.

13. **Other Guaranties.** The obligations of Guarantor hereunder are separate and distinct from, and in addition to, the obligations of Guarantor now or hereafter arising under any other guaranties, pursuant to which Guarantor has guaranteed payment and performance of certain other obligations of Borrower described therein.

14. **Notices.** All notices, demands, requests, consents, approvals or other communications (collectively called "***Notices***") required or permitted to be given hereunder to Lender or Guarantor or which are given to Lender or Guarantor with respect to this Guaranty shall be given in the same manner as is specified in the Loan Agreement, directed to the party to be so notified and addressed as set forth below.

If to Lender, to:

Natixis, New York Branch
1251 Avenue of the Americas, 5th Floor

New York, New York 10020
Attention: Real Estate Administration
Email: USCIBGlobalFinanceAssetManagementTeam@natixis.com
Phone: (212) 891-6100

with a copy to:

Winston & Strawn LLP
200 Park Avenue
New York, New York 10166
Attention: Michael A. Moser, Esq.
Email: mmoser@winston.com
Telecopier: (212) 294-4700

If to Guarantor, to:

c/o Onni Group
200-1010 Seymour Street
Vancouver, BC, V6B 3M6
Attention: Sam Parrotta
Email: sparrotta@onni.com

with a copy to:

Allen Matkins Leck Gamble Mallory & Natsis LLP
1900 Main Street, 5th Floor
Irvine, California 92614-7321
Attention: Susan E. Graham, Esq.
Email: sgraham@allenmatkins.com
Telecopier: (949) 553-8354.

**15.** **Guarantor's Receipt of Loan Documents.** Guarantor by its execution hereof acknowledges receipt of true copies of all of the Loan Documents, the terms and conditions of which are hereby incorporated herein by reference.

**16.** **Interest; Expenses.**

(a) If Guarantor fails to pay all or any sums due hereunder upon demand by Lender, the amount of such sums payable by Guarantor to Lender shall bear interest from the date of demand until paid at the Default Rate in effect from time to time.

(b) Guarantor hereby agrees to pay all actual, out-of-pocket costs, charges and expenses, including reasonable attorneys' fees and disbursements, which may be incurred by Lender in enforcing the covenants, agreements, obligations and liabilities of Guarantor under this Guaranty.

**17.** **Joint and Several Obligations.** If Guarantor consists of more than one Person, each such Person shall have joint and several liability for the obligations of Guarantor hereunder.

**18.** **Specific Limitation on Guaranty and Indemnity Obligations.** Guarantor and Lender hereby confirm that it is the intention of Guarantor and Lender that this Guaranty not constitute a fraudulent transfer or fraudulent conveyance (a "***Fraudulent Conveyance***") under the Bankruptcy Code,

the Uniform Fraudulent Conveyance Act or any other debtor relief law or insolvency law (whether statutory, common law, case law or otherwise) or any jurisdiction whatsoever (collectively, the "***Bankruptcy Laws***"). To give effect to the foregoing intention of Guarantor and Lender, each of such parties hereby irrevocably agrees that the Guaranteed Obligations shall be limited to (but shall not be less than) such maximum amount as will, after giving effect to the maximum amount of such obligations and all other liabilities (whether contingent or otherwise) of Guarantor that are relevant under such Bankruptcy Laws, result in the Guaranteed Obligations not constituting a Fraudulent Conveyance under the Bankruptcy Laws, as of the date of execution and delivery of this Guaranty.

**19.** **Counterparts.** This Guaranty may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

**20.** **State-Specific Provisions.** Solely to the extent that, and despite the express intent of Guarantor and Lender that the laws of the State of New York shall govern this Guaranty, a court of competent jurisdiction finds that the laws of the State of California apply to this Guaranty, the following provisions shall govern and control in the event of a conflict with any other provision in this Guaranty:

(a) Guarantor expressly waives: (i) any and all rights of subrogation, reimbursement, indemnification and contribution and any other rights and defenses that are or may become available to Guarantor by reason of California Civil Code Sections 2787 to 2855, inclusive; and (ii) any right to require the marshalling of assets, whether under Section 2899 or Section 3433 of the California Civil Code or otherwise.

(b) Guarantor waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a non-judicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

(c) Guarantor hereby waives all rights and defenses that Guarantor may have because Borrower's debt is secured by real property. This means, among other things:

(i) Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower; and

(ii) if Lender forecloses on any real property collateral pledged by Borrower:

1. the amount of the Debt may be reduced only by the price for which such collateral is sold at the foreclosure sale, even if such collateral is worth more than the sale price; and

2. Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower.

This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's debt is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

(d) Guarantor hereby waives any rights under California Code of Civil Procedure Sections 580a and 726(b), which provide, among other things: that a creditor must file a complaint for

deficiency within three (3) months of a non-judicial foreclosure sale or judicial foreclosure sale, as applicable; that a fair market value hearing must be held; and that the amount of the deficiency judgment shall be limited to the amount by which the unpaid debt exceeds the fair market value of the security, but not more than the amount by which the unpaid debt exceeds the sale price of the security.

(e) Guarantor acknowledges that, notwithstanding any other provision of this Guaranty or any of the other Loan Documents to the contrary (including without limitation any non-recourse provision under the Loan Documents), the obligations of Guarantor under this Guaranty are unlimited personal obligations of Guarantor which are not secured by the Security Instrument or any other security instrument.

[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date first above written.

**GUARANTOR**:

**PANNI HOLDINGS LTD.,**
a British Columbia corporation

By:______________________________
Name: Sam Parrotta
Title: Authorized Signatory

______________________________
**ROSSANO DE COTIIS**, a natural person

**PAYMENT GUARANTY**

made by

**ROSSANO DE COTIIS** and **PANNI HOLDINGS LTD.**,
collectively, as Guarantor,

in favor of

**NATIXIS, NEW YORK BRANCH,**
as Lender

Dated as of June 17, 2019

# PAYMENT GUARANTY

This **PAYMENT GUARANTY** (this "***Guaranty***"), dated as of June 17, 2019, is made by **ROSSANO DE COTIIS**, a natural person, having an address at c/o Onni Group, 200-1010 Seymour Street, Vancouver, British Columbia V6B 3M6 ("***De Cotiis Guarantor***"), and **PANNI HOLDINGS LTD.**, a British Columbia corporation, having an address at 200-1010 Seymour Street, Vancouver, British Columbia, V6B 3M6 ("***Panni Guarantor***"; together with De Cotiis Guarantor, individually or collectively, as the context may require, "***Guarantor***"), in favor of **NATIXIS, NEW YORK BRANCH**, having an address at 1251 Avenue of the Americas, New York, New York 10020 (together with its successors and assigns, "***Lender***").

## R E C I T A L S:

WHEREAS, pursuant to that certain Loan Agreement, dated as of the date hereof (as the same may be amended, modified, supplemented, restated or replaced from time to time, the "***Loan Agreement***"), between ONNI WILSHIRE COURTYARD LLC, a Delaware limited liability company ("***Borrower***"), and Lender, Lender has agreed to make a loan (the "***Loan***") to Borrower in an original principal amount of $470,202,594.00, subject to the terms and conditions of the Loan Agreement; and

WHEREAS, as a condition to Lender's making the Loan, Lender is requiring that Guarantor execute and deliver to Lender this Guaranty; and

WHEREAS, Guarantor hereby acknowledges that (i) De Cotiis Guarantor owns direct or indirect ownership interests in Borrower and (ii) Borrower and Panni Guarantor have common legal and beneficial ownership and are under common Control (within the meaning of clause (ii) of the definition of "Control"), and, accordingly, each Guarantor will materially benefit from Lender's agreeing to make the Loan.

NOW, THEREFORE, in consideration of the premises set forth herein and as an inducement for and in consideration of the agreement of Lender to make the Loan pursuant to the Loan Agreement, Guarantor hereby agrees, covenants, represents and warrants to Lender as follows:

1. **Definitions.**

(a) All capitalized terms used and not defined herein shall have the respective meanings given such terms in the Loan Agreement.

(b) The term "***Guaranteed Obligations***" means the payment of the principal under the Note when due in accordance with the Note and the other Loan Documents, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter (*provided, however*, that in no event shall Guarantor's liability hereunder for the payment of the principal under the Note exceed the Maximum Guaranteed Obligations Amount (without reduction on account of any prepayment or amortization of the Loan (except as otherwise provided in Section 2(e) below), it being the intention that Guarantor is guaranteeing the last portion of the Loan to be satisfied in an amount equal to the Maximum Guaranteed Obligations Amount)).

(c) The term "***Debt Yield***" means as of any date of determination, the ratio (expressed as a percentage) calculated by Lender in its reasonable discretion of (i) the UNOI as of such date of determination to (ii) the sum of (a) the Maximum Potential Loan Amount *plus* (b) the "Maximum Potential Loan Amount" (as defined in the Mezzanine Loan Agreement).

(d) The term "***Maximum Guaranteed Obligations Amount***" means $137,550,648.50, as the same may be reduced pursuant to Section 2(e) below.

**2. Guaranty.**

(a) Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Lender the full, prompt and complete payment when due of the Guaranteed Obligations.

(b) All sums payable to Lender under this Guaranty shall be payable on demand and without reduction for any offset, claim, counterclaim or defense.

(c) Guarantor hereby agrees to indemnify, defend and save harmless Lender from and against any and all actual costs, actual losses, liabilities, claims, causes of action, actual expenses and damages, including reasonable attorneys' fees and disbursements, which Lender may suffer or which otherwise may arise in connection with the enforcement by Lender of the Loan Documents and/or by reason of Borrower's failure to pay any of the Guaranteed Obligations when due, irrespective of whether such costs, losses, liabilities, claims, causes of action, expenses or damages are incurred by Lender prior or subsequent to (i) Lender's declaring the Principal, interest and other sums evidenced or secured by the Loan Documents to be due and payable, (ii) the commencement or completion of a judicial or non-judicial foreclosure of the Security Instrument or (iii) the conveyance of all or any portion of the Property by deed-in-lieu of foreclosure.

(d) Guarantor agrees that no portion of any sums applied (other than sums received from Guarantor in full or partial satisfaction of its obligations hereunder), from time to time, in reduction of the Debt shall be deemed to have been applied in reduction of the Guaranteed Obligations until such time as the Debt has been paid in full, or Guarantor shall have made the full payment required hereunder, it being the intention hereof that the Guaranteed Obligations shall be the last portion of the Debt to be deemed satisfied.

(e) Subject to the terms of Section 5(i) hereof, from and after the date upon which Current Mezzanine Loan Guarantor shall have delivered to Current Mezzanine Lender the Current Mezzanine Loan Payment Guaranty pursuant to and in accordance with the requirements of Section 10.1(j) of the Current Mezzanine Loan Agreement, the Maximum Guaranteed Obligations Amount shall thereafter be reduced on a dollar-for-dollar basis by the amount of any payment made by Current Mezzanine Loan Guarantor to Lender pursuant to Section 2(f) of the Current Mezzanine Loan Payment Guaranty in respect of the "Guaranteed Obligations" under and as defined in the Current Mezzanine Loan Payment Guaranty.

(f) Notwithstanding anything to the contrary contained in this Guaranty, Guarantor's obligations hereunder for the payment of the Guaranteed Obligations shall terminate and this Guaranty shall thereafter become null and void and of no further force and effect, upon the date on which the Debt Yield is at least equal to 7.50%.

(g) Guarantor acknowledges that, notwithstanding any other provision of this Guaranty or any of the other Loan Documents to the contrary (including without limitation any non-recourse provision under the Loan Documents), the obligations of Guarantor under this Guaranty are unlimited personal obligations of Guarantor which are not secured by the Security Instrument or any other security instrument.

**3. Representations and Warranties.** Guarantor hereby represents and warrants to Lender as follows (which representations and warranties shall be given as of the date hereof and shall survive the execution and delivery of this Guaranty):

(a) Execution. This Guaranty has been duly executed and delivered by Guarantor.

(b) Enforceability. This Guaranty constitutes a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally.

(c) No Violation. The execution, delivery and performance by Guarantor of its obligations under this Guaranty does not and will not violate any law, regulation, order, writ, injunction or decree of any court or governmental body, agency or other instrumentality applicable to Guarantor, or result in a breach of any of the terms, conditions or provisions of, or constitute a default under, or result in the creation or imposition of any mortgage, lien, charge or encumbrance of any nature whatsoever upon any of the assets of Guarantor pursuant to the terms of any mortgage, indenture, agreement or instrument to which Guarantor is a party or by which it or any of its properties is bound. Guarantor is not in default under any other guaranty which it has provided to Lender.

(d) No Litigation. Except as otherwise may have been previously disclosed to Lender in writing, there are no actions, suits or proceedings at law or in equity, pending or, to Guarantor's actual knowledge, threatened in writing against or affecting Guarantor or which involve or might involve the validity or enforceability of this Guaranty or which would be reasonably expected to materially adversely affect the financial condition of Guarantor or the ability of Guarantor to perform any of its obligations under this Guaranty. Guarantor is not in default beyond any applicable grace or cure period with respect to any order, writ, injunction, decree or demand of any Governmental Authority which would be reasonably expected to materially adversely affect the financial condition of Guarantor or the ability of Guarantor to perform any of its obligations under this Guaranty.

(e) Consents. All consents, approvals, orders or authorizations of, or registrations, declarations or filings with, all Governmental Authorities (collectively, the "***Consents***") that are required in connection with the valid execution, delivery and performance by Guarantor of this Guaranty have been obtained and Guarantor agrees that all Consents required in connection with the carrying out or performance of any of Guarantor's obligations under this Guaranty will be obtained when required.

(f) Financial Statements and Other Information. All financial statements of Guarantor heretofore delivered to Lender are true and correct in all material respects and fairly present the financial condition of Guarantor as of the respective dates thereof, and no materially adverse change has occurred in the financial conditions reflected therein since the respective dates thereof. None of the aforesaid financial statements or any certificate or statement furnished to Lender by or on behalf of Guarantor in connection with the transactions contemplated hereby, and none of the representations and warranties in this Guaranty contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein or herein not materially misleading. Guarantor is not insolvent within the meaning of the United States Bankruptcy Code or any other applicable law, code or regulation and the execution, delivery and performance of this Guaranty will not render Guarantor insolvent.

(g) Consideration. De Cotiis Guarantor is the owner, directly or indirectly, of legal and beneficial ownership interests in Borrower. Borrower and Panni Guarantor have common legal and beneficial ownership and are under common Control (within the meaning of clause (ii) of the definition of "Control").

4. **Financial Statements.**

(a) De Cotiis Guarantor shall deliver to Lender, (i) within one hundred fifty (150) days after the end of each calendar year, a complete copy of De Cotiis Guarantor's annual financial statements, together with a certification by De Cotiis Guarantor that such statements are true, correct, complete and accurate in all material respects and present fairly the financial condition of De Cotiis Guarantor and has have been prepared in accordance with GAAP or any other accounting method, consistently applied (*provided* that, if such statements are in the same form as the financial statements delivered to Lender in connection with the closing of the Loan, such statements shall be deemed acceptable as to form), and (ii) within forty-five (45) days after request by Lender, such other financial information with respect to De Cotiis Guarantor as Lender may reasonably request.

(b) Panni Guarantor shall deliver to Lender, (i) within one hundred fifty (150) days after the end of each fiscal year of Panni Guarantor, a complete copy of Panni Guarantor's annual financial statements audited by a "big four" accounting firm or another independent certified public accountant reasonably acceptable to Lender, and (ii) within forty-five (45) days after request by Lender, such other financial information with respect to Panni Guarantor as Lender may reasonably request.

**5. Unconditional Character of Obligations of Guarantor.**

(a) The obligations of Guarantor hereunder shall be irrevocable, absolute and unconditional, irrespective of the validity, regularity or enforceability, in whole or in part, of the other Loan Documents or any provision thereof, or the absence of any action to enforce the same, any waiver or consent with respect to any provision thereof, the recovery of any judgment against Borrower, Guarantor or any other Person or any action to enforce the same, any failure or delay in the enforcement of the obligations of Borrower under the other Loan Documents or Guarantor under this Guaranty, or any setoff or counterclaim, and irrespective of any other circumstances which might otherwise limit recourse against Guarantor by Lender or constitute a legal or equitable discharge or defense of a guarantor or surety. Lender may enforce the obligations of Guarantor under this Guaranty by a proceeding at law, in equity or otherwise, independent of any loan foreclosure or similar proceeding or any deficiency action against Borrower or any other Person at any time, either before or after an action against the Property or any part thereof, Borrower or any other Person. **This Guaranty is a guaranty of payment and performance and not merely a guaranty of collection.** Guarantor waives diligence, notice of acceptance of this Guaranty, filing of claims with any court, any proceeding to enforce any provision of any other Loan Document against Guarantor, Borrower or any other Person, any right to require a proceeding first against Borrower or any other Person, or to exhaust any security (including, without limitation, the Property) for the performance of the Guaranteed Obligations or any other obligations of Borrower or any other Person, or any protest, presentment, notice of default or other notice or demand whatsoever (except to the extent expressly provided to the contrary in this Guaranty).

(b) The obligations of Guarantor under this Guaranty, and the rights of Lender to enforce the same by proceedings, whether by action at law, suit in equity or otherwise, shall not be in any way affected by any of the following:

(i) any insolvency, bankruptcy, liquidation, reorganization, readjustment, composition, dissolution, receivership, conservatorship, winding up or other similar proceeding involving or affecting Borrower, the Property or any part thereof, Guarantor or any other Person;

(ii) any failure by Lender or any other Person, whether or not without fault on its part, to perform or comply with any of the terms of the Loan Agreement, or any other Loan Documents, the Mezzanine Loan Documents or any document or instrument relating to any of the foregoing;

(iii) the sale, transfer or conveyance of the Property or any interest therein to any Person, whether now or hereafter having or acquiring an interest in the Property or any part thereof and whether or not pursuant to any foreclosure, trustee sale or similar proceeding against Borrower or the Property or any interest therein;

(iv) the conveyance to Lender, any Affiliate of Lender or Lender's nominee of the Property or any interest therein by a deed-in-lieu of foreclosure;

(v) the release of Borrower or any other Person from the performance or observance of any of the agreements, covenants, terms or conditions contained in any of the Loan Documents by operation of law or otherwise; or

(vi) the release in whole or in part of any collateral for any or all Guaranteed Obligations or for the Loan or any portion thereof.

(c) Except as otherwise specifically provided in this Guaranty, Guarantor hereby expressly and irrevocably waives all defenses in an action brought by Lender to enforce this Guaranty based on claims of waiver, release, surrender, alteration or compromise and all setoffs, reductions, or impairments, whether arising hereunder or otherwise.

(d) Lender may deal with Borrower and Affiliates of Borrower in the same manner and as freely as if this Guaranty did not exist and shall be entitled, among other things, to grant Borrower or any other Person such extension or extensions of time to perform any act or acts as may be deemed advisable by Lender, at any time and from time to time, without terminating, affecting or impairing the validity of this Guaranty or the obligations of Guarantor hereunder.

(e) No compromise, alteration, amendment, modification, extension, renewal, release or other change of, or waiver, consent, delay, omission, failure to act or other action with respect to, any liability or obligation under or with respect to, or of any of the terms, covenants or conditions of, the Loan Documents shall in any way alter, impair or affect any of the obligations of Guarantor hereunder, and Guarantor agrees that if any Loan Document is modified with Lender's consent, the Guaranteed Obligations shall automatically be deemed modified to include such modifications.

(f) Lender may proceed to protect and enforce any or all of its rights under this Guaranty by suit in equity or action at law, whether for the specific performance of any covenants or agreements contained in this Guaranty or otherwise, or to take any action authorized or permitted under applicable law, and shall be entitled to require and enforce the performance of all acts and things required to be performed hereunder by Guarantor. Each and every remedy of Lender shall, to the extent permitted by law, be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity.

(g) No waiver shall be deemed to have been made by Lender of any rights hereunder unless the same shall be in writing and signed by Lender, and any such waiver shall be a waiver only with respect to the specific matter involved and shall in no way impair the rights of Lender or the obligations of Guarantor to Lender in any other respect or at any other time.

(h) At the option of Lender, Guarantor may be joined in any action or proceeding commenced by Lender against Borrower in connection with or based upon any other Loan Documents and recovery may be had against Guarantor in such action or proceeding or in any independent action or proceeding against Guarantor to the extent of Guarantor's liability hereunder, without any requirement

that Lender first assert, prosecute or exhaust any remedy or claim against Borrower or any other Person, or any security for the obligations of Borrower or any other Person.

(i) Guarantor agrees that this Guaranty shall continue to be effective or shall be reinstated, as the case may be, if at any time any payment is made by Borrower, Guarantor or Current Mezzanine Loan Guarantor to Lender and such payment is rescinded or must otherwise be returned by Lender (as determined by Lender in its sole and absolute discretion) upon insolvency, bankruptcy, liquidation, reorganization, readjustment, composition, dissolution, receivership, conservatorship, winding up or other similar proceeding involving or affecting Borrower, Mezzanine Borrower, Guarantor or Current Mezzanine Loan Guarantor, all as though such payment had not been made. Without limiting the foregoing, in the event that any payment made to Lender pursuant to Section 2(f) of the Current Mezzanine Loan Payment Guaranty is rescinded or must otherwise be returned by Lender (as determined by Lender in its sole and absolute discretion) upon insolvency, bankruptcy, liquidation, reorganization, readjustment, composition, dissolution, receivership, conservatorship, winding up or other similar proceeding involving or affecting Borrower, Mezzanine Borrower, Guarantor or Current Mezzanine Loan Guarantor, then Guarantor agrees that the amount by which the Maximum Guaranteed Obligations Amount had theretofore previously been reduced pursuant to Section 2(e) hereof with respect to such payment made pursuant to Section 2(f) of the Current Mezzanine Loan Payment Guaranty shall be reversed (and Guarantor's liability shall be reinstated) on a dollar-for-dollar basis by the amount so rescinded or returned.

(j) In the event that Guarantor shall advance or become obligated to pay any sums under this Guaranty or in connection with the Guaranteed Obligations or in the event that for any reason whatsoever Borrower or any subsequent owner of the Property or any part thereof is now, or shall hereafter become, indebted to Guarantor, Guarantor agrees that (i) the amount of such sums and of such indebtedness and all interest thereon shall at all times be subordinate as to lien, the time of payment and in all other respects to all sums, including principal and interest and other amounts, at any time owed to Lender under the Loan Documents, and (ii) Guarantor shall not be entitled to enforce or receive payment thereof until the Debt has been indefeasibly paid in full. Nothing herein contained is intended or shall be construed to give Guarantor any right of subrogation in or under the Loan Documents or any right to participate in any way therein, or in the right, title or interest of Lender in or to any collateral for the Loan, notwithstanding any payments made by Guarantor under this Guaranty, until the actual and irrevocable receipt by Lender of payment in full of all of the Debt. If any amount shall be paid to Guarantor on account of such subrogation rights at any time when any such sums due and owing to Lender shall not have been fully paid, such amount shall be paid by Guarantor to Lender for credit and application against such sums due and owing to Lender.

(k) Guarantor's obligations hereunder shall survive a foreclosure, deed-in-lieu of foreclosure or similar proceeding involving the Property and the exercise by Lender of any or all of its remedies pursuant to the Loan Documents.

**6. Covenants.**

(a) As used in this Section 6, the following terms shall have the respective meanings set forth below:

(i) "***GAAP***" shall mean generally accepted accounting principles, consistently applied.

(ii) "***Liquid Assets***" shall mean the liquid assets of Guarantor in the form of cash, readily marketable securities traded on a national exchange or on the National

Association of Securities Dealers Automatic Quotations (NASDAQ), obligations of the United States of America or Canada, or guaranteed by the United States of America or Canada, corporate debt securities traded on a national exchange, Guarantor's cash in partnerships in which Guarantor is a partner (but only to the extent that such cash is available for distribution to Guarantor and unencumbered), the undrawn amount of funds available to be directly borrowed by Guarantor under a line of credit or other credit facility then in effect and provided by a commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia or under the laws of Canada having combined capital and surplus of not less than $1,000,000,000.00, which commercial bank has a rating of at least "AA" or such comparable rating from S&P or Moody's, respectively, and with respect to which no default or other event or circumstance exists that would cause Guarantor not to be able to borrow such funds on not more five (5) Business Days' notice, and such other investments as may be acceptable to Lender in its sole discretion.

(iii) "***Net Worth***" shall mean, as of a given date, (x) the total assets of Guarantor (excluding the value of Guarantor's direct and indirect interests in Borrower and the Property) as of such date less (y) Guarantor's total liabilities as of such date, determined in accordance with GAAP.

(b) Until all of the Guaranteed Obligations have been paid in full, Guarantor (i) shall maintain an aggregate Net Worth in excess of $225,000,000.00 (the "***Net Worth Covenant***") and shall maintain, in the aggregate, Liquid Assets in excess of $30,000,000.00 (the "***Liquidity Covenant***"; and, collectively with the Net Worth Covenant, the "***Guarantor Financial Covenants***"), and (ii) shall not sell, pledge, mortgage or otherwise transfer any of its assets, or any interest therein, on terms materially less favorable than would be obtained in an arms-length transaction.

(c) Guarantor shall not, at any time while a default in the payment of the Guaranteed Obligations has occurred and is continuing beyond the expiration of any applicable notice and cure periods, either (i) enter into or effectuate any transaction with any Affiliate which would reduce the Net Worth of Guarantor or (ii) sell, pledge, mortgage or otherwise transfer to any Person any of Guarantor's assets, or any interest therein; *provided* that, Guarantor shall be permitted to enter into transactions described in this subclause (ii) for so long as each such transaction (x) is conducted in the ordinary course of Guarantor's business and is on an arms-length basis with a person that is not Affiliated with Guarantor, (y) would not reduce Guarantor's Net Worth or Liquid Assets below the thresholds required pursuant to the Guarantor Financial Covenants, and (z) would not be reasonably expected to have a material adverse effect on Guarantor's ability to satisfy the Guaranteed Obligations.

**7.** **Entire Agreement/Amendments.** This instrument represents the entire agreement between the parties with respect to the subject matter hereof. The terms of this Guaranty shall not be waived, altered, modified, amended, supplemented or terminated in any manner whatsoever except by written instrument signed by Lender and Guarantor.

**8.** **Successors and Assigns.** This Guaranty shall be binding upon Guarantor, and Guarantor's estate, heirs, personal representatives, successors and assigns, may not be assigned or delegated by Guarantor and shall inure to the benefit of Lender and its successors and assigns.

**9.** **Applicable Law and Consent to Jurisdiction.** This Guaranty shall be governed by, and construed and enforced in accordance with, the substantive laws of the State of New York. Guarantor irrevocably (a) agrees that any suit, action or other legal proceeding arising out of or relating to this

Guaranty may be brought in a court of record in the City and County of New York or in the Courts of the United States of America located in the Southern District of New York, (b) consents to the jurisdiction of each such court in any such suit, action or proceeding and (c) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in any of such courts and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. Guarantor irrevocably consents to the service of any and all process in any such suit, action or proceeding by service of copies of such process to Guarantor at its address provided in Section 14 hereof. Nothing in this Section 9, however, shall affect the right of Lender to serve legal process in any other manner permitted by law or affect the right of Lender to bring any suit, action or proceeding against Guarantor or its property in the courts of any other jurisdictions.

**10.** **Section Headings**. The headings of the sections and paragraphs of this Guaranty have been inserted for convenience of reference only and shall in no way define, modify, limit or amplify any of the terms or provisions hereof.

**11.** **Severability**. Any provision of this Guaranty which may be determined by any competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, Guarantor hereby waives any provision of law which renders any provision hereof prohibited or unenforceable in any respect.

**12.** **WAIVER OF TRIAL BY JURY**. GUARANTOR HEREBY WAIVES THE RIGHT OF TRIAL BY JURY IN ANY LITIGATION, ACTION OR PROCEEDING ARISING HEREUNDER OR IN CONNECTION HEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR, AND IS INTENDED TO ENCOMPASS EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER OF TRIAL BY JURY BY GUARANTOR.

**13.** **Other Guaranties**. The obligations of Guarantor hereunder are separate and distinct from, and in addition to, the obligations of Guarantor now or hereafter arising under any other guaranties, pursuant to which Guarantor has guaranteed payment and performance of certain other obligations of Borrower described therein.

**14.** **Notices**. All notices, demands, requests, consents, approvals or other communications (collectively called "***Notices***") required or permitted to be given hereunder to Lender or Guarantor or which are given to Lender or Guarantor with respect to this Guaranty shall be given in the same manner as is specified in the Loan Agreement, directed to the party to be so notified and addressed as set forth below.

If to Lender, to:

Natixis, New York Branch
1251 Avenue of the Americas, 5th Floor
New York, New York 10020
Attention: Real Estate Administration
Email: USCIBGlobalFinanceAssetManagementTeam@natixis.com
Phone: (212) 891-6100

with a copy to:

Winston & Strawn LLP
200 Park Avenue
New York, New York 10166
Attention: Michael A. Moser, Esq.
Email: mmoser@winston.com
Telecopier: (212) 294-4700

If to Guarantor, to:

c/o Onni Group
200-1010 Seymour Street
Vancouver, BC, V6B 3M6
Attention: Sam Parrotta
Email: sparrotta@onni.com

with a copy to:

Allen Matkins Leck Gamble Mallory & Natsis LLP
1900 Main Street, 5th Floor
Irvine, California 92614-7321
Attention: Susan E. Graham, Esq.
Email: sgraham@allenmatkins.com
Telecopier: (949) 553-8354.

**15. Guarantor's Receipt of Loan Documents.** Guarantor by its execution hereof acknowledges receipt of true copies of all of the Loan Documents, the terms and conditions of which are hereby incorporated herein by reference.

**16. Interest; Expenses.**

(a) If Guarantor fails to pay all or any sums due hereunder upon demand by Lender, the amount of such sums payable by Guarantor to Lender shall bear interest from the date of demand until paid at the Default Rate in effect from time to time.

(b) Guarantor hereby agrees to pay all actual, out-of-pocket costs, charges and expenses, including reasonable attorneys' fees and disbursements, which may be incurred by Lender in enforcing the covenants, agreements, obligations and liabilities of Guarantor under this Guaranty.

**17. Joint and Several Obligations.** If Guarantor consists of more than one Person, each such Person shall have joint and several liability for the obligations of Guarantor hereunder.

**18. Specific Limitation on Guaranty and Indemnity Obligations.** Guarantor and Lender hereby confirm that it is the intention of Guarantor and Lender that this Guaranty not constitute a fraudulent transfer or fraudulent conveyance (a "***Fraudulent Conveyance***") under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act or any other debtor relief law or insolvency law (whether statutory, common law, case law or otherwise) or any jurisdiction whatsoever (collectively, the "***Bankruptcy Laws***"). To give effect to the foregoing intention of Guarantor and Lender, each of such parties hereby irrevocably agrees that the Guaranteed Obligations shall be limited to (but shall not be less than) such maximum amount as will, after giving effect to the maximum amount of such obligations and

all other liabilities (whether contingent or otherwise) of Guarantor that are relevant under such Bankruptcy Laws, result in the Guaranteed Obligations not constituting a Fraudulent Conveyance under the Bankruptcy Laws, as of the date of execution and delivery of this Guaranty.

**19. Counterparts.** This Guaranty may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

**20. State-Specific Provisions.** Solely to the extent that, and despite the express intent of Guarantor and Lender that the laws of the State of New York shall govern this Guaranty, a court of competent jurisdiction finds that the laws of the State of California apply to this Guaranty, the following provisions shall govern and control in the event of a conflict with any other provision in this Guaranty:

(a) Guarantor expressly waives: (i) any and all rights of subrogation, reimbursement, indemnification and contribution and any other rights and defenses that are or may become available to Guarantor by reason of California Civil Code Sections 2787 to 2855, inclusive; and (ii) any right to require the marshalling of assets, whether under Section 2899 or Section 3433 of the California Civil Code or otherwise.

(b) Guarantor waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a non-judicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

(c) Guarantor hereby waives all rights and defenses that Guarantor may have because Borrower's debt is secured by real property. This means, among other things:

(i) Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower; and

(ii) if Lender forecloses on any real property collateral pledged by Borrower:

1. the amount of the Debt may be reduced only by the price for which such collateral is sold at the foreclosure sale, even if such collateral is worth more than the sale price; and

2. Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower.

This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's debt is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

(d) Guarantor hereby waives any rights under California Code of Civil Procedure Sections 580a and 726(b), which provide, among other things: that a creditor must file a complaint for deficiency within three (3) months of a non-judicial foreclosure sale or judicial foreclosure sale, as applicable; that a fair market value hearing must be held; and that the amount of the deficiency judgment shall be limited to the amount by which the unpaid debt exceeds the fair market value of the security, but not more than the amount by which the unpaid debt exceeds the sale price of the security.

(e) Guarantor acknowledges that, notwithstanding any other provision of this Guaranty or any of the other Loan Documents to the contrary (including without limitation any non-recourse provision under the Loan Documents), the obligations of Guarantor under this Guaranty are unlimited personal obligations of Guarantor which are not secured by the Security Instrument or any other security instrument.

[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date first above written.

**GUARANTOR**:

**PANNI HOLDINGS LTD.**,
a British Columbia corporation

By:____________________________
Name: Sam Parrotta
Title: Authorized Signatory

____________________________
**ROSSANO DE COTIIS**, a natural person

# FIRST AMENDMENT TO LOAN AGREEMENT AND PAYMENT GUARANTY

This **FIRST AMENDMENT TO LOAN AGREEMENT AND PAYMENT GUARANTY**, dated as of October 31, 2019 (this "***Amendment***"), is made by and among **ONNI WILSHIRE COURTYARD LLC**, a Delaware limited liability company ("***Borrower***"), having an address at c/o Onni Group, 200-1010 Seymour Street, Vancouver, British Columbia V6B 3M6, and **NATIXIS REAL ESTATE CAPITAL LLC**, a Delaware limited liability company, having an address at 1251 Avenue of the Americas, New York, New York 10020 (together with its successors and assigns, "***Lender***"), and acknowledged and agreed to by **ROSSANO DE COTIIS**, a natural person, having an address at c/o Onni Group, 200-1010 Seymour Street, Vancouver, British Columbia V6B 3M6 ("***De Cotiis Guarantor***"), and **PANNI HOLDINGS LTD.**, a British Columbia corporation, having an address at 200-1010 Seymour Street, Vancouver, British Columbia, V6B 3M6 ("***Panni Guarantor***"; together with De Cotiis Guarantor, individually or collectively, as the context may require, "***Guarantor***").

WITNESSETH:

WHEREAS, pursuant to that certain Loan Agreement (the "***Original Loan Agreement***"), dated as of June 17, 2019 (the "***Original Closing Date***"), by and between Borrower and NATIXIS, NEW YORK BRANCH ("***Original Lender***"), Original Lender made a loan to Borrower in the maximum principal amount of up to $470,202,594.00 (the "***Loan***"), which Loan is evidenced by: (i) that certain Promissory Note A-1 in the stated principal amount of $50,000,000.00, dated as of the Original Closing Date, made by Borrower, as maker, payable to the order of Original Lender ("***Note A-1***"); (ii) that certain Promissory Note A-2 in the stated principal amount of $50,000,000.00, dated as of the Original Closing Date, made by Borrower, as maker, payable to the order of Original Lender ("***Note A-2***"); (iii) that certain Promissory Note A-3 in the stated principal amount of $50,000,000.00, dated as of the Original Closing Date, made by Borrower, as maker, payable to the order of Original Lender ("***Note A-3***"); (iv) that certain Promissory Note A-4 in the stated principal amount of $50,000,000.00, dated as of the Original Closing Date, made by Borrower, as maker, payable to the order of Original Lender ("***Note A-4***"); (v) that certain Promissory Note A-5 in the stated principal amount of $50,000,000.00, dated as of the Original Closing Date, made by Borrower, as maker, payable to the order of Original Lender ("***Note A-5***"); (vi) that certain Promissory Note A-6 in the stated principal amount of $50,000,000.00, dated as of the Original Closing Date, made by Borrower, as maker, payable to the order of Original Lender ("***Note A-6***"); (vii) that certain Promissory Note A-7 in the stated principal amount of $50,000,000.00, dated as of the Original Closing Date, made by Borrower, as maker, payable to the order of Original Lender ("***Note A-7***"); (viii) that certain Promissory Note A-8 in the stated principal amount of $50,000,000.00, dated as of the Original Closing Date, made by Borrower, as maker, payable to the order of Original Lender ("***Note A-8***"); (ix) that certain Promissory Note A-9 in the stated principal amount of $50,000,000.00, dated as of the Original Closing Date, made by Borrower, as maker, payable to the order of Original Lender ("***Note A-9***"); and (x) that certain Promissory Note A-10 in the stated principal amount of $20,202,594.00, dated as of the Original Closing Date, made by Borrower, as maker, payable to the order of Original Lender ("***Note A-10***"; and, together with Note A-1, Note A-2, Note A-3, Note A-4, Note A-5, Note A-6, Note A-7, Note A-8 and Note A-9, collectively, the "***Note***");

WHEREAS, as a condition to the making of the Loan to Borrower, Guarantor delivered to Original Lender, among other things, that certain Payment Guaranty, dated as of the Original Closing Date, by Guarantor in favor of Original Lender (the "***Original Payment Guaranty***");

WHEREAS, Original Lender assigned the Loan, the Original Loan Agreement, the Note, the Original Payment Guaranty and the other "Loan Documents" (as defined in the Original Loan Agreement) to Lender pursuant to, among other things, (i) that certain Assignment of Loan Documents, dated as of October 31, 2019, by Original Lender in favor of Lender, and (ii) those certain Allonges to each Note, dated as of October 31, 2019, from Original Lender to Lender;

WHEREAS, (i) Lender is the current holder of the Note and (ii) there is presently outstanding on the Note an aggregate unpaid principal balance of $408,165,893.80;

WHEREAS, on July 2, 2019, Borrower entered into that certain Office Lease (the "***Original WeWork Lease***"), dated as of July 2, 2019, by and between Borrower, as landlord, and 5750 Wilshire Boulevard Tenant LLC, a New York limited liability company ("***WeWork***"), as tenant, upon obtaining Lender's prior written consent pursuant to and in accordance with the applicable terms of the Original Loan Agreement;

WHEREAS, the Original WeWork Lease is a "Material Lease" under and as defined in the Original Loan Agreement;

WHEREAS, on September 5, 2019, Borrower entered into an amendment of the Original WeWork Lease pursuant to that certain First Amendment to Office Lease Agreement, dated as of September 5, 2019 (the "***WeWork Lease Amendment***"), without first obtaining Lender's prior written consent pursuant to and in accordance with the applicable terms of the Original Loan Agreement;

WHEREAS, Borrower has requested that Lender agree to waive the Event of Default arising as a result of Borrower having entered into the WeWork Lease Amendment without first obtaining Lender's prior written consent in contravention of the applicable terms of the Original Loan Agreement (the "***Current Event of Default***");

WHEREAS, as a condition to entering into this Amendment, Lender is, among other things, (i) requiring Borrower to deposit with Lender on the date hereof an amount equal to $49,227,914.85 (the "***First Amendment Deposit***") (of which (x) $6,086,902.07 shall be transferred by Lender into the Shortfall Reserve Subaccount (as hereinafter defined) and (y) $43,141,012.78 shall be transferred by Lender into the Upfront TI/LC Reserve Subaccount (and, concurrently with the execution of this Amendment, Lender shall disburse to Borrower from the Upfront TI/LC Reserve Subaccount funds in an amount equal to $3,000,000.00 in the aggregate)) and (ii) requiring Guarantor to deliver to Lender the Completion Guaranty (as hereinafter defined);

WHEREAS, in furtherance of the foregoing, the parties have agreed to execute and deliver this Amendment for the purpose of amending the Original Loan Agreement and the Original Payment Guaranty; and

NOW THEREFORE, in consideration of Ten Dollars ($10.00) paid in hand, the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower, Guarantor and Lender agree to amend the Original Loan Agreement and the Original Payment Guaranty as follows:

1. Definitions. Capitalized terms used in this Amendment and not defined herein shall have the meaning provided in the Original Loan Agreement.

2. Termination of Future Advances. Effective as of the date of this Amendment, (a) Lender's commitments to make any further Future Advances (as defined in the Original Loan Agreement) are hereby terminated and Lender shall have no obligations under the Loan Documents to fund (and Borrower shall have no right under the Loan Documents to receive) any further Future Advances, and (b) all references in the Loan Documents to "Future Advances" shall hereafter be inapplicable and of no further force and effect. Borrower, Guarantor and Lender acknowledge and agree that, as of the date hereof, (i) the outstanding principal balance of the Loan is $408,165,893.80 (which comprises (x) the Initial Advance (as defined in the Original Loan Agreement) made on the Original Closing Date in the amount of $407,643,729.00 and (y) Shortfall Future Advances (as defined in the Original Loan Agreement) made prior to the date hereof in the aggregate amount of $522,164.80), and (ii) the outstanding principal balance of each Note is as set forth on **Schedule 10** attached hereto, which amounts are now due and owing on each such Note, plus interest, without defense, offset or counterclaim of any kind.

3. Amendments to Original Loan Agreement. Effective as of the date of this Amendment, the Original Loan Agreement is hereby amended as follows:

a.) Section 1.1.1 of the Original Loan Agreement is hereby amended to delete the definitions of "Spread" and "Yield Maintenance Date" and substitute in their place the following definitions (in alphabetical order):

"***Spread***: two and three-tenths percent (2.30%).

***Yield Maintenance Date***: the Payment Date occurring in January, 2021."

b.) Section 1.1.2 of the Original Loan Agreement is hereby amended to delete the definitions of "Commitment Percentage", "Force Funding Date", "Loan Pro Rata Share", "Mezzanine Loan Future Advance", "Mezzanine Loan Future Advance Conditions", "Mezzanine Loan Pro Rata Share", "Mezzanine Loan Unfunded Shortfall Advances Amount", "Qualified Transferee", "Qualified Trustee" and "Unfunded Shortfall Advances Amount".

c.) Section 1.1.2 of the Original Loan Agreement is hereby amended to delete the definitions of "Guaranty", "Loan Documents", "Primary Tenant", "Primary Tenant Lease", "Primary Tenant Premises", "Primary Tenant Sweep Period" and "Shortfall Reserve Deficiency" and substitute in their place the following definitions (in alphabetical order):

"***Guaranty***: collectively, (i) the Recourse Guaranty, (ii) the Payment Guaranty, (iii) the Additional Payment Guaranty and (iv) the Completion Guaranty.

***Loan Documents***: this Agreement and all other documents, agreements and instruments now or hereafter evidencing, securing or delivered to Lender in connection with the Loan, including the following, each of which is dated as of the date hereof: (i) the Note; (ii) the Security Instrument; (iii) the Assignment of Leases; (iv) the Assignment of Agreements; (v) the Clearing Account Agreement; (vi) the Deposit Account Agreement; (vii) the Guaranty; (viii) the Assignment of Management Agreement; (ix) the Assignment of Parking Management Agreement; (x) the Pledge of Letter of Credit; and (xi) the Assignment of Interest Rate Cap; as each of the foregoing may be (and each of the foregoing defined terms shall refer to such documents as they may be) amended, restated, replaced, supplemented, severed, split, consolidated, renewed or otherwise modified from time to time.

***Primary Tenant***: individually or collectively, as the context may require: (i) initially, 20th Century Fox as tenant under the 20th Century Fox Lease, and thereafter, any Acceptable Replacement Tenant(s) occupying all or substantially all of the 20th Century Fox Premises; (ii) initially, Mediabrands Worldwide as tenant under the Mediabrands Worldwide Lease, and thereafter, any Acceptable Replacement Tenant(s) occupying all or substantially all of the Mediabrands Worldwide Premises; (iii) initially, WeWork as tenant under the WeWork Lease, and thereafter, any Acceptable Replacement Tenant(s) occupying all or substantially all of the WeWork Premises; and/or (iv) initially, each Other Primary Tenant as tenant under the applicable Other Primary Tenant Lease, and thereafter, any Acceptable Replacement Tenant(s) occupying all or substantially all of the applicable Other Primary Tenant Premises.

***Primary Tenant Lease***: individually or collectively, as the context may require: (i) initially, the 20th Century Fox Lease, and thereafter, the Lease of any Acceptable Replacement Tenant(s) occupying all or substantially all of the 20th Century Fox Premises; (ii) initially, the Mediabrands Worldwide Lease, and thereafter, the Lease of any Acceptable Replacement Tenant(s) occupying all or substantially all of the Mediabrands Worldwide Premises; (iii) initially, the WeWork Lease, and thereafter, the Lease of any Acceptable Replacement Tenant(s) occupying all or substantially all of the WeWork Premises; and/or (iv) initially, each Other Primary Tenant Lease, and thereafter, the Lease of any Acceptable Replacement Tenant(s) occupying all or substantially all of the applicable Other Primary Tenant Premises.

***Primary Tenant Premises***: individually or collectively, as the context may require, (i) the 20th Century Fox Premises, (ii) the Mediabrands Worldwide Premises, (iii) the WeWork Premises and/or (iv) any Other Primary Tenant Premises.

***Primary Tenant Sweep Period***: shall:

(A) commence upon:

(i) any termination of, or receipt by Borrower of a notice to terminate, any Primary Tenant Lease;

(ii) any Primary Tenant becoming the subject of a Bankruptcy

Action;

(iii) any Primary Tenant "going dark" in a majority of the applicable Primary Tenant Premises for a period of six (6) or more months;

(iv) the occurrence of any monetary or material non-monetary default (beyond any applicable notice and/or cure period) under any Primary Tenant Lease;

(v) the failure of the WeWork Premises Acceptance Date to have occurred on or prior to February 1, 2020; or

(vi) at any time following the Payment Date occurring in September, 2020, WeWork shall fail, for a period of ninety (90) or more consecutive days, to have at least seventy-five percent (75%) of the WeWork Premises in the aggregate open, operational and available for subtenants under the WeWork Lease; and

(B) end upon:

(i) in the case of a Primary Tenant Sweep Period triggered by any of the events described in clause (A) above, the occurrence of a Primary Tenant Replacement Event with respect to the applicable Primary Tenant Lease;

(ii) in the case of a Primary Tenant Sweep Period triggered by an event described in subclause (A)(ii) above only, the dismissal of such Bankruptcy Action and the affirmance of the applicable Primary Tenant Lease;

(iii) in the case of a Primary Tenant Sweep Period triggered by an event described in subclause (A)(iii) above only, such Primary Tenant re-opening for business in all or substantially all of the applicable Primary Tenant Premises for a continuous period of not less than three (3) months;

(iv) in the case of a Primary Tenant Sweep Period triggered by an event described in subclause (A)(iv) above only, the cure of such monetary or material non-monetary default (provided no other monetary or material non-monetary default (beyond any applicable notice and/or cure period) then exists under such Primary Tenant Lease);

(v) in the case of a Primary Tenant Sweep Period triggered by an event described in subclause (A)(v) above only, the satisfaction of the following conditions: (x) the WeWork

Premises Acceptance Date shall have occurred; and (y) Borrower shall have caused to be delivered to Lender an Acceptable Tenant Estoppel with respect to the WeWork Lease;

(vi) in the case of a Primary Tenant Sweep Period triggered by an event described in subclause (A)(vi) above only, WeWork shall, for a period of ninety (90) or more consecutive days, have at least seventy-five percent (75%) of the WeWork Premises in the aggregate open, operational and available for subtenants under the WeWork Lease; or

(vii) in the case of a Primary Tenant Sweep Period triggered by any of the events described in clause (A) above, the date on which the Debt Service Coverage Ratio (which, for the avoidance of doubt, shall be calculated without giving effect to any Rents under the Primary Tenant Lease that is the cause of the applicable Primary Tenant Sweep Period) is at least equal to 1.200:1 (the "***Primary Tenant Sweep Period DSCR Cure***").

Notwithstanding the foregoing, a Primary Tenant Sweep Period shall not be deemed to terminate in the event a Primary Tenant Sweep Period then exists for any other reason.

***Shortfall Reserve Deficiency***: the amount, if any, by which (i) $3,000,000.00 *exceeds* (ii) the balance of funds then on deposit in the Shortfall Reserve Subaccount."

d.) Section 1.1.2 of the Original Loan Agreement is hereby amended to add the following definitions (in alphabetical order):

"***Completion Guaranty***: that certain Completion Guaranty, dated as of October 31, 2019, made by Guarantor in favor of Lender, as the same may be amended, restated, replaced, extended, renewed, supplemented or otherwise modified from time to time.

***Pledge of Letter of Credit***: individually or collectively, as the context may require: (i) that certain pledge of letter of credit executed by Borrower and Lender pursuant to and in accordance with Section 5.28(a)(y) hereof, as the same may be amended, restated, replaced, extended, renewed, supplemented or otherwise modified from time to time; and (ii) that certain pledge of letter of credit executed by Borrower and Lender pursuant to and in accordance with Section 5.28(b)(y) hereof, as the same may be amended, restated, replaced, extended, renewed, supplemented or otherwise modified from time to time.

***WeWork***: 5750 Wilshire Boulevard Tenant LLC, a New York limited liability company, as tenant under the WeWork Lease.

***WeWork Lease***: that certain Office Lease, dated as of July 2, 2019, by and between Borrower, as landlord, and WeWork, as tenant (the "***Original WeWork Lease***"), as amended by that certain First Amendment to Office Lease Agreement, dated as of September 5, 2019 (the "***WeWork Lease Amendment***"), as the same may be further amended, modified, supplemented or replaced from time to time in accordance with the terms and conditions of this Agreement.

***WeWork New Premises Letter of Credit***: the "New Premises Letter of Credit" (as defined in the WeWork Lease).

***WeWork Original Premises Letter of Credit***: the "Letter of Credit" (as defined in the WeWork Lease).

***WeWork Premises***: the space at the Property demised to WeWork pursuant to the WeWork Lease.

***WeWork Premises Acceptance Date***: the date on which (i) Borrower shall have delivered the entirety of the WeWork Premises to WeWork with both the "Base Building Delivery Condition" (as defined in the WeWork Lease) and the "New Premises Base Building Delivery Condition" (as defined in the WeWork Lease) having been satisfied and (ii) WeWork shall have accepted and taken possession of the entirety of the WeWork Premises in accordance with the provisions of the WeWork Lease."

e.) Section 2.11 of the Original Loan Agreement is hereby deleted in its entirety and all references thereto shall be inapplicable.

f.) Section 3.13 of the Original Loan Agreement is hereby deleted in its entirety and all references thereto shall be inapplicable.

g.) Section 3.14 of the Original Loan Agreement is hereby deleted in its entirety and replaced with the following:

**"3.14. Shortfall Reserve**.

(a) On October 31, 2019, Borrower shall deposit with Lender an amount equal to $6,086,902.07 and Lender shall cause such amount to be transferred to a Subaccount (the "***Shortfall Reserve Subaccount***"). Additionally, Borrower shall pay to Lender any Shortfall Reserve Rebalancing Deposit required pursuant to Section 3.14(b), and Lender shall transfer such amounts into the Shortfall Reserve Subaccount. So long as no Event of Default shall have occurred and then be continuing, in the event that there is a Shortfall with respect to any Payment Date, Lender shall, to the extent there are sufficient sums then on deposit in the Shortfall Reserve Subaccount, transfer funds held in the Shortfall Reserve Subaccount to the Deposit Account in an amount equal to the Shortfall with respect to such Payment Date, for the purpose of paying, in full, the remaining unpaid portion of the Monthly Total Payment Amount with respect to such Payment Date (which such application of funds by Lender shall be made in the order of priority set forth in Section 3.10(a)(i) through (ix) hereof). Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right, but not the

obligation, to continue to disburse funds held in the Shortfall Reserve Subaccount to pay any Shortfall, *provided* that Lender's failure to disburse such funds shall not relieve Borrower of its obligation to pay all amounts due Lender in accordance with this Agreement on any Payment Date (including the Monthly Total Payment Amount) or otherwise. Borrower expressly acknowledges and agrees that: (i) in the event that on any Payment Date (x) an Event of Default has occurred and is then continuing or (y) the Monthly Total Payment Amount due on such Payment Date exceeds the balance of funds then on deposit in the Shortfall Reserve Subaccount, then, in either case, Borrower shall remain liable for the payment of the Monthly Total Payment Amount on any such Payment Date; and (ii) Lender shall have no obligation to disburse more than the remaining funds then on deposit in the Shortfall Reserve Subaccount on any Payment Date if the amount of such remaining funds is less than the applicable Shortfall.

(b) Notwithstanding anything to the contrary contained in this Section 3.12, in the event that at any time Lender reasonably determines that (A) the balance of funds then on deposit in the Shortfall Reserve Subaccount is less than (B) $1,000,000.00, Borrower shall, within ten (10) days after receipt of written notice from Lender, deposit with Lender in the Shortfall Reserve Subaccount an amount equal to the Shortfall Reserve Deficiency (any amounts required to be paid under this sentence being referred to as a "***Shortfall Reserve Rebalancing Deposit***"); *provided, however*, that upon the occurrence of the Shortfall Reserve Release Date, (x) all funds then on deposit in the Shortfall Reserve Subaccount shall be deposited into the Deposit Account upon the next Payment Date and applied in accordance with Section 3.10 and (y) thereafter, Borrower shall no longer have any obligation hereunder to make any Shortfall Reserve Balancing Deposits."

h.) Section 3.19 of the Original Loan Agreement is hereby deleted in its entirety and replaced with the following:

"**3.19. Upfront TI/LC Reserve**.

(a) On June 17, 2019, Borrower deposited with Lender an amount equal to $710,275.00 and Lender caused such amount to be transferred to a Subaccount (the "***Upfront TI/LC Reserve Subaccount***"). On October 31, 2019, (i) Borrower shall deposit with Lender an amount equal to $43,141,012.78 and Lender shall cause such amount to be transferred to the Upfront TI/LC Reserve Subaccount and (ii) Lender shall make a disbursement to Borrower from the Upfront TI/LC Reserve Subaccount in an amount equal to $3,000,000.00 in the aggregate for the payment of Approved Leasing Expenses with respect to the Upfront TI/LC Leases (the "***Initial Upfront TI/LC Reserve Disbursement***"). Attached hereto as **Schedule 9** is a schedule of Tenant improvement allowances and brokerage commissions due under the Leases set forth on **Schedule 9** (each, an "***Upfront TI/LC Lease***") as of October 31, 2019.

(b) So long as no Event of Default shall have occurred and then be continuing, and so long as the applicable Upfront TI/LC Lease is in full force and effect with no defaults thereunder beyond any applicable notice and cure periods, Lender shall, provided sufficient sums then remain in the Upfront TI/LC Reserve Subaccount, disburse

funds held in the Upfront TI/LC Reserve Subaccount to Borrower (an "***Upfront TI/LC Reserve Disbursement***") within five (5) Business Days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $5,000, *provided* that: (i) such disbursement is for an Approved Leasing Expense set forth on **Schedule 9** with respect to the applicable Upfront TI/LC Lease; (ii) the total amount of such disbursement (together with all disbursements previously made from the Upfront TI/LC Reserve Subaccount with respect to such Upfront TI/LC Lease) does not exceed the applicable amount set forth on **Schedule 9** for such Upfront TI/LC Lease; (iii) if the amount of such disbursement exceeds $250,000, Lender shall have (if it desires) verified (by an inspection conducted at Borrower's reasonable expense) performance of any construction work associated with such Approved Leasing Expense; (iv) the request for disbursement is accompanied by (A) an Officer's Certificate certifying (v) that such funds will be used only to pay (or reimburse Borrower for) Approved Leasing Expenses and a description thereof, (w) that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (x) that the same has not been the subject of a previous disbursement, (y) that all previous disbursements from the Upfront TI/LC Reserve Subaccount have been used only to pay (or reimburse Borrower for) the previously identified Approved Leasing Expenses and (z) that any construction work associated with such Approved Leasing Expenses has been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (B) reasonably detailed supporting documentation as to the amount, necessity and purpose therefor (*provided, however*, that Borrower shall not be required under this clause (B) to deliver to Lender copies of any individual invoices that are for an amount less than $10,000 each, so long as the aggregate total amount of all such invoices does not exceed $50,000 with respect to any individual Upfront TI/LC Reserve Disbursement), (C) copies of appropriate Lien waivers or other evidence of payment reasonably satisfactory to Lender in connection with any construction work associated with such Approved Leasing Expenses and (D) at Lender's option, a title search for the Property indicating that it is free from all Liens not previously approved by Lender (the requirements of the foregoing clause (iv) being collectively referred to as the "***Upfront TI/LC Disbursement Backup Documentation***"); and (v) Borrower shall have delivered to Lender the Upfront TI/LC Disbursement Backup Documentation and/or WeWork Tenant Allowance Backup Documentation (as defined below), as applicable, with respect to all previous disbursements from the Upfront TI/LC Reserve Subaccount to the extent not previously delivered to Lender hereunder (including, without limitation, the Initial Upfront TI/LC Reserve Disbursement and any other disbursements made in accordance with Section 3.19(c) below); *provided further* that, notwithstanding the foregoing, if the applicable Approved Leasing Expense that is the subject of such disbursement is with respect to the payment of all or a portion of the "Tenant Improvement Allowance" (as defined in the WeWork Lease) in connection with tenant improvement work being performed at the Property by WeWork (rather than Borrower) pursuant to and in accordance with the WeWork Lease (a "***WeWork Tenant Allowance***"), the requirements of the foregoing clauses (iii) and (iv) shall be deemed satisfied if the request for disbursement is accompanied by (X) an Officer's Certificate certifying that (I) such funds will be used only to pay (or reimburse Borrower for) Approved Leasing Expenses in

connection with such WeWork Tenant Allowance, (II) all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (III) such WeWork Tenant Allowance has not been the subject of a previous disbursement, (IV) all previous disbursements from the Upfront TI/LC Reserve Subaccount have been used only to pay (or reimburse Borrower for) the previously identified Approved Leasing Expenses, (V) WeWork has satisfied all of the conditions precedent to the disbursement of such WeWork Tenant Allowance under the WeWork Lease (including, without limitation, the conditions set forth in Section 10 of the "Tenant Work Letter" attached to the Original WeWork Lease as Exhibit B thereto or the conditions set forth in Section 10 of the "New Premises Tenant Work Letter" attached to the WeWork Lease Amendment as Exhibit B thereto (as applicable)) and (VI) the documentation attached to the request for disbursement pursuant to clause (Y) below is a true, correct and complete copy of all documentation delivered by WeWork to Borrower in connection with WeWork's request for disbursement by Borrower of the applicable WeWork Tenant Allowance, (Y) copies of all documentation delivered by WeWork to Borrower in satisfaction of the conditions precedent to the disbursement of such WeWork Tenant Allowance under the WeWork Lease (including, without limitation, all documentation delivered pursuant to Section 10 of the "Tenant Work Letter" attached to the Original WeWork Lease as Exhibit B thereto or pursuant to Section 10 of the "New Premises Tenant Work Letter" attached to the WeWork Lease Amendment as Exhibit B thereto (as applicable)), and (Z) at Lender's option, a title search for the Property indicating that it is free from all Liens not previously approved by Lender (the requirements of the foregoing clauses (X), (Y) and (Z) being collectively referred to as the "***WeWork Tenant Allowance Backup Documentation***"). Any such disbursement of more than $150,000 to pay (rather than reimburse) Approved Leasing Expenses may, at Lender's option, be made by joint check payable to Borrower and the payee of such Approved Leasing Expenses. Notwithstanding anything to the contrary in this Agreement, funds in the Upfront TI/LC Reserve Subaccount shall not be used to pay (or reimburse Borrower for) any Approved Leasing Expenses relating to the Primary Tenant Premises until there are no funds remaining in the Primary Tenant Reserve Subaccount.

(c) Notwithstanding anything to the contrary in this Section 3.19, in connection with any request for an Upfront TI/LC Reserve Disbursement (other than a request for the disbursement of all remaining funds on deposit in the Upfront TI/LC Reserve Subaccount), Borrower shall not be required to satisfy the requirements of clauses (iii) and (iv) of Section 3.19(b) above (or clauses (X), (Y) and (Z) of Section 3.19(b) above, as applicable) with respect to such Upfront TI/LC Reserve Disbursement so long as (A) no Event of Default shall have occurred and then be continuing, (B) the request for such Upfront TI/LC Reserve Disbursement is accompanied by an Officer's Certificate certifying that (I) such funds will be used only to pay (or reimburse Borrower for) Approved Leasing Expenses in connection with an Upfront TI/LC Lease, (II) all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (III) such Approved Leasing Expenses have not been the subject of a previous disbursement and (IV) all previous disbursements from the Upfront TI/LC Reserve Subaccount have been used only to pay (or reimburse Borrower for) the previously identified Approved Leasing

Expenses, and (C) the amount of such Upfront TI/LC Reserve Disbursement shall not exceed $3,000,000.00 in the aggregate. It is hereby acknowledged and agreed that, as of October 31, 2019, Borrower has not delivered to Lender the Upfront TI/LC Disbursement Backup Documentation and/or WeWork Tenant Allowance Backup Documentation, as applicable, with respect to the Initial Upfront TI/LC Reserve Disbursement."

i.) The following shall be inserted as a new <u>Section 3.21</u> of the Original Loan Agreement:

"**3.21. <u>Letter of Credit Reserve</u>**. In the event that Lender receives any sums in respect of the WeWork Original Premises Letter of Credit and/or the WeWork New Premises Letter of Credit pursuant to the terms of the applicable Pledge of Letter of Credit entered into in accordance with the terms hereof, Lender shall cause such sums to be deposited into a Subaccount (the "***Letter of Credit Reserve Subaccount***"). All funds deposited into the Letter of Credit Reserve Subaccount shall be held by Lender as additional security for the Debt. Provided that no Event of Default has occurred and is continuing, Lender shall disburse funds held in the Letter of Credit Reserve Subaccount to Borrower (a "***Letter of Credit Reserve Disbursement***") within five (5) Business Days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $5,000 (except to the extent the same is a final disbursement), provided that: (i) such disbursement is for an Approved Leasing Expense; (ii) if the amount of such disbursement exceeds $250,000, Lender shall have (if it desires) verified (by an inspection conducted at Borrower's reasonable expense) performance of any construction work associated with such Approved Leasing Expense; and (iii) the request for disbursement is accompanied by (A) an Officer's Certificate certifying (v) that such funds will be used only to pay (or reimburse Borrower for) Approved Leasing Expenses and a description thereof, (w) that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (x) that the same has not been the subject of a previous disbursement, (y) that all previous disbursements from the Letter of Credit Reserve Subaccount have been used only to pay (or reimburse Borrower for) the previously identified Approved Leasing Expenses and (z) that any construction work associated with such Approved Leasing Expenses has been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (B) reasonably detailed supporting documentation as to the amount, necessity and purpose therefor (*provided, however*, that Borrower shall not be required under this clause (B) to deliver to Lender copies of any individual invoices that are for an amount less than $10,000 each, so long as the aggregate total amount of all such invoices does not exceed $50,000 with respect to any individual Letter of Credit Reserve Disbursement), (C) copies of appropriate Lien waivers or other evidence of payment reasonably satisfactory to Lender in connection with any construction work associated with such Approved Leasing Expenses and (D) at Lender's option, a title search for the Property indicating that it is free from all Liens not previously approved by Lender. Any such disbursement of more than $150,000 to pay (rather than reimburse) Approved Leasing Expenses may, at Lender's option, be made by joint check payable to Borrower and the payee of such Approved Leasing Expenses. Notwithstanding anything to the contrary in this Agreement, funds in the Letter of Credit Reserve Subaccount shall not be

used to pay (or reimburse Borrower for) any Approved Leasing Expenses relating to the Primary Tenant Premises until there are no funds remaining in the Primary Tenant Reserve Subaccount."

j.) The following shall be inserted as a new Section 5.28 of the Original Loan Agreement:

"**5.28. WeWork Letters of Credit**.

(a) Borrower shall, within five (5) Business Days from and after Borrower's receipt of the WeWork Original Premises Letter of Credit, deliver, or cause to be delivered, to Lender: (x) the original executed WeWork Original Premises Letter of Credit (to be held and/or drawn upon by Lender in accordance with the terms and conditions of the pledge of letter of credit delivered pursuant to clause (y) below), together with the form "assignment" of the issuer thereof filled-out in blank and fully executed such that, if and when Lender is so entitled under the Loan Documents, Lender may present the same to such issuer and consummate an assignment of such WeWork Original Premises Letter of Credit to Lender; and (y) a fully executed original pledge of letter of credit, in the form attached hereto as Exhibit B, with respect to the WeWork Original Premises Letter of Credit.

(b) Borrower shall, within five (5) Business Days from and after Borrower's receipt of the WeWork New Premises Letter of Credit, deliver, or cause to be delivered, to Lender: (x) the original executed WeWork New Premises Letter of Credit (to be held and/or drawn upon by Lender in accordance with the terms and conditions of the pledge of letter of credit delivered pursuant to clause (y) below), together with the form "assignment" of the issuer thereof filled-out in blank and fully executed such that, if and when Lender is so entitled under the Loan Documents, Lender may present the same to such issuer and consummate an assignment of such WeWork New Premises Letter of Credit to Lender; and (y) a fully executed original pledge of letter of credit, in the form attached hereto as Exhibit B, with respect to the WeWork New Premises Letter of Credit."

k.) Section 9.1(a) of the Original Loan Agreement is hereby amended to delete the following: ", subject, with respect to any non-public information, to such Investor's execution of a confidentiality agreement agreeing to keep such information confidential (which may be via electronic means through a "click-through" screen), subject to customary exceptions (including, without limitation, auditors, accountants, attorneys and other agents of such Investor, bank regulators or other Governmental Authorities or as required by law or legal process)".

l.) Section 9.2 of the Original Loan Agreement is hereby amended to delete the following: "Such information shall be subject to the confidentiality requirements set forth in Section 9.1(a); *provided, however*, that".

m.) Section 9.4(a) of the Original Loan Agreement is hereby amended to delete the following: "reallocate the Commitment Percentage allocable to each Note and/or component,".

n.) Section 9.4(j) of the Original Loan Agreement is hereby amended to delete the

following: "; *provided, however*, that Borrower shall not be required under this clause (2) to reimburse Lender for such costs and expenses in excess of $75,000.00".

o.) Section 9.5(b) of the Original Loan Agreement is hereby amended to delete the following: "; *provided, however*, that if Lender or any Co-Lender sells or transfers all or any portion of its right, title and interest in, to, and under the Loan to a Co-Lender that is not a Qualified Transferee, such assigning Lender or assigning Co-Lender (as applicable) shall remain responsible for such assuming Co-Lender's obligations hereunder with respect to the making of Future Advances".

p.) **Schedule 1** of the Original Loan Agreement is hereby amended to delete the references to the following definitions: "Acquiring Korean Trust"; "Basel III Regulations"; "Borrower Shortfall Outside Future Advance Requirements"; "Borrower TI/LC Outside Future Advance Requirements"; "Future Advance"; "Future Advance Cap"; "Future Advance Title Endorsement"; "HVCRE"; "Shortfall Future Advance"; "Shortfall Future Advance Cap"; "Shortfall Required Advance"; "TI/LC Future Advance"; "TI/LC Future Advance Cap"; "TI/LC Future Advance Request"; "TI/LC Required Advance"; and "TI/LC Reserve Subaccount".

q.) **Schedule 6** attached to the Original Loan Agreement is hereby amended to delete clause (i)(f) of the definition of "Project Operating Revenue" and replace it with the following:

> "(f) (1) with the exception of the WeWork Lease, for which the Tenant is not scheduled to take occupancy within nine (9) months; and (2) with respect to the WeWork Lease, to exclude revenue from such Lease until WeWork has accepted delivery of the WeWork Premises and has no remaining termination options regarding requirements for buildout or delivery of space (*provided* that, notwithstanding the foregoing, revenue with respect to the WeWork Original Premises will be included if WeWork has accepted delivery of the WeWork Original Premises and does not have any remaining terminations regarding requirements for buildout or delivery of the WeWork Original Premises);"

r.) **Schedule 9** attached to the Original Loan Agreement is hereby deleted in its entirety and replaced with **Schedule 9** attached hereto.

s.) **Exhibit B** attached hereto is hereby incorporated into the Original Loan Agreement as **Exhibit B** thereto.

4. Amendments to Original Payment Guaranty. Effective as of the date of this Amendment, the Original Payment Guaranty is hereby amended as follows:

a.) Section 1(d) of the Original Payment Guaranty is hereby deleted in its entirety and replaced with the following:

> "(d) The term "***Maximum Guaranteed Obligations Amount***" means an amount equal to the Guaranteed Loan Amount, as the same may be reduced pursuant to Section 2(e) below."

b.) The following shall be inserted as a new Section 1(e) of the Original Payment

Guaranty:

> "(e) The term "***Guaranteed Loan Amount***" means $137,550,648.50; *provided, however*, that in the event the WeWork Premises Acceptance Date shall not have occurred on or prior to February 1, 2020, the "Guaranteed Loan Amount" shall be increased to $238,805,502.81."

5. Current Event of Default. Lender hereby waives the Current Event of Default effective as of the date on which the Conditions Precedent (as defined below) have been satisfied in full. The foregoing waiver contained in this Section 5 is specific in intent and is valid only for the specific purpose for which it is given. Lender hereby confirms that, other than the Current Event of Default (which Lender is hereby waiving effective upon the satisfaction in full of the Conditions Precedent), as of the date hereof, (x) no other Event of Default has been declared by Lender under the Loan Documents, and (y) Lender does not have actual knowledge of any other Event of Default. Lender hereby confirms that, upon Lender's waiver of the Current Event of Default pursuant to the terms of this Section 5, including, but not limited to, the satisfaction in full of the Conditions Precedent, (A) interest on the Debt shall no longer accrue and be payable at the Default Rate as a result of the Current Event of Default and (B) no default rate interest is due and payable under the Loan Documents as a result of the Current Event of Default. Nothing contained herein obligates Lender to agree to any additional waivers of, or consent rights (on behalf of Borrower and/or Guarantor) with respect to, any provisions of any of the Loan Documents. Any waiver set forth in this Section 5 is a waiver of the Current Event of Default only and shall not operate as a waiver of the rights of Lender to exercise any and all rights and remedies resulting from (i) any existing and/or continuing Defaults or Events of Default of which Lender is not actually aware as of the date hereof and/or (ii) any other future Defaults or Events of Default, whether or not of a similar nature to the Current Event of Default and whether or not known to Lender. As used herein, the term "***Conditions Precedent***" means, collectively, (a) the execution and delivery of this Amendment by Borrower, Guarantor and Lender, (b) the execution and delivery of the Completion Guaranty by Guarantor, (c) the delivery to Lender of the First Amendment Deposit, (d) the delivery to Lender of copies of executed documents modifying the Current Mezzanine Loan concurrently herewith, which documents shall be acceptable to Lender, and (e) the payment by Borrower to Lender of all out-of-pocket fees, costs and expenses (including, without limitation, reasonable attorney's fees) paid or incurred by Lender in connection with the Current Event of Default, this Amendment and/or the satisfaction of the other Conditions Precedent.

6. Representations, Warranties and Covenants. As a material inducement for Lender to enter into this Amendment:

A. Borrower hereby represents and warrants to Lender that:

i. Borrower has full power and authority to execute, deliver and perform its obligations under this Amendment and all other documents delivered to Lender in connection with this Amendment. This Amendment is binding upon and enforceable against Borrower in accordance with its terms.

ii. Other than the Current Event of Default, there is no Default or Event of Default under any of the Loan Documents and no event exists which, with the giving of notice or the passage of time or both, would constitute a Default or Event of Default under any of the Loan Documents.

iii. Borrower does not have any (i) offsets or defenses against the payment of any sums due and/or payable under the Note or any other Loan Documents, or (ii) claims against Lender or any employee, officer, director, agent or attorney of Lender in connection with any of the Loan Documents.

iv. Each of the representations and warranties set forth in the Original Loan Agreement remains true, complete and correct as of the date originally made.

B. Guarantor hereby represents and warrants to Lender that:

i. Guarantor has full power and authority to execute, deliver and perform its obligations under this Amendment and all other documents delivered to Lender in connection with this Amendment. This Amendment is binding upon and enforceable against Guarantor in accordance with its terms.

ii. Other than the Current Event of Default, there is no Default or Event of Default under any of the Loan Documents and no event exists which, with the giving of notice or the passage of time or both, would constitute a Default or Event of Default under any of the Loan Documents.

iii. Guarantor does not have any (i) offsets or defenses against the payment of any sums due and/or payable under any guaranty or indemnity agreement executed by Guarantor in connection with the Loan, or any other amounts payable under the Loan Documents, or (ii) claims against Lender or any employee, officer, director, agent or attorney of Lender in connection with any of the Loan Documents.

iv. Each of the representations and warranties set forth in the Original Payment Guaranty remains true, complete and correct as of the date originally made.

7. <u>Reaffirmation of Obligations.</u>

A. Borrower hereby acknowledges, confirms, ratifies and reaffirms the terms, provisions, validity and binding nature, both at the time of delivery and on the date hereof, of its obligations under the Note and the other Loan Documents, as such documents have been amended by this Amendment and all of Lender's rights and remedies thereunder, and agrees that any reference made in the Note or in any of the other Loan Documents to such documents shall mean such documents as amended by this Amendment. Borrower ratifies, confirms and acknowledges that the obligations, indebtedness and liabilities of Borrower under

the Loan Documents and this Amendment and all sums due thereunder or hereunder (but expressly excluding any and all of Borrower's Environmental Indemnification Obligations) are duly and properly secured by the Security Instrument and all other security or collateral instruments for the full extent thereof, without defense, offset, claim or counterclaim of any kind whatsoever.

B. Guarantor hereby consents to the amendment of the Original Loan Agreement and the Original Payment Guaranty as set forth herein and the other matters set forth in this Amendment and expressly acknowledges, confirms, ratifies and reaffirms the terms, provisions, validity and binding nature, both at the time of delivery and on the date hereof, of its obligations under each guaranty and/or indemnity agreement executed by Guarantor in connection with the Loan (including, without limitation, the Guaranty), agrees that any reference made in such documents, the Note or in any of the other Loan Documents to such documents shall mean such documents as amended by this Amendment, and agrees that the obligations arising thereunder shall continue and remain in full force and effect and shall in no way be impaired or diminished as a result of this Amendment. Guarantor further expressly acknowledges that, under each such guaranty and/or indemnity agreement, Guarantor's consent to this Amendment, or any future amendments, is not necessary to the continued validity of such guaranty and/or indemnity agreement, and the fact that Guarantor has consented to this Amendment shall not modify the terms of such guaranty and/or indemnity to give Guarantor the right to approve future modifications or waiver of any agreement or obligation subject to such guaranty and/or indemnity nor to make such approval a condition precedent to the continuing validity and enforceability of such guaranty and/or indemnity. Without limiting the foregoing, Guarantor expressly acknowledges and agrees that all references in the Recourse Guaranty to the term "Shortfall Reserve Rebalancing Deposit" shall mean such term as amended by this Amendment.

8. No Waiver. Borrower, Guarantor and Lender further agree that nothing contained in this Amendment, nor in any other communication (whether written, oral or electronic) or contact with, or conduct by, between or among Lender, Borrower or Guarantor, shall constitute (or be deemed to constitute or be construed as) a (i) waiver, modification (other than as expressly provided herein), alteration, amendment (other than as expressly provided herein) or release of any of the terms and provisions of the Loan Documents or of any of Lender's various rights, powers or remedies against Borrower, Guarantor or any other party to any of the Loan Documents or pursuant to applicable law, (ii) course of dealing obligating Lender to provide any additional or other accommodations, financial or otherwise, to Borrower, Guarantor or any other party to any of the Loan Documents at any time other than those expressly set forth in the Loan Documents, or (iii) commitment or any agreement to make a commitment with respect to any possible waiver, amendment, consent or other modification of the terms provided in the Note, the Original Loan Agreement, the Original Payment Guaranty or any other Loan Document. Neither the previous nor future acceptance by Lender of interest or other payments proffered by Borrower or on Borrower's behalf with regard to any outstanding amounts due under the Loan Documents, nor the commencement or continuation of discussions with Borrower regarding the Loan or any of the Loan Documents or any other obligation owed by Borrower to Lender, either directly or indirectly, shall constitute a waiver or limitation of

Lender's rights and remedies under the Loan Documents, at law or in equity.

9. No Novation. Except as expressly set forth herein, the Original Loan Agreement and the Original Payment Guaranty shall continue unmodified and in full force and effect. It is the intent of the parties that this Amendment shall not constitute a novation of the Original Loan Agreement and/or the Original Payment Guaranty.

10. Other Loan Documents. Each of the Loan Documents are hereby amended so that (a) each reference therein to the defined term "Loan Agreement" shall mean the Original Loan Agreement, as amended by this Amendment, and as the same may be further amended, consolidated, severed, substituted, renewed or replaced from time to time, and (b) each reference therein to the defined term "Payment Guaranty" shall mean the Original Payment Guaranty, as amended by this Amendment, and as the same may be further amended, consolidated, severed, substituted, renewed or replaced from time to time. Except as amended by this Amendment, each of the Loan Documents shall continue to remain in full force and effect. Each of Borrower and Guarantor further agrees that this Amendment is not intended to be, nor shall it be construed to create, a novation or accord and satisfaction of the Note or the indebtedness evidenced thereby.

11. Fees, Costs and Expenses. Borrower and Guarantor hereby covenant and agree to pay all out-of-pocket fees, costs and expenses (including, without limitation, reasonable attorney's fees) paid or incurred by Lender in connection with the negotiation and execution of this Amendment and/or in connection with the satisfaction of any of the other Conditions Precedent.

12. Headings. Each of the captions contained in this Amendment are for the convenience of reference only and shall not define or limit the provisions hereof.

13. Governing Law. This Amendment shall be governed by, and construed and enforced in accordance with, the laws of the State of New York (without regard to any conflict of laws or principles).

14. Counterparts. This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. Signature and acknowledgement pages may be detached from the counterparts and attached to a single copy of this Amendment to physically form one document.

15. Submission of Agreement. The submission of this Amendment to Borrower and Guarantor or their agents or attorneys for review or signature does not constitute a commitment or agreement by Lender with respect to the matters set forth herein. This Amendment shall have no binding force or effect unless and until duly executed and delivered by Borrower, Guarantor and Lender.

16. Severability. The provisions of this Amendment are severable, and if any one clause or provision hereof shall be held invalid or unenforceable in whole or in part, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, and not any other clause or provision of this Amendment.

[REMAINDER OF PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER**:

**ONNI WILSHIRE COURTYARD LLC,**
a Delaware limited liability company

By:______________________________
Name: Sam Parrotta
Title: Authorized Signatory

[SIGNATURE PAGES CONTINUE ON FOLLOWING PAGE]

**LENDER**:

**NATIXIS REAL ESTATE CAPITAL LLC**,
a Delaware limited liability company

By:______________________________
Name: Khaled Mohiuddin
Title: Director

By:______________________________
Name: Jonathan Rechner
Title: Executive Director

[SIGNATURE PAGES CONTINUE ON FOLLOWING PAGE]

**ACKNOWLEDGED AND AGREED TO AS TO SECTIONS 4, 6(B), 7(B), 8, 10 AND 11 HEREOF:**

**GUARANTOR**:

**PANNI HOLDINGS LTD.,**
a British Columbia corporation

By:________________________________
Name: Sam Parrotta
Title: Authorized Signatory

________________________________
**ROSSANO DE COTIIS**, a natural person

## Schedule 9

### Upfront TI/LC Schedule

| Suite | Tenant Name | Outstanding TI | Outstanding LC | Total |
|---|---|---|---|---|
| 200<br>300<br>400<br>550 | 5750 Wilshire Boulevard Tenant LLC<br>(Original WeWork Lease – 158k SF) | $21,329,109.40 | $500,000.00 | $21,829,109.40 |
| 100<br>110<br>175<br>201<br>301 | 5750 Wilshire Boulevard Tenant LLC<br>(WeWork Lease Amendment – 176k SF) | $18,555,915.00 | $1,000,000.00 | $19,555,915.00 |
| 285 | Booking.com (USA) Inc. | $207,375.00 | | $207,375.00 |
| 300 | Twentieth Century-Fox Television, Inc. | $309,260.00 | | $309,260.00 |
| 105<br>375 | ATTN: Inc. | $1,168,827.22 | $187,211.16 | $1,356,038.38 |
| 600 | Skydance Media, LLC | | $193,640.00 | $193,640.00 |
| 655 | United Beauty Brands, LLC | $399,950.00 | | $399,950.00 |
| | **Total** | **$41,970,436.62** | **$1,880,851.16** | **$43,851,287.78** |

# Schedule 10

## Outstanding Principal Balance of the Notes

| | |
|---|---|
| Note A-1 | $43,403,194.61 |
| Note A-2 | $43,403,194.61 |
| Note A-3 | $43,403,194.61 |
| Note A-4 | $43,403,194.61 |
| Note A-5 | $43,403,194.61 |
| Note A-6 | $43,403,194.61 |
| Note A-7 | $43,403,194.61 |
| Note A-8 | $43,403,194.61 |
| Note A-9 | $43,403,194.61 |
| Note A-10 | $17,537,142.31 |
| **Total:** | **$408,165,893.80** |

**Exhibit B**

**Form of Pledge of Letter of Credit**

(attached)

# PLEDGE OF LETTER OF CREDIT

This **PLEDGE OF LETTER OF CREDIT** (this "**Agreement**"), made as of ___________, 20__, by and among **NATIXIS REAL ESTATE CAPITAL LLC**, a Delaware limited liability company, having an address at 1251 Avenue of the Americas, New York, New York 10020 (together with its successors and assigns, "**Lender**"), and **ONNI WILSHIRE COURTYARD LLC**, a Delaware limited liability company, having an address at c/o Onni Group, 200-1010 Seymour Street, Vancouver, British Columbia V6B 3M6 ("**Borrower**").

WITNESSETH:

WHEREAS, pursuant to that certain Loan Agreement (the "**Original Loan Agreement**"), dated as of June 17, 2019, by and between Borrower and NATIXIS, NEW YORK BRANCH ("**Original Lender**"), Original Lender made a loan (the "**Loan**") to Borrower, subject to the terms and conditions of the Original Loan Agreement;

WHEREAS, Original Lender assigned the Loan and the Original Loan Agreement to Lender pursuant to, among other things, that certain Assignment of Loan Documents, dated as of October 31, 2019, by Original Lender in favor of Lender (the "**Loan Assignment**");

WHEREAS, on October 31, 2019, Lender, Borrower and Guarantor entered into that certain First Amendment to Loan Agreement and Payment Guaranty, dated as of October 31, 2019 (the "**First Amendment to Loan Agreement**"; the Original Loan Agreement, as assigned to Lender pursuant to the Loan Assignment, and as amended by the First Amendment to Loan Agreement, and as the same may be further amended, modified, supplemented, restated or replaced from time to time, the "**Loan Agreement**");

WHEREAS, 5750 Wilshire Boulevard Tenant LLC, a New York limited liability company ("**Tenant**"), as tenant, and Borrower, as landlord, have entered into that certain Office Lease Agreement, dated as of July 2, 2019, as amended by that certain First Amendment to Office Lease Agreement, dated as of September 5, 2019 (as the same may be further amended, modified, supplemented or replaced from time to time in accordance with the terms and conditions of the Loan Documents, the "**Lease**"), for certain space located at the Property, which requires that Tenant deliver one or more letters of credit to Borrower as additional security for Tenant's obligations under the Lease; and

WHEREAS, pursuant to the terms of the Lease, Tenant has caused to be delivered to Borrower the Letter of Credit (as hereinafter defined) and, pursuant to the Loan Agreement, Borrower is hereby pledging and delivering to Lender the Letter of Credit as additional security for the Loan, subject at all times to the terms and conditions of the Lease.

NOW, THEREFORE, in consideration of the agreements and the covenants hereinafter contained, the parties hereto agree as follows:

1. **Definitions**. As used in this Agreement:

a. "**Approved Issuing Bank**" shall mean one of the following banks: Wells Fargo Bank, N.A., Mizuho Bank, LTD., Goldman Sachs Lending Partners LLC, Bank of

America, N.A., JPMorgan Chase Bank, N.A., Morgan Stanley Bank, N.A., Bank Leumi USA, Barclays Bank PLC, Credit Suisse or any other bank reasonably approved by Lender.

b. "**Letter of Credit**" shall mean that certain [Irrevocable Standby Letter of Credit] No. [___________], dated as of [___________], 20[__], issued by [___________] ("**Issuing Bank**"), in favor of Borrower, in the current amount of $[___________], a copy of which is attached hereto as **Exhibit A**, as the same may be amended from time to time in accordance with the Loan Documents.

c. "**Replacement Letter of Credit**" shall mean collectively, one or more clean, unconditional and irrevocable letters of credit, issued by an Approved Issuing Bank for the benefit of Borrower, with Tenant or a party designated by Borrower (but not Borrower) as the account party and having an initial expiry date of not earlier than one year from the date of issue (or such shorter initial period taking into account any fixed expiration dates for Tenant's credit facility). The Replacement Letter of Credit shall be freely assignable and/or transferable in its entirety one or more times to any successor of or assignee to Lender under the Loan Documents. The Replacement Letter of Credit must be in the form required pursuant to the terms of the Lease and reasonably satisfactory to Lender and, without limiting the foregoing, must (i) contain an "evergreen clause" for automatic one (1) year renewals, (ii) be payable upon presentation at a bank branch in New York, New York of sight draft and certifications substantially similar to the original Letter of Credit without the payment of any fee and (iii) be delivered to Lender together with the Approved Issuing Bank's form "assignment" filled-out in blank and fully executed such that, if and when Lender is so entitled under this Agreement and the other Loan Documents, Lender may present the same to Approved Issuing Bank and consummate an assignment of such Replacement Letter of Credit to Lender.

d. All other capitalized terms used in this Agreement without definition shall have the respective meanings attributed thereto in the Loan Agreement.

2. **Delivery of Letter of Credit**. Simultaneously herewith, Borrower is delivering to Lender the original Letter of Credit to be held and/or drawn upon by Lender in accordance with the Lease, this Agreement and the other Loan Documents, and Lender, by its execution of this Agreement, is acknowledging the receipt of (a) the Letter of Credit; and (b) an assignment of the Letter of Credit in blank executed by the Borrower (the "**Assignment**"), a copy of which is attached hereto as **Exhibit B**.

3. **Right of Setoff**. In addition to its rights and interests as set forth in this Agreement, Lender at its option, upon the occurrence and during the continuance of an Event of Default, but subject at all times to the terms and conditions of the Lease and applicable law governing the Lease (including, in particular, any limitations on drawing on the Letter of Credit and applying the proceeds thereof in accordance with the Lease and applicable law), may at any time and from time to time with or without notice to Borrower, draw upon the Letter of Credit and the cash proceeds of a draw upon same and apply same to the payment or reduction in whole or in part of the Debt, it being understood and agreed that Lender shall not be obligated to assert or enforce any rights or the security interest hereunder or to take any action in reference thereto. Subject to the terms of the Lease, all cash proceeds received by Lender as a result of a draw upon the Letter of Credit (or, to the extent applicable, the Replacement Letter of Credit) or in respect

of interest or other distributions from, payment of, collection from, sale or conversion or exchange of, or other realization upon, the Letter of Credit (or, to the extent applicable, the Replacement Letter of Credit) may, upon the occurrence and during the continuance of an Event of Default, in the discretion of Lender, continue to be held by Lender as part of the collateral or may then and/or at any time thereafter, be applied in whole or in part by Lender in payment of the Debt, in such order as Lender shall desire. Lender, in its discretion, at any time and from time to time, may release or relinquish its rights, remedies or the security interest hereunder as to any particular item of the collateral without thereby affecting or invalidating its rights, remedies and security interest hereunder as to any other item of the collateral.

**4. Representations and Warranties of Borrower.** Borrower represents and warrants to Lender as of the date hereof that:

(a) The execution, delivery and performance by Borrower of this Agreement and the delivery of the Letter of Credit does not contravene (i) any applicable law or regulation or (ii) any agreement by which Borrower is bound;

(b) This Agreement is the legal, valid, and binding obligation of Borrower, enforceable against Borrower in accordance with its terms;

(c) No consent or approval of any person, corporation, governmental body, regulatory authority or other entity is or will be necessary for the execution, delivery and performance of this Agreement or the exercise by Lender of any rights with respect to the Letter of Credit;

(d) There are no pending or, to the best of Borrower's knowledge, threatened, in writing, actions or proceedings before any court, judicial body, administrative or governmental agency or arbitrator which may materially adversely affect (x) the delivery and drawing upon the Letter of Credit, or (y) the value of the Letter of Credit or the performance by the Issuing Bank thereunder;

(e) Borrower has full power and authority to deliver and assign the Letter of Credit to Lender in accordance with the terms of this Agreement (subject to compliance with the applicable terms of the Letter of Credit regarding the assignment thereof);

(f) Borrower (1) is not obligated in any way whatsoever to the issuer of the Letter of Credit in connection with the issuance of the Letter of Credit, and (2) does not have any reimbursement obligation to the issuer with respect to the Letter of Credit;

(g) On the date hereof, Borrower is the sole beneficiary of the Letter of Credit, and to Borrower's best knowledge, the Letter of Credit has been validly issued and is in full force and effect free and clear of all security interests, liens and encumbrances whatsoever; and

(h) To Borrower's knowledge, there are no setoffs, counterclaims, or defenses on the part of the Issuing Bank to pay any amounts due under the Letter of Credit.

5. **Affirmative Covenants and Agreements**. So long as all or any portion of the Debt remains outstanding and unpaid:

(a) Borrower shall, at the written request of Lender at any time and from time to time, at Borrower's sole cost and expense, promptly take such action and deliver such financing statements and execute and deliver such further instruments and documents as Lender may reasonably request in order to enable Lender to exercise and enforce its rights and remedies hereunder. Borrower shall pay any and all transfer fees required in connection with any transfer or assignment (including, without limitation, the Assignment) of the Letter of Credit or the Replacement Letter of Credit, as applicable, pursuant to the terms of this Agreement.

(b) Borrower shall defend Borrower's and Lender's title and interest in and to the Letter of Credit (or, to the extent applicable, the Replacement Letter of Credit) against any and all attachments, executions, liens, claims, security interests or other encumbrances of any nature, however arising, at Borrower's sole cost and expense.

(c) Borrower shall promptly enforce the applicable provisions of the Lease requiring Tenant to deliver an amendment, extension and/or renewal of the Letter of Credit pursuant to and in accordance with the terms of the Lease. Any such amendments, extensions or renewals of the Letter of Credit delivered (or required to be delivered) pursuant to the terms of the Lease shall be in the form and face amount required by the Lease and reasonably acceptable to Lender, and Borrower shall cause the same to be delivered directly to Lender (together with the Issuing Bank's form "assignment" filled-out in blank and fully executed such that, if and when Lender is so entitled under this Agreement and the other Loan Documents, Lender may present the same to the Issuing Bank and consummate an assignment of the Letter of Credit (as so amended, extended or renewed) to Lender). Notwithstanding the foregoing, in the event that any such amendment, extension or renewal is inadvertently delivered to Borrower, Borrower shall, within three (3) Business Days after its receipt thereof, cause same to be delivered to Lender subject to and in accordance with the terms of this Agreement.

(d) If the Issuing Bank gives notice to Borrower (or Tenant) that it shall not renew the Letter of Credit, then Borrower shall, within three (3) Business Days of receipt thereof, notify Lender of the same and, if a Replacement Letter of Credit has not been delivered to Lender within the thirty (30) day period set forth in the Lease for delivery of same by Tenant, Lender may, subject to the terms and conditions of the Lease, present the Letter of Credit to the Issuing Bank and draw the full then-current face amount of the Letter of Credit (which funds will then be deposited into the Letter of Credit Reserve Subaccount in accordance with the terms hereof and the terms of the Loan Agreement). In furtherance of the foregoing, Lender will give Borrower no less than one (1) Business Day's advance notice before Lender presents the Letter of Credit to the Issuing Bank so that Borrower may accompany Lender to the Issuing Bank to ensure that Lender is able to draw the funds.

(e) Borrower grants Lender a security interest in the Letter of Credit and in the proceeds of any draw thereon and the interest thereon.

(f) Borrower shall promptly notify Lender of any circumstance or default which gives rise to a right to draw upon the Letter of Credit in accordance with the Lease.

(g) If at any time the signatory to the Assignment on behalf of Borrower (or any assignment of a Replacement Letter of Credit, as applicable) is no longer an authorized signatory of Borrower, Borrower shall provide a replacement Assignment in substantially the form attached hereto as **Exhibit B** (or in such other form otherwise reasonably acceptable to Lender) executed by an authorized signatory of Borrower.

(h) In the event that Lender shall assign its interest in the Loan, Lender shall have the right to transfer the Letter of Credit and this Agreement to the assignee of Lender's interest in the Loan.

(i) In the event Tenant has fully satisfied the conditions for the reduction of the face amount of the Letter of Credit in accordance with the terms of the Lease, and Tenant elects to so reduce the face amount of the Letter of Credit, Borrower shall deliver, or shall cause Tenant to deliver, to Lender, either (1) a Replacement Letter of Credit, which Replacement Letter of Credit shall be identical to the Letter of Credit held by Lender (other than the reduction of the face amount thereof to the amount specified in the Lease) or otherwise in the form required pursuant to the terms of the Lease, or (2) an amendment to the Letter of Credit held by Lender, reducing the face amount of the Letter of Credit to the amount specified in the Lease. In the event that a Replacement Letter of Credit is delivered to Lender in accordance with the foregoing, Lender shall return the existing Letter of Credit held by Lender to Borrower (and such Replacement Letter of Credit shall thereafter be deemed to be the "Letter of Credit" for all purposes under this Agreement).

**6. Negative Covenants.** So long as all or any portion of the Debt remains outstanding and unpaid, Borrower shall not, without the prior written consent of Lender:

(a) sell, assign, withdraw, transfer or otherwise dispose of, and Borrower shall not cause, suffer or permit the sale, assignment, withdrawal, transfer or other disposition of, the Letter of Credit, or any portion thereof; or

(b) except in connection with the delivery of a Replacement Letter of Credit in accordance with the terms of the Lease and this Agreement, cause or permit the waiver, modification, surrender, release or termination in any respect of any rights of the payee, beneficiary or holder of the Letter of Credit.

**7. Default.**

(a) The occurrence of any of the following events shall be an "**Event of Default**" under the Loan Documents:

(1) if any representation or warranty made or given by any of Borrower to Lender under this Agreement shall be false or misleading in any material respect as of the date the representation or warranty was made, unless, with respect to any such misrepresentation (each, a "**Misrepresentation**"), (A) such Misrepresentation was not knowingly or intentionally made, (B) such Misrepresentation was not made with respect to any of the representations set forth in <u>Section 4.1</u> of the Loan Agreement with respect to Borrower's status as a Special Purpose Entity, (C) Lender has suffered no material losses, claims, damages or liabilities on account of such Misrepresentation, nor

has the same resulted in a material adverse effect with respect to (x) the ability of Borrower or Guarantor to perform their respective obligations under the Loan Documents, (y) the validity, priority or enforceability of any Loan Document or the liens, rights or remedies of Lender under any Loan Document or (z) the use, operation or value of the Property, each as determined by Lender, (D) such Misrepresentation can be cured (meaning that the facts and circumstances underlying the applicable Misrepresentation can be changed such that the applicable representation or information as made or delivered will be true and correct) and (E) such Misrepresentation has been so cured within fifteen (15) days after the earlier of (x) the date on which Borrower first has actual knowledge that such Misrepresentation exists and (y) the date on which Lender first notifies Borrower in writing that such Misrepresentation exists;

(2) the Letter of Credit is subjected to levy of execution, attachment, restraint or other judicial process based upon a claim against Borrower; or the Letter of Credit is the subject of a claim by any person or entity (other than Lender) of a lien, security interest or other right or interest; *provided* that, for the avoidance of doubt, a draw upon the Letter of Credit made in accordance with the terms of the Letter of Credit and this Agreement shall not constitute a "claim" for purposes of this clause (2);

(3) the failure of Borrower to pay, within ten (10) days of Lender's written request therefor, any transfer fees due and payable in connection with the transfer or assignment (including, without limitation, the Assignment) of the Letter of Credit or Replacement Letter of Credit, as applicable, pursuant to the terms of this Agreement; or

(4) the failure of Borrower to comply with or perform any of its undertakings or obligations pursuant to this Agreement not specified in clauses (1) through (3) above, for thirty (30) days after notice to Borrower from Lender.

(b) Upon the occurrence and during the continuance of an Event of Default, or if the landlord under the Lease otherwise becomes entitled to draw upon the Letter of Credit, Lender may, without further notice, but subject in each case to the terms of the Lease (including any draw conditions set forth in the Lease) and applicable law, draw upon the Letter of Credit and deposit and maintain such proceeds in the Letter of Credit Reserve Subaccount in accordance with the terms hereof and the terms of the Loan Agreement until such time as Tenant is entitled to a return of the proceeds under the Lease.

(c) No delay or omission by Lender in exercising any right or remedy upon an Event of Default shall impair or prohibit the exercise of any such right or remedy in the future or be deemed to constitute a waiver of any such right or remedy or acquiescence therein. Every right and remedy granted to Lender under this Agreement or by law may be exercised by Lender at any time and from time to time, and as often as Lender may deem it expedient.

**8. Possession of, and Draw Down on, the Letter of Credit.**

(a) In each case, except as expressly set forth in this Section 8, during the term of the Loan: (i) Lender has the sole right to possession of the Letter of Credit (or any Replacement Letter of Credit) and the sole right to draw on the Letter of Credit (or any

Replacement Letter of Credit); and (ii) Borrower has no right to possession of the Letter of Credit (or any Replacement Letter of Credit) and no right to draw on the Letter of Credit (or any Replacement Letter of Credit).

(b) Borrower agrees that, in the event Borrower has the right to draw upon the Letter of Credit (or any Replacement Letter of Credit) in accordance with the terms of the Lease, Borrower shall notify Lender of such right no later than three (3) Business Days after Borrower has actual knowledge of such right. Thereafter, Borrower shall, at Lender's election and at Borrower's sole cost and expense, either (i) promptly draw upon the Letter of Credit (or Replacement Letter of Credit), but in no event later than five (5) Business Days after delivery by Lender of the original Letter of Credit (or Replacement Letter of Credit, as applicable) to Borrower, or (ii) cooperate with Lender to draw upon the same, and, in either event, shall deposit (or cause to be deposited) the proceeds thereof into the Letter of Credit Reserve Subaccount to be held in accordance with the terms hereof and the terms of the Loan Agreement. Without limiting the foregoing, Borrower hereby grants Lender the right, at Borrower's sole cost and expense, to draw upon the Letter of Credit (or any Replacement Letter of Credit) if and/or when Borrower is entitled to draw upon the Letter of Credit (or any Replacement Letter of Credit) in accordance with the Lease and to deposit the proceeds thereof into the Letter of Credit Reserve Subaccount to be held in accordance with the terms hereof and the terms of the Loan Agreement.

(c) Borrower agrees that: (i) Lender shall have no duty to confirm the validity of Borrower's claim of a right to make a draw on the Letter of Credit; (b) Lender is hereby authorized by Borrower to rely on Borrower's request regarding such matter; and (c) Borrower shall indemnify and hold Lender harmless from and against any claims or liabilities arising from or with respect to Lender's compliance with the terms of this Section 8.

9. **Return of Letter of Credit and any Proceeds Thereof.** Borrower shall be entitled to the return of the Letter of Credit (and shall thereafter be entitled to draw thereon in accordance with the terms of the Lease) after the earliest to occur of (x) Tenant being entitled to a return of the Letter of Credit pursuant to the terms of the Lease and applicable law, (y) repayment in full of Debt or (z) as otherwise expressly set forth in this Agreement.

10. **Intentionally Omitted.**

11. **No Waiver.** Any and all of Lender's rights with respect to the pledge, assignment and security interest granted hereunder shall continue unimpaired, and Borrower shall be and remain obligated in accordance with the terms hereof notwithstanding (a) the bankruptcy, insolvency or reorganization of Borrower, (b) the release or substitution of any item of collateral at any time, or of any rights or interests therein, or (c) any delay, extension of time, renewal, compromise or other indulgence granted by Lender in reference to any of the Loan. No delay or extension of time by Lender in exercising any power of sale, option or other right or remedy hereunder, and no failure by Lender to give notice or make demand, shall constitute a waiver thereof, or limit, impair or, prejudice Lender's right to take any action against Borrower or to exercise any other power of sale, option or any other right or remedy hereunder, under law or in equity.

**12. Expenses**. Without limiting any other provision of this Agreement, Borrower shall pay to Lender on demand, from time to time all expenses (including, but not limited to, reasonable attorneys' fees and costs, taxes, and all transfer, recording, filing and other charges) of, or incidental to, the transfer or collection of the Letter of Credit, or in any way relating to the enforcement, protection or preservation of the rights or remedies of Lender under this Agreement or with respect to any of the Loan or otherwise incurred by Lender under or in connection with this Agreement.

**13. Lender Appointed Attorney-In-Fact and Performance by Lender**. Borrower hereby irrevocably constitutes and appoints Lender as Borrower's true and lawful attorney-in-fact, with full power of substitution, and, after the occurrence of an Event of Default, to execute, acknowledge and deliver any instruments and to do in Borrower's name, place and stead, all such acts, things and deeds for and on behalf of and in the name of Borrower, which Borrower could or might do or which Lender may deem necessary, desirable or convenient to accomplish the purposes and intent of this Agreement. Borrower hereby ratifies and confirms all that said attorney-in-fact may so do and hereby declares this power of attorney to be coupled with an interest and irrevocable. If Borrower fails to perform any agreement herein contained, Lender may itself perform or cause performance thereof and any expenses of Lender incurred in connection therewith shall be paid by Borrower as provided herein.

**14. Captions**. All captions in this Agreement are included herein for convenience of reference only and shall not constitute part of this Agreement for any other purpose.

**15. Miscellaneous**.

(a) This Agreement constitutes the entire and final agreement among the parties with respect to the subject matter hereof and may not be changed, terminated or otherwise varied except by a writing duly executed by the parties.

(b) No waiver of any term or condition of this Agreement, whether by delay, omission or otherwise, shall be effective unless in writing and signed by the party sought to be charged, and then such waiver shall be effective only in the specific instance and for the purpose for which given.

(c) In the event that any provision of this Agreement or the application thereof to Borrower or any circumstance in any jurisdiction governing this Agreement shall, to any extent, be invalid or unenforceable under any applicable statute, regulation, or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such statute, regulation or rule of law, and the remainder of this Agreement and the application of any such invalid or unenforceable provision to parties, jurisdictions, or circumstances other than to whom or to which it is held invalid or unenforceable, shall not be affected thereby nor shall same affect the validity or enforceability of any other provision of this Agreement.

(d) This Agreement shall be binding upon Borrower and its successors and assigns and shall inure to the benefit of Lender and its successors and assigns.

(e) This Agreement shall be governed by and construed and enforced in all

respects in accordance with the laws of the State of New York.

(f) All notices or other communications required or permitted to be given hereunder shall be deemed to have been satisfactorily given or served for all purposes if delivered in accordance with the Loan Agreement.

(g) This Agreement may be executed in counterparts, each of which shall constitute, when taken together, an original, fully executed agreement.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement the day and year first above written.

**BORROWER**:

**ONNI WILSHIRE COURTYARD LLC,**
a Delaware limited liability company

By:_______________________________
Name: Sam Parrotta
Title: Authorized Signatory

[*Signatures Continued on Next Page*]

**<u>LENDER</u>:**

**NATIXIS REAL ESTATE CAPITAL LLC,**
a Delaware limited liability company

By:_________________________________
Name:
Title:

By:_________________________________
Name:
Title:

**EXHIBIT A**

**Letter of Credit**

(attached)

## EXHIBIT B

**Assignment in Blank for Letter of Credit**

(attached)

# SECOND AMENDMENT TO LOAN AGREEMENT AND REAFFIRMATION OF LOAN DOCUMENTS

This **SECOND AMENDMENT TO LOAN AGREEMENT AND REAFFIRMATION OF LOAN DOCUMENTS** (this "**Amendment**") executed on November 10, 2022 (the "**Execution Date**"), but intended to be effective as of July 9, 2022 (except in respect of Section 8 hereof, which amendments shall be effective as of the Execution Date only, the "**Effective Date**"), is among **WELLS FARGO BANK, NATIONAL ASSOCIATION, SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE BENEFIT OF THE HOLDERS OF NATIXIS COMMERCIAL MORTGAGE SECURITIES TRUST 2019-MILE, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2019-MILE**, having an address of c/o Midland Loan Services, 10851 Mastin Street, Suite 300, Overland Park, Kansas 66210, Attention: Asset Management (together with its successors and assigns, "**Lender**"), **ONNI WILSHIRE COURTYARD LLC**, a Delaware limited liability company, having an address of c/o Onni Group, 200-1010 Seymour Street, Vancouver, BC V6B 3M6 (together with its successors and assigns, "**Borrower**"), and **ROSSANO DE COTIIS**, a natural person, having an address at c/o Onni group, 200-1010 Seymour Street, Vancouver, British Columbia V6B 3M6 ("**De Cotiis Guarantor**"), and PANNI HOLDINGS LTD., a British Columbia corporation, having an address at 200-1010 Seymour Street, Vancouver, British Columbia V6B 3M6 ("**Panni Guarantor**"; together with De Cotiis Guarantor, individually or collectively, as the context may require, "**Guarantor**").

WHEREAS, Natixis, New York Branch ("**Original Lender**") provided a commercial mortgage loan in the maximum aggregate principal amount of $470,202,594.00 (the "**Loan**") to Borrower which is evidenced by, among other things (i) that certain Promissory Note A-1 in the principal amount of up to $50,000,000.00 ("**Note A-1**"), that certain Promissory Note A-2 in the principal amount of up to $50,000,000.00 ("**Note A-2**"), that certain Promissory Note A-3 in the principal amount of up to $50,000,000.00 ("**Note A-3**"), that certain Promissory Note A-4 in the principal amount of up to $50,000,000.00 ("**Note A-4**"), that certain Promissory Note A-5 in the principal amount of up to $50,000,000.00 ("**Note A-5**"), that certain Promissory Note A-6 in the principal amount of up to $50,000,000.00 ("**Note A-6**"), that certain Promissory Note A-7 in the principal amount of up to $50,000,000.00 ("**Note A-7**"), that certain Promissory Note A-8 in the principal amount of up to $50,000,000.00 ("**Note A-8**"), that certain Promissory Note A-9 in the principal amount of up to $50,000,000.00 ("**Note A-9**"), and that certain Promissory Note A-10 in the principal amount of up to $20,202,594.00 ("**Note A-10**"; and together with Note A-9, Note A-8, Note A-7, Note A-6, Note A-5, Note A-4, Note A-3, Note A-2, and Note A-1, the "**Notes**"), (ii) that certain Loan Agreement dated June 17, 2019 by and among Borrower and Original Lender, as amended by that certain First Amendment to Loan Agreement and Payment Guaranty ("**First Amendment**") dated as of October 31, 2019 (as so amended, the "**Loan Agreement**"), and (iii) the other Loan Documents.

WHEREAS, for purposes of calculating interest and other amounts payable on the Loan, the Notes were divided into seven (7) components: "Component A," "Component B," "Component

C," "Component D," "Component E," "Component F," and "Component G" (collectively, the "**Components**").

WHEREAS, Lender is now the holder of the Loan, including the Components, the Loan Agreement, and all of the other Loan Documents.

WHEREAS, by notice dated April 19, 2022, Borrower notified Lender that Borrower desires to extend the Stated Maturity Date from the Initial Stated Maturity Date to the First Extended Maturity Date pursuant to Section 2.8 of the Loan Agreement.

WHEREAS, pursuant to Section 2.6(g) of the Loan Agreement, Borrower was required to obtain a Third Year Interest Rate Protection Agreement not later than the date that was thirty (30) days prior to the scheduled expiration date of the Interest Rate Protection Agreement that was obtained by Borrower on the Closing Date.

WHEREAS, the Interest Rate Protection Agreement obtained by Borrower on the Closing Date expired on July 9, 2021, and Borrower failed to obtain a Third Year Interest Rate Protection Agreement, which constitutes an Event of Default pursuant to Section 8.1(o) of the Loan Agreement (the "**Existing Event of Default**").

WHEREAS, pursuant to Section 2.8(a) of the Loan Agreement, it is a condition precedent to the extension of the Stated Maturity Date that no Event of Default exists at the time an extension request is made.

WHEREAS, Borrower has requested that Lender waive the Existing Event of Default and agree to extend the Stated Maturity Date notwithstanding the Existing Event of Default, and Lender is willing to do so on and subject to the terms and conditions set forth in this Amendment.

WHEREAS, as a condition to Lender's waiver of the Existing Event of Default and agreement to extend the Stated Maturity Date, Lender requires that the Loan be converted to an Alternate Rate Loan.

WHEREAS, capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement.

NOW, THEREFORE, for and in consideration of the sum of TEN and NO/100 DOLLARS ($10.00), and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby covenant and agree as follows:

1. <u>Loan Information</u>. Lender and Borrower hereby acknowledge and agree that:

   a. The outstanding principal balance of Component A as of the Execution Date is $158,000,000 and the interest rate on Component A is a variable rate that as of the Execution Date is 1.511828312% per annum.

b. The outstanding principal balance of Component B as of the Execution Date is $35,500,000 and the interest rate on Component B is a variable rate that as of the Execution Date is 1.811% per annum.

c. The outstanding principal balance of Component C as of the Execution Date is $32,000,000 and the interest rate on Component C is a variable rate that as of the Execution Date is 2.211% per annum.

d. The outstanding principal balance of Component D as of the Execution Date is $32,000,000 and the interest rate on Component D is a variable rate that as of the Execution Date is 2.761% per annum.

e. The outstanding principal balance of Component E as of the Execution Date is $34,600,000 and the interest rate on Component E is a variable rate that as of the Execution Date is 3.511% per annum.

f. The outstanding principal balance of Component F as of the Execution Date is $36,400,000 and the interest rate on Component F is a variable rate that as of the Execution Date is 4.261% per annum.

g. The outstanding principal balance of Component G as of the Execution Date is $79,665,893.80 and the interest rate on Component G is a variable rate that as of the Execution Date is 5.261% per annum.

h. Lender has in its possession as of the date hereof, the following sums:

i. $0.50 in the Required Repairs Subaccount;

ii. $6,600,412.13 (tax) and $1,504,908.70 (insurance) in the Tax and Insurance Subaccount;

iii. $363,501.05 in the Capital Reserve Subaccount;

iv. $11,879,631.98 in the Rollover Reserve Subaccount;

v. $95,620.06 in the Cash Collateral Reserve Subaccount;

vi. $0.00 in the Primary Tenant Reserve Subaccount;

vii. $236,056.62 in the Shortfall Reserve Subaccount;

viii. $560,892.15 in the Free Rent Reserve Subaccount;

ix. $35,887.33 in the Ground Rent Reserve Subaccount;

x. $43,962,827.19 in the Upfront TI/LC Reserve Subaccount;

xi. $0.00 in the Letter of Credit Reserve Subaccount; and

xii. $483,081.21 in the Proposition 13 Buyout Reserve Subaccount.

2. WeWork Amendments. The WeWork Lease has been terminated pursuant to a Termination Agreement dated October 21, 2021 ("Termination Date'), the WeWork Original Premises Letter of Credit has been terminated, and the WeWork New Premises Letter of Credit has been drawn in full, with the proceeds thereof deposited into the Letter of Credit Reserve Subaccount. Accordingly:

a. The following definitions are deleted from the First Amendment for periods from and after the Termination Date, except to the extent such defined terms are utilized in provisions of the Loan Documents and retention thereof provides context regarding the intended operation of such provisions: "Pledge of Letter of Credit," "WeWork," "WeWork Lease" "WeWork New Premises Letter of Credit," "WeWork Original Premises Letter of Credit," WeWork Premises," "WeWork Premises Acceptance Date," "WeWork Tenant Allowance," and "WeWork Tenant Allowance Backup Documentation."

b. Section 5.28 of the Loan Agreement and Exhibit B to the First Amendment, Form of Pledge of Letter of Credit, are hereby deleted from the First Amendment for periods from and after the Termination Date.

c. Section 1(d) of the Payment Guaranty is deleted in its entirety and replaced with the following:

"(d) the term "***Maximum Guaranteed Obligations Amount***" means $238,805,502.81"

3. Conditional Waiver of Existing Event of Default. Subject to satisfaction of the Conditions to Effectiveness in Section 4 of this Amendment and performance by Borrower and Guarantor of their respective obligations and covenants hereunder, Lender hereby waives the Existing Event of Default. Such waiver shall not in any way limit any other rights of Lender under the Loan Agreement or the Loan Documents, or constitute a waiver of any now or future Events of Default (other than the Existing Event of Default).

4. Conditions to Effectiveness. The effectiveness of this Amendment is strictly conditioned upon the occurrence of each of the following to the satisfaction of Lender, unless otherwise waived by Lender:

a. As of the Execution Date, Borrower shall have paid to Lender a modification fee in an amount equal to $1,020,415.00 (the "**Modification Fee**");

b. Borrower shall have delivered to Lender, no later than ten (10) Business Days after the Execution Date (the "**Interest Rate Protection Deadline**") (i) evidence

satisfactory to Lender, in its sole discretion, that Borrower has entered into a new interest rate protection agreement which expires no earlier than the First Extended Stated Maturity Date, and which rate protection agreement complies with the terms and conditions set forth in Section 2.6.1 of the Loan Agreement and has the effect of capping the Applicable Index at the Applicable Rate Cap Amount and (ii) a fully executed Interest Rate Cap Assignment and Security Agreement in favor of Lender, assigning the rate protection agreement described in the foregoing item (i) in compliance with Section 2.6.1 of the Loan Agreement (items (i) and (ii) collectively, the "**Interest Rate Protection Documentation**"); and

c. As of the Execution Date, Mezzanine Borrower shall have extended the Maturity Date (as defined in the Mezzanine Loan Agreement) of the Mezzanine Loan to a date not sooner than the First Extended Maturity Date, and all conditions precedent to such extension shall have been satisfied by Mezzanine Borrower or waived in writing by Mezzanine Lender, and reasonably satisfactory documentation evidencing same shall have been provided to Lender.

For the avoidance of doubt, if Borrower fails to deliver the Interest Rate Protection Documentation to Lender on or prior to the Interest Rate Protection Deadline, then the extension of the Stated Maturity Date to the First Extended Stated Maturity Date contemplated hereby shall be of no force and effect and Borrower acknowledges that multiple Events of Default [*i.e.,* the Existing Event of Default, together with a Stated Maturity Date Event of Default] automatically shall exist and be outstanding without any further action or notice by Lender to Borrower, all of which are hereby waived, and Lender shall be entitled to exercise all rights and remedies under the Loan Documents and at law.

5. Stated Maturity Date. Subject to the final sentence in the final paragraph in Section 4, the Stated Maturity Date is hereby extended from the Effective Date to July 9, 2023, i.e, the First Extended Stated Maturity Date. Subject to full and timely performance by the Borrower in respect of delivery of the Interest Rate Protection Documentation to Lender in accordance with Section 4, the condition set forth in Section 2.8(a) of the Loan Agreement is hereby waived by Lender with respect to the extension of the Stated Maturity Date to the First Extended Stated Maturity Date. For the avoidance of doubt, any further extension of the Stated Maturity Date pursuant to Section 2.8 of the Loan Agreement shall be subject to all of the conditions described in Section 2.8 of the Loan Agreement, including but not limited to Section 2.8(a).

6. Borrower Representations and Warranties. Borrower hereby represents and warrants to Lender as follows:

a. Borrower has the full power and authority to enter into and perform this Amendment. The execution, delivery and performance of this Amendment (1) has been duly and validly exercised by all necessary action on the part of Borrower, (2) does not conflict with or result in a violation of Borrower's organizational documents or any judgment, order or decree of any court or arbiter in any proceeding to which Borrower is a party, (3) does not conflict with, or constitute a material breach of, or constitute a material default under, any contract, agreement or other instrument by which Borrower is bound or to which Borrower is a party.

b. Borrower has thoroughly read and reviewed the terms and provisions of this Amendment and is familiar with same, and Borrower has entered into this Amendment voluntarily, without duress or undue influence of any kind, and with the advice and representation of legal counsel, if any, selected by Borrower.

c. This Amendment constitutes the binding and valid obligations of Borrower and is enforceable in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

d. Borrower has good, marketable and indefeasible title in fee to the real property comprising part of the Property and good title to the balance of the Property, free and clear of all Liens except the Permitted Encumbrances. Borrower has good, marketable and insurable (at regular rates) title to the leasehold interest created pursuant to the Ground Lease and good title to the balance of the Property, free and clear of all Liens except the Permitted Encumbrances.

e. The financial statements for the Property and the Borrower previously delivered to Lender are in all material respects, true, accurate and complete for the time periods referenced therein.

f. Borrower has not received written notice from any governmental entity claiming that the Property is not on the date of this Amendment in compliance in all material respects with any laws, ordinances, rules, and regulations bearing upon the use and operation of the Property, including specifically, but without limitation, any such notice relating to housing codes, zoning laws, building codes and regulations.

g. There are no outstanding judgments against Borrower, or any pending or, to Borrower's actual knowledge threatened, lawsuits, actions, administrative proceedings, adversary proceedings, condemnation proceedings, annexation proceedings, arbitrations or other legal proceedings, including (but not limited to) garnishment, attachment or similar proceedings against Borrower, or the Property (collectively, the "**Legal Proceedings**"). Should any Legal Proceedings be instituted or otherwise become pending against Borrower or the Property after the date hereof, Borrower shall promptly notify Lender of the same promptly after Borrower obtains actual knowledge of the same and shall promptly provide to Lender such other disclosures regarding the additional Legal Proceedings as Lender shall reasonably require.

h. To Borrower's actual knowledge, neither Borrower nor the Property is in violation of or in default with respect to any requirement of any law, rule, regulation, order, writ, judgment, injunction, decree, determination, or award or any indenture, agreement, lease, or instrument, including, but not limited to, any default on any

contractual obligation to any of its respective affiliates (nor is there any waiver in effect which, if not in effect, would result in such a violation or default), where, in each case, such violation or default is reasonably likely to have a material adverse effect on Borrower or any portion of the Property. Without limiting the generality of the foregoing, to the best of Borrower's knowledge, neither Borrower nor the Property (i) has directly or indirectly violated any Environmental Law, nor has any Loan Party received any written notice of any such violation; or (ii) has any material liability under any Environmental Law, and Borrower has not received written notice or other written communication of a material investigation, or, is under a material investigation, by any governmental authority having authority to enforce any Environmental Law with respect of any of the Property.

i. As of the date hereof, to the best of Borrower's knowledge, Borrower is in possession of all licenses, permits, and other authorizations necessary and required by applicable law for the conduct of its business and the operation of the Property. To the best of Borrower's knowledge, all such licenses, permits, and authorizations are valid and in full force and effect.

j. As of the Execution Date, the Management Agreement for the Property is valid, in full force and effect, and there does not exist any default in the performance by Borrower of any terms or covenants thereunder, where, in each case, such default could have a material adverse effect on the Property.

k. All insurance policies and coverages required by the Loan Documents are in full force and effect, Borrower, to the best of Borrower's knowledge, is not in default with respect to any provision contained in any of the insurance policies providing such insurance coverage, and all premiums for such insurance policies have been paid in full through the expiration date of such insurance policies. Such policies and coverages shall be renewed in a timely manner so as to ensure there is no lapse or gap in coverage.

l. The financial statements of the Loan Parties that heretofore have been provided to Lender are materially in accordance with the requirements set forth in the Loan Agreement.

m. A Cash Trap Period was activated on July 1, 2020 and such Cash Trap Period remains in effect as of the Execution Date.

n. None of the certificates, statements, or information furnished to Lender by or on behalf of Borrower in connection with this Amendment or the transactions contemplated hereby, to Borrower's knowledge, contains any untrue statement of a material fact, or omits or will omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, true, accurate, complete or not misleading.

o. Except for the Existing Event of Default, Borrower is in compliance with all covenants under the Loan Documents, as amended and modified by this Amendment, and as of the Execution Date and after giving effect to this Amendment, no Event of Default exists under the Loan Documents.

7. Guarantor Representations and Warranties. Guarantor hereby represents and warrants to Lender as follows:

a. Guarantor has full power and authority to execute, deliver and perform its obligations under this Amendment and all other documents delivered to Lender in connection with this Amendment. This Amendment is binding upon and enforceable against Guarantor in accordance with its terms.

b. Guarantor has thoroughly read and reviewed the terms and provisions of this Amendment and is familiar with same, and Guarantor has entered into this Amendment voluntarily, without duress or undue influence of any kind, and with the advice and representation of legal counsel, if any, selected by Guarantor.

c. Guarantor does not have any (i) offsets or defenses against the payment of any sums due and/or payable under any guaranty or indemnity agreement executed by Guarantor in connection with the Loan, or any other amounts payable under the Loan Documents, or (ii) claims against Lender or any employee, officer, director, agent or attorney of Lender in connection with any of the Loan Documents.

d. Each of the representations and warranties set forth in the Original Payment Guaranty (as well as the other instruments comprising the Guaranty) remains true, complete and correct as of the date originally made.

8. SOFR Conversion Amendments. The following amendments are made to the Loan Agreement, effective as of the Execution Date.

a. Section 1.1.1 shall be amended as follows:

i. The following definitions in Section 1.1.1 shall be amended and restated or added as set forth below:

***Interest Rate:*** for any Interest Period, an interest rate per annum equal to (i) for a Term SOFR Loan, the Term SOFR Spread, plus the greater of (a) Term SOFR for such Interest Period and (b) the Term SOFR Floor; (ii) for a Base Rate Loan, the Base Rate Spread plus the greater of (a) the Base Rate and (b) the Base Rate Floor; and (iii) for an Alternate Rate Loan, the Alternate Rate Spread plus the greater of (a) the Alternate Rate and (b) the Alternate Rate Floor.

***Term SOFR Floor:*** 1.921%.

ii. The following definition shall be deleted in its entirety from Section 1.1.1:

***Applicable Index***

***LIBOR Floor***

b. Section 1.1.2 shall be amended as follows:

i. The following definitions in Section 1.1.2 shall be amended and restated or added as set forth below:

***Alternate Index****:* a floating rate index (a) that is commonly accepted by market participants in CMBS loans as a replacement for Term SOFR (or the then-current Benchmark) and (b) the reference rate which is then generally being implemented by Lender (or the Servicer, acting therefor) in CMBS loans as a replacement for Term SOFR (or the then-current Benchmark).

***Alternate Rate Floor:*** in connection with any conversion of the Loan from: (i) a Term SOFR Loan to an Alternate Rate Loan, the difference between (a) the sum of the Term SOFR Floor plus the Term SOFR Spread, minus (b) the Alternate Rate Spread; or (ii) a Base Rate Loan to an Alternate Rate Loan, the difference between (a) the sum of the Base Rate Floor plus the Base Rate Spread, minus (b) the Alternate Rate Spread; provided, however, that in either (i) or (ii), if such difference is a negative number, then the Alternate Rate Floor shall be zero.

***Alternate Rate Spread:*** in connection with any conversion of the Loan from (i) a Term SOFR Loan to an Alternate Rate Loan, the difference (expressed as the number of basis points) between (a) the Term SOFR Rate as of the Determination Date for which Term SOFR was last available minus (b) the Alternate Rate as of such Determination Date; or (ii) a Base Rate Loan to an Alternate Rate Loan, the difference (expressed as the number of basis points) between (1) the Base Rate plus the Base Rate Spread in effect for the Interest Period prior to the Interest Period in which the Alternate Rate is to be applied minus (2) the Alternate Rate as of such Determination Date, provided, however, that in either (i) or (ii), if such difference is a negative number, then the Alternate Rate Spread shall be zero.

***Applicable Spread:*** the Term SOFR Spread, the Base Rate Spread or the Alternate Rate Spread, as applicable.

***Benchmark Replacement Date:***

(a) in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of the relevant Alternate Rate permanently or indefinitely cases to provide such Alternate Rate; or

(b) in the case of clause (c) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information.

***Benchmark Transition Event:*** the occurrence of one or more of the following events with respect to the then-current Alternate Rate:

(a) a public statement or publication of information by or on behalf of the administrator of the Benchmark announcing that such administrator has ceased or will cease to

provide the Benchmark, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Benchmark;

(b) a public statement or publication of information by the regulatory supervisor for the administrator of the Benchmark, the central bank for the currency of the Benchmark, an insolvency official with jurisdiction over the administrator for the Benchmark, a resolution authority with jurisdiction over the administrator for the Benchmark or a court or an entity with similar insolvency or resolution authority over the administrator for the Benchmark, which states that the administrator of the Benchmark has ceased or will cease to provide the Benchmark permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Benchmark; or

(c) a public statement or publication of information by or on behalf of the administrator of the Benchmark or the regulatory supervisor for the administrator of the Benchmark announcing that the Benchmark is not, or as of a specified future date will not be, representative.

***Applicable Rate Cap Amount:*** the Term SOFR Rate Cap Amount, the Base Rate Cap Amount or the Alternate Rate Cap Amount, as applicable.

***Base Rate Floor:*** in connection with any conversion of the Loan from: (i) a Term SOFR Loan to a Base Rate Loan, the difference between (a) the sum of the Term SOFR Floor plus the Term SOFR Spread, minus (b) the Base Rate Spread; or (ii) an Alternate Rate Loan to a Base Rate Loan, the difference between (a) the sum of the Alternate Rate Floor plus the Alternate Rate Spread minus (b) the Base Rate Spread; provided, however, that if such difference is a negative number, then the Base Rate Floor shall be zero.

***Base Rate Spread:*** in connection with any conversion of the Loan from (i) a Term SOFR Loan to a Base Rate Loan, the difference (expressed as the number of basis points) between (a) the Term SOFR Rate on the date that Term SOFR was last applicable to the Loan minus (b) the Base Rate on the date that Term SOFR was last applicable to the Loan; or (ii) an Alternate Rate Loan to a Base Rate Loan, the difference (expressed as the number of basis points) between (1) the Alternate Rate plus the Alternate Rate Spread on the date that the Alternate Rate was last applicable to the Loan minus (2) the Base Rate on the date that the Alternate Rate was last applicable to the Loan; provided, however, that in either (i) or (ii), if such difference is a negative number, then the Base Rate Spread shall be zero.

***Benchmark:*** shall mean, initially, Term SOFR; provided that if a Benchmark Transition Event and its related Benchmark Replacement Date shall have occurred with respect to Term SOFR or the then-current Benchmark, then "Benchmark" means the applicable Alternate Index determined pursuant to such defined term and Section 2.10 hereof.

***Conforming Changes:*** shall mean, with respect to either the use or administration of Term SOFR, the Term SOFR Rate, or the use, administration, adoption or implementation of any Benchmark Replacement or any Base Rate Loan, any technical, administrative or operational

changes (including changes to the definition of "Business Day," "Determination Date," "Interest Period," "Payment Date," "Periodic Term SOFR Determination Day" and "U.S. Government Securities Business Day," timing and frequency of determining rates and making payments of interest, preceding and succeeding business day conventions and other administrative or operational matters, including, but not limited to, rounding conventions) that Lender determines may be appropriate or necessary to reflect the adoption and implementation and to permit the administration by the Lender of any such rate or to permit the use and administration thereof by Lender in a manner substantially consistent with market practice (or, if Lender decides that adoption of any portion of such market practice is not administratively feasible or if Lender determines that no market practice for the administration of any such rate exists, in such other

***Determination Date:*** with respect to any Interest Period, (a) if the Loan is a Term SOFR Loan, the Periodic Term SOFR Determination Day for such Interest Period, (b) if the Loan is a Base Rate Loan, the date one (1) Business Day prior to the first day of the Interest Period, or (c) if the Loan is an Alternate Rate Loan, the date and time determined by Lender in accordance with the Conforming Changes; provided, however, that Lender may elect once during the Term, in its sole discretion, to change the Determination Date upon not less than thirty (30) days' written notice thereof to Borrower setting forth such changed date, in which event, upon the effective date of such notice, the Determination Date hereunder shall be the date set forth therein.

***Forward Rate:*** (i) if the Loan is a Term SOFR Loan, such rate as Lender reasonably determines; (ii) if the Loan is a Base Rate Loan, the mid-market 12-month forward Prime Rate as shown on Bloomberg at 11:00 a.m., New York City time, two (2) Business Days prior to the Determination Date (or, if such mid-market 12-month forward Prime Rate shall not exist, such rate as Lender reasonably determines); or (iii) if the Loan is an Alternate Rate Loan, the mid-market 12-month forward Alternate Index rate as shown on Bloomberg at 11:00 a.m., New York City time, two (2) Business Days prior to the Determination Date (or, if such mid-market 12-month forward Alternate Index rate shall not exist, such rate as Lender reasonably determines).

***Periodic Term SOFR Determination Day:*** shall have the meaning set forth in the definition of "Term SOFR." For the avoidance of doubt, the first Periodic Term SOFR Determination Day upon which Term SOFR will be calculated under the Loan Agreement will be November 10, 2022, and the Term SOFR Rate will apply to the Interest Period commencing November 9, 2022 for payment on the December 9, 2022 Payment Date.

***Relevant Governmental Body***: shall mean the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

***SOFR***: shall mean a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

***SOFR Administrator***: shall mean the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

***Term SOFR:*** shall mean, with respect to each Interest Period, the Term SOFR Reference Rate (rounded upwards, as necessary, to the nearest 1/1,000 of 1%) for a one-month period on the

day (such day, the "***Periodic Term SOFR Determination Day***") that is two (2) U.S. Government Securities Business Days prior to the fifteenth (15th) day of the calendar month occurring during such Interest Period, as such rate is published by the Term SOFR Administrator; provided, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for a one-month period has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for a one-month period as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for a one-month period was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day.

***Term SOFR Administrator:*** shall mean CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by Lender in its reasonable discretion).

***Term SOFR Loan:*** shall mean the Loan at such time as interest thereon accrues at a rate of interest equal to the Term SOFR Rate.

***Term SOFR Rate:*** shall mean, with respect to each Interest Period, the per annum rate of interest equal to (i) the greater of Term SOFR and the Term SOFR Floor, plus (ii) the Term SOFR Spread.

***Term SOFR Reference Rate:*** shall mean the one-month forward-looking term rate based on SOFR, currently identified on the CME Group's website at https://www.cmegroup.com/market-data/cme-group-benchmark-administration/term-sofr.html, or any successor source.

***Term SOFR Spread:*** 2.379%.

***Term SOFR Rate Cap Amount:*** 3.671%.

***U.S. Government Securities Business Day:*** shall mean any day except for (a) a Saturday, (b) a Sunday, or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

ii. The following definitions shall be deleted from Section 1.1.2 in their entirety:

***LIBOR***

***LIBOR Loan***

***LIBOR Rate Cap Amount***

c. The following sections shall be amended as follows:

i. **Section 2.2.4(a)(ii):** the reference to the term "the LIBOR" shall be deleted and replaced with a reference to the term "Term SOFR."

ii. **Section 2.6.1(a):** the Section shall be deleted in its entirety and replaced with the following:

"(a) the Interest Rate Protection Agreement is with a financial institution having a long term, unsecured and subordinated debt rating of at least "A+" by S&P and "A1" by Moody's; has a term ending no earlier than the Payment Date occurring in July, 2021; is an interest rate cap in respect of a notional amount not less than the Outstanding Principal Balance that shall have the effect of capping the Benchmark at the Applicable Rate Cap Amount; and provides that the only obligation of Borrower thereunder is the making of a single payment upon the execution and delivery thereof."

iii. **Section 2.6.1(d)**: this Section shall be deleted in its entirety.

iv. **Section 2.6.1(e)**: references to the term "LIBOR Loan" shall be deleted and replaced with references to "Term SOFR Loan"; the following words shall be deleted: "an Alternate Rate Loan or from a Base Rate Loan to"; the term "LIBOR Conversion" shall be deleted and replaced with the term "Rate Conversion"; and the reference to the term "Applicable Index" shall be deleted and replaced with a reference to the term "Benchmark."

v. **Section 2.6.1(f):** the reference to the term "LIBOR Conversion" shall be deleted and replaced with a reference to the term "Rate Conversion."

vi. **Section 2.8(e):** the reference to the term "Applicable Index" shall be deleted and replaced with a reference to the term "Benchmark."

vii. **Section 2.10:** the Section shall be deleted in its entirety and replaced with the following:

"**2.10 Rate Conversion**

(a) Notwithstanding anything to the contrary herein or in any other Loan Document, if Lender determines (which determination shall be conclusive and binding upon Borrower absent manifest error) that adequate and reasonable means do not exist for ascertaining the Benchmark and the Benchmark has not been succeeded by an Alternate Index (including in circumstances where a Benchmark Transition Event and its related Benchmark Replacement Date have not occurred with respect to such Benchmark), then Lender shall give notice by electronic mail of such determination, to Borrower at least three (3) U.S. Government Securities Business Days prior to the next succeeding Determination Date, with a written confirmation of such determination promptly thereafter. If such notice is given, the Loan shall bear interest based on the Base Rate beginning on the first day of the Interest Period for which the Benchmark was not available (and for each subsequent Interest Period until Lender provides notice, if applicable, pursuant to Section 2.10(c)). Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to convert a Term SOFR Loan or an Alternate Rate Loan to a Base Rate Loan.

(b) Notwithstanding anything to the contrary herein or in any other Loan Document, if Lender determines (which determination shall be conclusive and binding upon Borrower absent manifest error) that the Benchmark cannot be determined and the Benchmark has been succeeded by an Alternate Index (including in circumstances where a Benchmark Transition Event and its related Benchmark Replacement Date have occurred in respect of any determination of the Benchmark on any date), the Alternate Index will replace the then-current Benchmark for all purposes hereunder or under any Loan Document in respect of such determination on such date and all determinations on all subsequent dates without any amendment to, or further action or consent of any other party to, this Agreement; provided that Lender shall have received (A) an opinion of nationally recognized REMIC counsel as to the compliance of such conversion with applicable REMIC requirements as determined under the Code, the regulations, revenue rulings, revenue procedures and other administrative, legislative and judicial guidance relating to the tax treatment of REMIC Trusts (which such opinion shall be, in form and substance and from a provider, in each case, acceptable to Lender in its sole discretion and acceptable to the Rating Agencies); provided, however, such condition may be satisfied with the issuance of a general guidance, ruling, bulletin or decision by the Internal Revenue Service reasonably acceptable to the Lender, (B) a Rating Comfort Letter in connection with such conversion, and (C) evidence satisfactory to Lender that such conversion does not violate ERISA. Lender shall provide notice of the foregoing conversion to an Alternate Rate Loan to Borrower at least one (1) U.S. Government Securities Business Day prior to the next succeeding Determination Date, with a written confirmation of such determination promptly thereafter. If such notice is given, the Loan shall be converted, as of the first day of the Interest Period for which the Benchmark was unavailable, to an Alternate Rate Loan. Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to convert a Term SOFR Loan or a Base Rate Loan to an Alternate Rate Loan, or to convert an Alternate Rate Loan to a Term SOFR Loan or a Base Rate Loan.

(c) If the Loan is bearing interest based on the Base Rate but thereafter:

(i) Lender shall determine (which determination shall be conclusive and binding upon Borrower absent manifest error) that the event(s) or circumstance(s) which resulted in such conversion to Base Rate shall no longer be applicable, Lender shall give notice thereof to Borrower by electronic mail of such determination to Borrower as soon as reasonably practical, at least one (1) U.S. Government Securities Business Day prior to the next succeeding Determination Date, with a written confirmation of such determination promptly thereafter, and if such notice is given, the Loan shall bear interest based on Term SOFR (*i.e.*, at the Term SOFR Rate) beginning on the first day of the next succeeding Interest Period; or

(ii) Term SOFR cannot be determined and has been succeeded by an Alternate Rate (and the requirements in the proviso to the first sentence of Section 2.10(b) above have been met), Lender shall give notice by electronic mail of such determination to Borrower at least one (1) U.S. Government Securities Business Day prior to the next succeeding Determination Date, with a written confirmation of such determination promptly thereafter, and if such notice is given the Loan shall be converted to an Alternate Rate Loan on the first day of the next-succeeding Interest Period.

Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to elect to have the Loan bear interest either based on Term SOFR (*i.e.*, at the Term SOFR Rate) or based on the Base Rate or the Alternate Rate.

(d) If any requirement of law or any change therein or in the interpretation or application thereof, shall hereafter make it unlawful for Lender in good faith to make or maintain the portion of the Loan bearing interest based on Term SOFR or the Alternate Rate, then (i) the obligation of Lender hereunder to make the Loan bearing interest based on Term SOFR or the Alternate Rate, as applicable, shall be canceled forthwith and (ii) subject to the terms and conditions in this Section 2.10 with respect to any conversion to the Alternate Rate, the Loan shall automatically bear interest based on the Base Rate on the first day of the immediately succeeding Interest Period or within such earlier period as required by applicable law. Borrower hereby agrees promptly to pay Lender (within ten (10) Business Days of Lender's written demand therefor), any additional amounts necessary to compensate Lender for any reasonable out-of-pocket costs incurred by Lender in making any conversion in accordance with this Agreement, including, without limitation, any interest or fees payable by Lender to lenders of funds obtained by it in order to make or maintain the Loan hereunder. Upon written demand from Borrower, Lender shall demonstrate in reasonable detail the circumstances giving rise to Lender's determination and the calculation substantiating the Base Rate and any additional costs incurred by Lender in making the conversion. Lender's written notice of such costs, as certified to Borrower, shall be conclusive absent manifest error.

(e) In connection with the use or administration of Term SOFR, the Term SOFR Rate, or the use, administration, adoption or implementation of any Benchmark Replacement or any Base Rate Loan, Lender will have the right to make Conforming Changes from time to time. Any determination, decision or election that may be made by Lender pursuant to this Section 2.10, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in Lender's sole discretion, and, notwithstanding anything to the contrary in the documentation relating to the securities, shall become effective without consent from Borrower.

(f) Borrower hereby agrees to promptly pay to Lender, upon demand, any additional amounts necessary to compensate Lender for any actual costs and expenses incurred by Lender in making any conversion in accordance with this Section 2.10, including without limitation, any interest or fees payable by Lender to lenders of funds obtained by it in order to make or maintain the Term SOFR Loan (or Alternate Rate Loan) hereunder and/or reasonable legal fees and related expenses relating to any conversion. Lender's notice of such costs, as certified to Borrower, shall be conclusive absent manifest error. Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.10(f) shall not constitute a waiver of such Lender's right to demand such compensation. Upon written request from Borrower, Lender shall specify in reasonable detail the circumstances giving rise to Lender's determination and the calculation substantiating the Alternate Rate and any additional costs incurred by Lender in making the conversion. Lender's written notice of such costs, as certified to Borrower, shall be conclusive absent manifest error.

(g) The Servicer does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to Term SOFR or the Term SOFR Rate, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Alternate Rate), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Alternate Rate) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes. The Servicer may select information sources or services in its reasonable discretion to ascertain Term SOFR or any other Benchmark, in each case pursuant to the terms of this Loan Agreement, and shall have no liability to the Borrower or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service."

9. No Offsets or Defenses. Borrower hereby acknowledges, confirms and warrants to Lender that as of the Execution Date, Borrower does not claim any offset, defense, claim, right of set-off or counterclaim against Lender under, arising out of or in connection with this Amendment, the Notes, the Loan Agreement or any of the other Loan Documents. In addition, Borrower covenants and agrees with Lender that if any offset, defense, claim, right of set-off or counterclaim exists as of the Execution Date, Borrower hereby irrevocably and expressly waives the right to assert such matter.

10. Release and Covenant Not to Sue. Each of Borrower and Guarantor, jointly and severally, on behalf of themselves and all of their respective officers, directors, partners, members, agents, representatives, employees, heirs, successors, and assigns (collectively, "**Releasing Loan Parties**"), do hereby unconditionally, irrevocably and fully remise, release, acquit, waive, satisfy, and forever discharge each of Lender, Servicer, and Original Lender, and each of their respective subsidiaries and affiliates and all of their respective past, present, and future shareholders, beneficial owners, members, partners, officers, directors, employees, agents, representatives, loan servicers, attorneys (including, without limitation, Eversheds Sutherland (US) LLP), accountants, participants, heirs, successors and assigns (collectively, the "**Released Parties**") from any and all manner of debts, accountings, bonds, warranties, representations, covenants, promises, contracts, controversies, agreements, liabilities, obligations, expenses, damages, judgments, executions, objections, defenses, setoffs, actions, claims, demands, and causes of action of any nature whatsoever, whether at law or in equity, whether known or unknown, either now accrued or hereafter maturing, which any of the Releasing Loan Parties now has or hereafter can, shall, or may have against any of the Released Parties by reason of any matter, cause, or thing from the beginning of the world to and including the date of this Agreement (collectively, the "**Released Claims**"), including, specifically, but without limitation, claims, causes of action and defenses (a) based on the negligence of Lender or any of the Released Parties or on any other "lender liability" theories of, among others, bad faith, breach of implied covenant of good faith, unfair dealing, duress, coercion, control, misrepresentation, omissions, misconduct, overreaching, unconscionability, disparate bargaining position, reliance, equitable subordination, fraud, or otherwise, and/or (b) arising out of or relating in any manner to (i) the Loan, including, but not limited to, the administration or funding thereof, (ii) any Loan Document or the indebtedness now

or previously evidenced and secured thereby, (iii) any of the Property or the development, financing, and operation thereof or (iv) any other agreement or transaction between any Loan Party and any of the Released Parties, including, without limitation, the transactions contemplated thereby. Furthermore, the Releasing Loan Parties, jointly and severally, for themselves and all of their respective officers, directors, partners, members, agents, representatives, employees, heirs, successors, and assigns, hereby covenant and agree never to institute or cause to be instituted or continue prosecution of any suit or other form of action or proceeding of any kind or nature whatsoever against any of the Released Parties, by reason of or in connection with any of the foregoing Released Claims. The Releasing Loan Parties acknowledge that there is a risk that subsequent to the execution of this Agreement, Releasing Loan Parties may discover, incur, or suffer from claims related to the Released Claims which were unknown or unanticipated at the time this Agreement is executed, including, without limitation, unknown or unanticipated claims which, if known by Releasing Loan Parties on the date this Agreement is being executed, may have materially affected the Releasing Loan Parties' decision to execute this Agreement. The Releasing Loan Parties acknowledge that Releasing Loan Parties are assuming the risk of such unknown and unanticipated claims related to the Released Claims and agree that this Agreement applies thereto.

11. Fees. Borrower agrees that simultaneously with the execution hereof and to the extent not previously paid, all fees, costs, and charges arising in connection with this Amendment, including without limitation, (i) all reasonable attorneys' fees, (ii) the Modification Fee and (iii) other closing costs reasonably incurred by Lender, inclusive of all charges, fees and expenses of Midland Loan Services, a Division of PNC Bank, National Association ("**Servicer**") will be paid as of the Execution Date, and that Lender shall have no obligation whatsoever for payment thereof. Borrower acknowledges and agrees that none of the fees, costs, and charges paid in connection with the execution of this Agreement may be applied to or set off against the principal balance of the Notes.

12. Notice Address for Lender. Notwithstanding anything to the contrary in the Loan Agreement, the notice address for the Lender is as follows:

> WELLS FARGO BANK, NATIONAL ASSOCIATION, SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE BENEFIT OF THE HOLDERS OF NATIXIS COMMERCIAL MORTGAGE SECURITIES TRUST 2019-MILE, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2019-MILE
> c/o Midland Loan Services
> 10851 Mastin Street, Suite 300
> Overland Park, Kansas 66210
> Attention: Asset Management

13. Omnibus Amendment. As of the date hereof, each reference in any of the Loan Documents to the terms which have been modified pursuant to this Amendment shall be deemed to be a reference to each such defined term as so modified.

14. References. From and after the date hereof, (i) all references in the Loan Agreement to "this Agreement", "hereunder", "hereof" or words of like import referring to the "Loan

Agreement" shall mean the Loan Agreement as modified by this Amendment, and as the same may be further amended, restated, replaced, supplemented or otherwise modified from time to time and (ii) all references in the other Loan Documents to the "Loan Agreement" shall mean the Loan Agreement, as modified by this Amendment, and as the same may be further amended, restated, replaced, supplemented or otherwise modified from time to time.

15. Affirmation, Confirmation and Ratification of Loan Documents.

a. All of the terms, covenants, and conditions contained in the Loan Agreement and the Loan Documents shall be and remain in full force and effect, except as specifically modified in this Amendment, and are hereby confirmed, ratified, acknowledged, republished and reaffirmed in their entirety by the parties hereto. To Borrower's knowledge, all of the representations and warranties of Borrower set forth in the Loan Documents are true, complete and correct in all material respects, except (a) to the extent such representations and warranties are expressly made as of a prior date, in which case such representations and warranties are true, complete and correct in all material respects as of such prior date and (b) by reason of changed facts or circumstances arising after the date such representations or warranties were made which were not prohibited to occur pursuant to the Loan Documents. It is expressly understood that the execution and delivery of this Amendment does not and shall not (i) give rise to any defense, set-off, right of recoupment, claim or counterclaim with respect to any of Lender's or Borrower's obligations under the Loan Documents or the enforcement thereof, (ii) operate as a waiver of any of Lender's or Borrower's rights, powers or privileges under the Loan Documents, or (iii) prejudice, limit or affect in any way any present or future rights, remedies, powers or benefits available to Lender or Borrower under the Loan Documents. In addition, the parties hereto expressly disclaim any intent to effect a novation or an extinguishment or discharge of any of the obligations pursuant to the Loan Documents or by any other document executed in connection therewith by reason of this Amendment. This Amendment shall be a "Loan Document" for all purposes under the Loan Agreement. All references in the Loan Documents to the defined term "Loan Documents" shall mean the Loan Documents, as amended and/or modified by this Amendment. All references in the Loan Documents to the defined term "Lender" shall mean Lender as defined herein.

b. Guarantor hereby consents to the amendment of the Loan Agreement and the Payment Guaranty as set forth herein and the other matters set forth in this Amendment and expressly acknowledges, confirms, ratifies and reaffirms the terms, provisions, validity and binding nature, both at the time of delivery and on the date hereof, of its obligations under the Guaranty (inclusive of each instrument comprising the Guaranty) executed by Guarantor in connection with the Loan, agrees that any reference made in such documents, the Notes, or in any of the other Loan Documents to such documents shall mean such documents as amended by this Amendment, and agrees that the obligations arising under the Guaranty shall continue and remain in full force and effect and shall in no way be impaired or diminished as a result of this Amendment. Guarantor further expressly

acknowledges that, under the Guaranty, Guarantor's consent to this Amendment, or any future amendments, is not necessary to the continued validity of the Guaranty, and the fact that Guarantor has consented to this Amendment shall not modify the terms of the Guaranty (except as so expressly provided in Section 2 hereof in respect of the Payment Guaranty) and/or give Guarantor the right to approve future modifications or waivers of any agreement or obligation subject to the Guaranty, nor to make such approval a condition precedent to the continuing validity and enforceability of the Guaranty.

16. Successors and Assigns. This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

17. No Further Modification. No further modification, amendment, extension, discharge, termination or waiver of any provision of the Loan Agreement, as modified by this Amendment, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by both parties, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

18. Third Party Beneficiary Status of Servicer. Borrower acknowledges and agrees that Servicer and its successors and assigns is intended as a third party beneficiary of this Agreement.

19. Governing Law. The terms and provisions of Section 10.6 of the Loan Agreement are hereby incorporated herein by reference as if fully set forth herein.

20. Counterparts; Electronic Signatures. This Amendment may be executed in counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same instrument, and the words "executed," signed," "signature," and words of like import as used above and elsewhere in this Amendment shall include, in addition to manually executed signatures, images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, any electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

21. Prior Agreements; Notice to Borrower. Borrower is hereby notified that this Amendment contains the entire agreement of the parties hereto in respect of the subject matter hereof, and all prior agreements among or between Borrower and Lender, whether oral or written,

are superseded by the terms of this Amendment with respect to such subject matter. This Amendment may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties hereto or thereto.

22. WAIVER OF TRIAL BY JURY. BORROWER, GUARANTOR AND LENDER EACH HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, GUARANTOR AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF BORROWER, GUARANTOR AND LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER PARTIES.

*[Signature(s) on Following Page]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

ONNI WILSHIRE COURTYARD LLC,
a Delaware limited liability company

By:____________________
Sam Parrotta
Authorized Signatory

*[Signature(s) Continue on Following Page]*

**GUARANTOR:**

**PANNI HOLDINGS LTD.,**
a British Columbia corporation

By:______________________________
Name:
Title:

______________________________
**ROSSANO DE COTIIS**, a natural person

**LENDER:**

**WELLS FARGO BANK, NATIONAL ASSOCIATION, SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE BENEFIT OF THE HOLDERS OF NATIXIS COMMERCIAL MORTGAGE SECURITIES TRUST 2019-MILE, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2019-MILE**

By: Midland Loan Services, a division of PNC Bank, National Association, its Servicer

By: ____________________
Name: Andrea Helm
Title: Senior Vice President

**SECOND AMENDMENT TO PAYMENT GUARANTY**

This **SECOND AMENDMENT TO PAYMENT GUARANTY**, dated as of December 18, 2019 (this "***Amendment***"), is made by and among **ROSSANO DE COTIIS**, a natural person, having an address at c/o Onni Group, 200-1010 Seymour Street, Vancouver, British Columbia V6B 3M6 ("***De Cotiis Guarantor***"), **PANNI HOLDINGS LTD.**, a British Columbia corporation, having an address at 200-1010 Seymour Street, Vancouver, British Columbia, V6B 3M6 ("***Panni Guarantor***"; together with De Cotiis Guarantor, individually or collectively, as the context may require, "***Guarantor***"), and **NATIXIS REAL ESTATE CAPITAL LLC**, a Delaware limited liability company, having an address at 1251 Avenue of the Americas, New York, New York 10020 (together with its successors and assigns, "***Lender***").

WITNESSETH:

WHEREAS, pursuant to that certain Loan Agreement (the "***Original Loan Agreement***"), dated as of June 17, 2019 (the "***Original Closing Date***"), by and between Borrower and NATIXIS, NEW YORK BRANCH ("***Original Lender***"), Original Lender made a loan to Borrower in the maximum principal amount of up to $470,202,594.00 (the "***Loan***"), which Loan is evidenced by: (i) that certain Promissory Note A-1 in the stated principal amount of $50,000,000.00, dated as of the Original Closing Date, made by Borrower, as maker, payable to the order of Original Lender ("***Note A-1***"); (ii) that certain Promissory Note A-2 in the stated principal amount of $50,000,000.00, dated as of the Original Closing Date, made by Borrower, as maker, payable to the order of Original Lender ("***Note A-2***"); (iii) that certain Promissory Note A-3 in the stated principal amount of $50,000,000.00, dated as of the Original Closing Date, made by Borrower, as maker, payable to the order of Original Lender ("***Note A-3***"); (iv) that certain Promissory Note A-4 in the stated principal amount of $50,000,000.00, dated as of the Original Closing Date, made by Borrower, as maker, payable to the order of Original Lender ("***Note A-4***"); (v) that certain Promissory Note A-5 in the stated principal amount of $50,000,000.00, dated as of the Original Closing Date, made by Borrower, as maker, payable to the order of Original Lender ("***Note A-5***"); (vi) that certain Promissory Note A-6 in the stated principal amount of $50,000,000.00, dated as of the Original Closing Date, made by Borrower, as maker, payable to the order of Original Lender ("***Note A-6***"); (vii) that certain Promissory Note A-7 in the stated principal amount of $50,000,000.00, dated as of the Original Closing Date, made by Borrower, as maker, payable to the order of Original Lender ("***Note A-7***"); (viii) that certain Promissory Note A-8 in the stated principal amount of $50,000,000.00, dated as of the Original Closing Date, made by Borrower, as maker, payable to the order of Original Lender ("***Note A-8***"); (ix) that certain Promissory Note A-9 in the stated principal amount of $50,000,000.00, dated as of the Original Closing Date, made by Borrower, as maker, payable to the order of Original Lender ("***Note A-9***"); and (x) that certain Promissory Note A-10 in the stated principal amount of $20,202,594.00, dated as of the Original Closing Date, made by Borrower, as maker, payable to the order of Original Lender ("***Note A-10***"; and, together with Note A-1, Note A-2, Note A-3, Note A-4, Note A-5, Note A-6, Note A-7, Note A-8 and Note A-9, collectively, the "***Note***");

WHEREAS, as a condition to the making of the Loan to Borrower, Guarantor delivered to Original Lender, among other things, that certain Payment Guaranty, dated as of the Original Closing Date, by Guarantor in favor of Original Lender (the "***Original Payment***

***Guaranty***");

WHEREAS, Original Lender assigned the Loan, the Original Loan Agreement, the Note, the Original Payment Guaranty and the other "Loan Documents" (as defined in the Original Loan Agreement) to Lender pursuant to, among other things, (i) that certain Assignment of Loan Documents, dated as of October 31, 2019, by Original Lender in favor of Lender, and (ii) those certain Allonges to each Note, dated as of October 31, 2019, from Original Lender to Lender;

WHEREAS, on October 31, 2019, Lender, Borrower and Guarantor entered into that certain First Amendment to Loan Agreement and Payment Guaranty, dated as of October 31, 2019 (the "***First Amendment to Loan Agreement***"; the Original Loan Agreement, as amended by the First Amendment to Loan Agreement, and as the same may be further amended, modified, supplemented, restated or replaced from time to time, the "***Loan Agreement***"; the Original Payment Guaranty, as amended by the First Amendment to Loan Agreement, the "***Amended Payment Guaranty***");

WHEREAS, the parties have agreed to execute and deliver this Amendment for the purpose of further amending the Amended Payment Guaranty; and

NOW THEREFORE, in consideration of Ten Dollars ($10.00) paid in hand, the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor and Lender agree to further amend the Amended Payment Guaranty as follows:

1. Definitions. Capitalized terms used in this Amendment and not defined herein shall have the meaning provided in the Amended Payment Guaranty.

2. Intentionally Omitted.

3. Intentionally Omitted.

4. Amendment to Amended Payment Guaranty. Effective as of the date of this Amendment, the Amended Payment Guaranty is hereby further amended as follows:

a.) Section 1(e) of the Amended Payment Guaranty is hereby deleted in its entirety and replaced with the following:

"(e) The term "***Guaranteed Loan Amount***" means $40,816,589.38."

5. Intentionally Omitted.

6. Representations, Warranties and Covenants. As a material inducement for Lender to enter into this Amendment:

A. Intentionally omitted.

B. Guarantor hereby represents and warrants to Lender that:

i. Guarantor has full power and authority to execute, deliver and perform its obligations under this Amendment and all other documents delivered to Lender in connection with this Amendment. This Amendment is binding upon and enforceable against Guarantor in accordance with its terms.

ii. There is no Default or Event of Default under any of the Loan Documents and no event exists which, with the giving of notice or the passage of time or both, would constitute a Default or Event of Default under any of the Loan Documents.

iii. Guarantor does not have any (i) offsets or defenses against the payment of any sums due and/or payable under any guaranty or indemnity agreement executed by Guarantor in connection with the Loan, or any other amounts payable under the Loan Documents, or (ii) claims against Lender or any employee, officer, director, agent or attorney of Lender in connection with any of the Loan Documents.

iv. Each of the representations and warranties set forth in the Amended Payment Guaranty remains true, complete and correct as of the date originally made.

7. Reaffirmation of Obligations.

A. Intentionally omitted.

B. Guarantor hereby expressly acknowledges, confirms, ratifies and reaffirms the terms, provisions, validity and binding nature, both at the time of delivery and on the date hereof, of its obligations under each guaranty and/or indemnity agreement executed by Guarantor in connection with the Loan (including, without limitation, the Guaranty), agrees that any reference made in such documents, the Note or in any of the other Loan Documents to such documents shall mean such documents as amended by this Amendment, and agrees that the obligations arising thereunder shall continue and remain in full force and effect and shall in no way be impaired or diminished as a result of this Amendment. Guarantor further expressly acknowledges that, under each such guaranty and/or indemnity agreement, Guarantor's consent to this Amendment, or any future amendments, is not necessary to the continued validity of such guaranty and/or indemnity agreement, and the fact that Guarantor has consented to this Amendment shall not modify the terms of such guaranty and/or indemnity to give Guarantor the right to approve future modifications or waiver of any agreement or obligation subject to such guaranty and/or indemnity nor to make such approval a condition precedent to the continuing validity and enforceability of such guaranty and/or indemnity.

8. No Waiver. Guarantor and Lender further agree that nothing contained in this Amendment, nor in any other communication (whether written, oral or electronic) or contact with, or conduct by, between or among Lender, Borrower or Guarantor, shall constitute (or be deemed to constitute or be construed as) a (i) waiver, modification (other than as expressly

provided herein), alteration, amendment (other than as expressly provided herein) or release of any of the terms and provisions of the Loan Documents or of any of Lender's various rights, powers or remedies against Borrower, Guarantor or any other party to any of the Loan Documents or pursuant to applicable law, (ii) course of dealing obligating Lender to provide any additional or other accommodations, financial or otherwise, to Borrower, Guarantor or any other party to any of the Loan Documents at any time other than those expressly set forth in the Loan Documents, or (iii) commitment or any agreement to make a commitment with respect to any possible waiver, amendment, consent or other modification of the terms provided in the Note, the Loan Agreement, the Amended Payment Guaranty or any other Loan Document. Neither the previous nor future acceptance by Lender of interest or other payments proffered by Borrower or on Borrower's behalf with regard to any outstanding amounts due under the Loan Documents, nor the commencement or continuation of discussions with Borrower regarding the Loan or any of the Loan Documents or any other obligation owed by Borrower to Lender, either directly or indirectly, shall constitute a waiver or limitation of Lender's rights and remedies under the Loan Documents, at law or in equity.

9. No Novation. Except as expressly set forth herein, the Amended Payment Guaranty shall continue unmodified and in full force and effect. It is the intent of the parties that this Amendment shall not constitute a novation of the Amended Payment Guaranty. Guarantor further agrees that this Amendment is not intended to be, nor shall it be construed to create, a novation or accord and satisfaction of the Note or the indebtedness evidenced thereby.

10. Intentionally Omitted.

11. Fees, Costs and Expenses. Guarantor hereby covenants and agrees to pay all out-of-pocket fees, costs and expenses (including, without limitation, reasonable attorney's fees) paid or incurred by Lender in connection with the negotiation and execution of this Amendment.

12. Headings. Each of the captions contained in this Amendment are for the convenience of reference only and shall not define or limit the provisions hereof.

13. Governing Law. This Amendment shall be governed by, and construed and enforced in accordance with, the laws of the State of New York (without regard to any conflict of laws or principles).

14. Counterparts. This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. Signature and acknowledgement pages may be detached from the counterparts and attached to a single copy of this Amendment to physically form one document.

15. Submission of Agreement. The submission of this Amendment to Borrower and Guarantor or their agents or attorneys for review or signature does not constitute a commitment or agreement by Lender with respect to the matters set forth herein. This Amendment shall have no binding force or effect unless and until duly executed and delivered by Guarantor and Lender.

16. Severability. The provisions of this Amendment are severable, and if any one clause or provision hereof shall be held invalid or unenforceable in whole or in part, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, and not any other clause or provision of this Amendment.

[REMAINDER OF PAGE IS INTENTIONALLY LEFT BLANK]

**GUARANTOR**:

**PANNI HOLDINGS LTD.,**
a British Columbia corporation

By:______________________________
Name: Sam Parrotta
Title: Authorized Signatory

______________________________
**ROSSANO DE COTIIS**, a natural person

**<u>LENDER</u>**:

**NATIXIS REAL ESTATE CAPITAL LLC,**
a Delaware limited liability company

By:__________________________________
Name: Sophia Ouyang
Title: Vice President

By:__________________________________
Name: Jonathan Rechner
Title: Executive Director

**FOURTH AMENDMENT TO LOAN AGREEMENT (AND CORRECTIVE AMENDMENT TO PAYMENT GUARANTY) AND REAFFIRMATION OF LOAN DOCUMENTS**

This **FOURTH AMENDMENT TO LOAN AGREEMENT (AND CORRECTIVE AMENDMENT TO PAYMENT GUARANTY) AND REAFFIRMATION OF LOAN DOCUMENTS** (this "**Amendment**") executed as of May 4, 2023 (the "**Execution Date**") but effective as of November 10, 2022 (the "**Effective Date**"), is among **WELLS FARGO BANK, NATIONAL ASSOCIATION, SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE BENEFIT OF THE HOLDERS OF NATIXIS COMMERCIAL MORTGAGE SECURITIES TRUST 2019-MILE, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2019-MILE**, having an address of c/o Midland Loan Services, 10851 Mastin Street, Suite 300, Overland Park, Kansas 66210, Attention: Asset Management (together with its successors and assigns, "**Lender**"), **ONNI WILSHIRE COURTYARD LLC**, a Delaware limited liability company, having an address of c/o Onni Group, 200-1010 Seymour Street, Vancouver, BC V6B 3M6 (together with its successors and assigns, "**Borrower**"), and **ROSSANO DE COTIIS**, a natural person, having an address at c/o Onni group, 200-1010 Seymour Street, Vancouver, British Columbia V6B 3M6 ("**De Cotiis Guarantor**"), and **PANNI HOLDINGS LTD.**, a British Columbia corporation, having an address at 200-1010 Seymour Street, Vancouver, British Columbia V6B 3M6 ("**Panni Guarantor**"; together with De Cotiis Guarantor, individually or collectively, as the context may require, "**Guarantor**").

WHEREAS, Natixis, New York Branch ("**Original Lender**") provided a commercial mortgage loan in the maximum aggregate principal amount of $470,202,594.00 (the "**Loan**") to Borrower which is evidenced by, among other things (i) that certain Promissory Note A-1 in the principal amount of up to $50,000,000.00 ("**Note A-1**"), that certain Promissory Note A-2 in the principal amount of up to $50,000,000.00 ("**Note A-2**"), that certain Promissory Note A-3 in the principal amount of up to $50,000,000.00 ("**Note A-3**"), that certain Promissory Note A-4 in the principal amount of up to $50,000,000.00 ("**Note A-4**"), that certain Promissory Note A-5 in the principal amount of up to $50,000,000.00 ("**Note A-5**"), that certain Promissory Note A-6 in the principal amount of up to $50,000,000.00 ("**Note A-6**"), that certain Promissory Note A-7 in the principal amount of up to $50,000,000.00 ("**Note A-7**"), that certain Promissory Note A-8 in the principal amount of up to $50,000,000.00 ("**Note A-8**"), that certain Promissory Note A-9 in the principal amount of up to $50,000,000.00 ("**Note A-9**"), and that certain Promissory Note A-10 in the principal amount of up to $20,202,594.00 ("**Note A-10**"; and together with Note A-9, Note A-8, Note A-7, Note A-6, Note A-5, Note A-4, Note A-3, Note A-2, and Note A-1, the "**Notes**"), (ii) that certain Loan Agreement dated June 17, 2019 by and among Borrower and Original Lender, as amended by that certain First Amendment to Loan Agreement and Payment Guaranty ("**First Amendment**") dated as of October 31, 2019 (as so amended, the "**Original Loan Agreement**"), and (iii) the other Loan Documents.

WHEREAS, for purposes of calculating interest and other amounts payable on the Loan, the Notes were divided into seven (7) components: "Component A," "Component B," "Component

C," "Component D," "Component E," "Component F," and "Component G" (collectively, the "**Components**").

WHEREAS, Lender is now the holder of the Loan, including the Components, the Loan Agreement, and all of the other Loan Documents.

WHEREAS, the parties hereto entered into that certain Second Amendment to Loan Agreement and Reaffirmation of Loan Documents executed November 10, 2022 and effective as of July 9, 2022 (the "**Second Amendment**") and that certain Third Amendment to Loan Agreement and Reaffirmation of Loan Documents executed on January 12, 2023 and effective as of November 10, 2022 (the "**Third Amendment**"; the Original Loan Agreement, as amended by the Second Amendment, and the Third Amendment, the "**Loan Agreement**").

WHEREAS, the parties hereto desire as of the Effective Date to correct an erroneous statement of the Maximum Guaranteed Obligations Amount.

WHEREAS, capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement.

NOW, THEREFORE, for and in consideration of the sum of TEN and NO/100 DOLLARS ($10.00), and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby covenant and agree as follows:

1. <u>Corrective Amendment</u>. Due to a scrivener's error in Section 2.c of the Second Amendment, the amount of the Maximum Guaranteed Obligations Amount was incorrectly stated to be $238,805,502.81, instead of $40,816,589.38. Accordingly, Section 1(d) of the Payment Guaranty is revised, *nunc pro tunc* as of the Effective Date to correct the Maximum Guaranteed Obligations Amount to be $40,816,589.38, as set forth in that certain Second Amendment to Payment Guaranty dated December 18, 2019 between Guarantor and Original Lender ("**Second Payment Guaranty Amendment**").

2. <u>Omnibus Amendment</u>. As of the Effective Date, each reference in any of the Loan Documents to the terms which have been modified pursuant to this Amendment shall be deemed to be a reference to each such defined term as so modified.

3. <u>References</u>. From and after the Effective Date, (i) all references in the Loan Agreement to "this Agreement", "hereunder", "hereof" or words of like import referring to the "Loan Agreement" shall mean the Loan Agreement as modified by this Amendment, and as the same may be further amended, restated, replaced, supplemented or otherwise modified from time to time, (ii) all references in the other Loan Documents to the "Loan Agreement" shall mean the Loan Agreement, as modified by this Amendment, and as the same may be further amended, restated, replaced, supplemented or otherwise modified from time to time and (iii) all references to the Payment Guaranty shall mean the Payment Guaranty dated as of June 17, 2019, as amended by the First Amendment and the Second Payment Guaranty Amendment, and as corrected, ratified and confirmed by this Amendment.

4. Affirmation, Confirmation and Ratification of Loan Documents.

a. All of the terms, covenants, and conditions contained in the Loan Agreement and the Loan Documents shall be and remain in full force and effect, except as specifically modified in this Amendment, and are hereby confirmed, ratified, acknowledged, republished and reaffirmed in their entirety by the parties hereto. To Borrower's knowledge, all of the representations and warranties of Borrower set forth in the Loan Documents are true, complete and correct in all material respects, except (a) to the extent such representations and warranties are expressly made as of a prior date, in which case such representations and warranties are true, complete and correct in all material respects as of such prior date and (b) by reason of changed facts or circumstances arising after the date such representations or warranties were made which were not prohibited to occur pursuant to the Loan Documents. It is expressly understood that the execution and delivery of this Amendment does not and shall not (i) give rise to any defense, set-off, right of recoupment, claim or counterclaim with respect to any of Lender's or Borrower's obligations under the Loan Documents or the enforcement thereof, (ii) operate as a waiver of any of Lender's or Borrower's rights, powers or privileges under the Loan Documents, or (iii) prejudice, limit or affect in any way any present or future rights, remedies, powers or benefits available to Lender or Borrower under the Loan Documents. In addition, the parties hereto expressly disclaim any intent to effect a novation or an extinguishment or discharge of any of the obligations pursuant to the Loan Documents or by any other document executed in connection therewith by reason of this Amendment. This Amendment shall be a "Loan Document" for all purposes under the Loan Agreement. All references in the Loan Documents to the defined term "Loan Documents" shall mean the Loan Documents, as amended and/or modified by this Amendment. All references in the Loan Documents to the defined term "Lender" shall mean Lender as defined herein.

b. Guarantor hereby consents to the amendment of the Loan Agreement as set forth herein and the other matters set forth in this Amendment and expressly acknowledges, confirms, ratifies and reaffirms the terms, provisions, validity and binding nature, both at the time of delivery and on the date hereof, of its obligations under the Guaranty (inclusive of each instrument comprising the Guaranty) executed by Guarantor in connection with the Loan, agrees that any reference made in such documents, the Notes, or in any of the other Loan Documents to such documents shall mean such documents as amended by this Amendment, and agrees that the obligations arising under the Guaranty shall continue and remain in full force and effect and shall in no way be impaired or diminished as a result of this Amendment. Guarantor further expressly acknowledges that, under the Guaranty, Guarantor's consent to this Amendment, or any future amendments, is not necessary to the continued validity of the Guaranty, and the fact that Guarantor has consented to this Amendment shall not modify the terms of the Guaranty and/or give Guarantor the right to approve future modifications or waivers of any agreement or obligation subject to the Guaranty, nor to make such approval a condition precedent to the continuing validity and enforceability of the Guaranty.

5. Successors and Assigns. This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

6. No Further Modification. No further modification, amendment, extension, discharge, termination or waiver of any provision of the Loan Agreement, as modified by this Amendment, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by both parties, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

7. Third Party Beneficiary Status of Servicer. Borrower acknowledges and agrees that Servicer and its successors and assigns is intended as a third party beneficiary of this Agreement.

8. Governing Law. The terms and provisions of Section 10.6 of the Loan Agreement are hereby incorporated herein by reference as if fully set forth herein.

9. Counterparts; Electronic Signatures. This Amendment may be executed in counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same instrument, and the words "executed," signed," "signature," and words of like import as used above and elsewhere in this Amendment shall include, in addition to manually executed signatures, images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, any electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

10. Prior Agreements; Notice to Borrower. Borrower is hereby notified that this Amendment contains the entire agreement of the parties hereto in respect of the subject matter hereof, and all prior agreements among or between Borrower and Lender, whether oral or written, are superseded by the terms of this Amendment with respect to such subject matter. This Amendment may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties hereto or thereto.

11. WAIVER OF TRIAL BY JURY. BORROWER, GUARANTOR AND LENDER EACH HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD

TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, GUARANTOR AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF BORROWER, GUARANTOR AND LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER PARTIES.

*[Signature(s) on Following Page]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

ONNI WILSHIRE COURTYARD LLC,
a Delaware limited liability company

By:______________________________
Sam Parrotta
Authorized Signatory

*[Signature(s) Continue on Following Page]*

Loan No. 030503020

**GUARANTOR:**

**PANNI HOLDINGS LTD.,**
a British Columbia corporation

By: ______________________
Name: ROSSANO DE COTIIS
Title: PRESIDENT

______________________
**ROSSANO DE COTIIS**, a natural person

Loan No. 030503020

**LENDER:**

**WELLS FARGO BANK, NATIONAL ASSOCIATION, SOLELY IN ITS CAPACITY AS TRUSTEE FOR THE BENEFIT OF THE HOLDERS OF NATIXIS COMMERCIAL MORTGAGE SECURITIES TRUST 2019-MILE, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2019-MILE**

By: Midland Loan Services, a division of PNC Bank, National Association, its Servicer

By: ____________________
Name: **Jason Coonrod**
Title: **Vice President**

**ADDITIONAL PAYMENT GUARANTY**

made by

**ROSSANO DE COTIIS** and **PANNI HOLDINGS LTD.**,
collectively, as Guarantor,

in favor of

**NATIXIS, NEW YORK BRANCH,**
as Lender

Dated as of June 17, 2019

# ADDITIONAL PAYMENT GUARANTY

This **ADDITIONAL PAYMENT GUARANTY** (this "***Guaranty***"), dated as of June 17, 2019, is made by **ROSSANO DE COTIIS**, a natural person, having an address at c/o Onni Group, 200-1010 Seymour Street, Vancouver, British Columbia V6B 3M6 ("***De Cotiis Guarantor***"), and **PANNI HOLDINGS LTD.**, a British Columbia corporation, having an address at 200-1010 Seymour Street, Vancouver, British Columbia, V6B 3M6 ("***Panni Guarantor***"; together with De Cotiis Guarantor, individually or collectively, as the context may require, "***Guarantor***"), in favor of **NATIXIS, NEW YORK BRANCH**, having an address at 1251 Avenue of the Americas, New York, New York 10020 (together with its successors and assigns, "***Lender***").

## R E C I T A L S:

WHEREAS, pursuant to that certain Loan Agreement, dated as of the date hereof (as the same may be amended, modified, supplemented, restated or replaced from time to time, the "***Loan Agreement***"), between ONNI WILSHIRE COURTYARD LLC, a Delaware limited liability company ("***Borrower***"), and Lender, Lender has agreed to make a loan (the "***Loan***") to Borrower in an original principal amount of $470,202,594.00, subject to the terms and conditions of the Loan Agreement; and

WHEREAS, Borrower has requested that Borrower not be required to make monthly deposits into the Rollover Reserve Subaccount under the Loan Agreement; and

WHEREAS, as a condition to Lender's agreeing that Borrower shall not be required to make monthly deposits into the Rollover Reserve Subaccount, Lender is requiring that Guarantor execute and deliver to Lender this Guaranty; and

WHEREAS, Guarantor hereby acknowledges that (i) De Cotiis Guarantor owns direct or indirect ownership interests in Borrower and (ii) Borrower and Panni Guarantor have common legal and beneficial ownership and are under common Control (within the meaning of clause (ii) of the definition of "Control"), and, accordingly, each Guarantor will materially benefit from Lender's agreeing to make the Loan.

NOW, THEREFORE, in consideration of the premises set forth herein and as an inducement for and in consideration of the agreement of Lender to make the Loan pursuant to the Loan Agreement, Guarantor hereby agrees, covenants, represents and warrants to Lender as follows:

**1. Definitions.**

(a) All capitalized terms used and not defined herein shall have the respective meanings given such terms in the Loan Agreement.

(b) The term "***Guaranteed Obligations***" means the payment of the principal under the Note when due in accordance with the Note and the other Loan Documents, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter (*provided, however*, that in no event shall Guarantor's liability hereunder for the payment of the principal under the Note exceed, as of any date, an amount equal to the Additional Payment Guaranty Amount (as defined below) as of such date (without reduction on account of any prepayment or amortization of the Loan, it being the intention that Guarantor is guaranteeing the last portion of the Loan to be satisfied in an amount equal to the Additional Payment Guaranty Amount)).

(c) The term "***Additional Payment Guaranty Amount***" means, as of any date, an amount equal to the product of (i) $133,333.33 *multiplied by* (ii) the total number of Payment Dates that have occurred during the period (x) commencing on the Closing Date and (y) ending on (and including) such date; *provided* that in no event shall the Additional Payment Guaranty Amount ever exceed the product of (A) $133,333.33 *multiplied by* (B) the total number of Payment Dates that have occurred during the period (x) commencing on the Closing Date and (y) ending on (and including) the Outside Date (as defined below). By way of illustration and not of limitation, as of October 31, 2019, the Additional Payment Guaranty Amount will be equal to $399,999.99 (*i.e.*, $133,333.33 *multiplied by* the three (3) Payment Dates that will theretofore have occurred).

(d) The term "***Outside Date***" means the earlier to occur of (i) the date upon which the Debt has been repaid in full in accordance with the terms of the Loan Documents and (ii) the date upon which title to the Property has been transferred by (x) foreclosure of the Security Instrument or (y) acceptance by Lender of a deed-in-lieu of foreclosure.

**2. Guaranty.**

(a) Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Lender the full, prompt and complete payment when due of the Guaranteed Obligations.

(b) All sums payable to Lender under this Guaranty shall be payable on demand and without reduction for any offset, claim, counterclaim or defense.

(c) Guarantor hereby agrees to indemnify, defend and save harmless Lender from and against any and all actual costs, actual losses, liabilities, claims, causes of action, actual expenses and damages, including reasonable attorneys' fees and disbursements, which Lender may suffer or which otherwise may arise in connection with the enforcement by Lender of the Loan Documents and/or by reason of Borrower's failure to pay any of the Guaranteed Obligations when due, irrespective of whether such costs, losses, liabilities, claims, causes of action, expenses or damages are incurred by Lender prior or subsequent to (i) Lender's declaring the Principal, interest and other sums evidenced or secured by the Loan Documents to be due and payable, (ii) the commencement or completion of a judicial or non-judicial foreclosure of the Security Instrument or (iii) the conveyance of all or any portion of the Property by deed-in-lieu of foreclosure.

(d) Guarantor agrees that no portion of any sums applied (other than sums received from Guarantor in full or partial satisfaction of its obligations hereunder), from time to time, in reduction of the Debt shall be deemed to have been applied in reduction of the Guaranteed Obligations until such time as the Debt has been paid in full, or Guarantor shall have made the full payment required hereunder, it being the intention hereof that the Guaranteed Obligations shall be the last portion of the Debt to be deemed satisfied.

(e) Guarantor acknowledges that, notwithstanding any other provision of this Guaranty or any of the other Loan Documents to the contrary (including without limitation any non-recourse provision under the Loan Documents), the obligations of Guarantor under this Guaranty are unlimited personal obligations of Guarantor which are not secured by the Security Instrument or any other security instrument.

**3. Representations and Warranties.** Guarantor hereby represents and warrants to Lender as follows (which representations and warranties shall be given as of the date hereof and shall survive the execution and delivery of this Guaranty):

(a) Execution. This Guaranty has been duly executed and delivered by Guarantor.

(b) Enforceability. This Guaranty constitutes a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally.

(c) No Violation. The execution, delivery and performance by Guarantor of its obligations under this Guaranty does not and will not violate any law, regulation, order, writ, injunction or decree of any court or governmental body, agency or other instrumentality applicable to Guarantor, or result in a breach of any of the terms, conditions or provisions of, or constitute a default under, or result in the creation or imposition of any mortgage, lien, charge or encumbrance of any nature whatsoever upon any of the assets of Guarantor pursuant to the terms of any mortgage, indenture, agreement or instrument to which Guarantor is a party or by which it or any of its properties is bound. Guarantor is not in default under any other guaranty which it has provided to Lender.

(d) No Litigation. Except as otherwise may have been previously disclosed to Lender in writing, there are no actions, suits or proceedings at law or in equity, pending or, to Guarantor's actual knowledge, threatened in writing against or affecting Guarantor or which involve or might involve the validity or enforceability of this Guaranty or which would be reasonably expected to materially adversely affect the financial condition of Guarantor or the ability of Guarantor to perform any of its obligations under this Guaranty. Guarantor is not in default beyond any applicable grace or cure period with respect to any order, writ, injunction, decree or demand of any Governmental Authority which would be reasonably expected to materially adversely affect the financial condition of Guarantor or the ability of Guarantor to perform any of its obligations under this Guaranty.

(e) Consents. All consents, approvals, orders or authorizations of, or registrations, declarations or filings with, all Governmental Authorities (collectively, the "***Consents***") that are required in connection with the valid execution, delivery and performance by Guarantor of this Guaranty have been obtained and Guarantor agrees that all Consents required in connection with the carrying out or performance of any of Guarantor's obligations under this Guaranty will be obtained when required.

(f) Financial Statements and Other Information. All financial statements of Guarantor heretofore delivered to Lender are true and correct in all material respects and fairly present the financial condition of Guarantor as of the respective dates thereof, and no materially adverse change has occurred in the financial conditions reflected therein since the respective dates thereof. None of the aforesaid financial statements or any certificate or statement furnished to Lender by or on behalf of Guarantor in connection with the transactions contemplated hereby, and none of the representations and warranties in this Guaranty contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein or herein not materially misleading. Guarantor is not insolvent within the meaning of the United States Bankruptcy Code or any other applicable law, code or regulation and the execution, delivery and performance of this Guaranty will not render Guarantor insolvent.

(g) Consideration. De Cotiis Guarantor is the owner, directly or indirectly, of legal and beneficial ownership interests in Borrower. Borrower and Panni Guarantor have common legal and beneficial ownership and are under common Control (within the meaning of clause (ii) of the definition of "Control").

4. **Financial Statements.**

(a) De Cotiis Guarantor shall deliver to Lender, (i) within one hundred fifty (150) days after the end of each calendar year, a complete copy of De Cotiis Guarantor's annual financial statements, together with a certification by De Cotiis Guarantor that such statements are true, correct, complete and accurate in all material respects and present fairly the financial condition of De Cotiis Guarantor and has have been prepared in accordance with GAAP or any other accounting method, consistently applied (*provided* that, if such statements are in the same form as the financial statements delivered to Lender in connection with the closing of the Loan, such statements shall be deemed acceptable as to form), and (ii) within forty-five (45) days after request by Lender, such other financial information with respect to De Cotiis Guarantor as Lender may reasonably request.

(b) Panni Guarantor shall deliver to Lender, (i) within one hundred fifty (150) days after the end of each fiscal year of Panni Guarantor, a complete copy of Panni Guarantor's annual financial statements audited by a "big four" accounting firm or another independent certified public accountant reasonably acceptable to Lender, and (ii) within forty-five (45) days after request by Lender, such other financial information with respect to Panni Guarantor as Lender may reasonably request.

**5. Unconditional Character of Obligations of Guarantor.**

(a) The obligations of Guarantor hereunder shall be irrevocable, absolute and unconditional, irrespective of the validity, regularity or enforceability, in whole or in part, of the other Loan Documents or any provision thereof, or the absence of any action to enforce the same, any waiver or consent with respect to any provision thereof, the recovery of any judgment against Borrower, Guarantor or any other Person or any action to enforce the same, any failure or delay in the enforcement of the obligations of Borrower under the other Loan Documents or Guarantor under this Guaranty, or any setoff or counterclaim, and irrespective of any other circumstances which might otherwise limit recourse against Guarantor by Lender or constitute a legal or equitable discharge or defense of a guarantor or surety. Lender may enforce the obligations of Guarantor under this Guaranty by a proceeding at law, in equity or otherwise, independent of any loan foreclosure or similar proceeding or any deficiency action against Borrower or any other Person at any time, either before or after an action against the Property or any part thereof, Borrower or any other Person. **This Guaranty is a guaranty of payment and performance and not merely a guaranty of collection.** Guarantor waives diligence, notice of acceptance of this Guaranty, filing of claims with any court, any proceeding to enforce any provision of any other Loan Document against Guarantor, Borrower or any other Person, any right to require a proceeding first against Borrower or any other Person, or to exhaust any security (including, without limitation, the Property) for the performance of the Guaranteed Obligations or any other obligations of Borrower or any other Person, or any protest, presentment, notice of default or other notice or demand whatsoever (except to the extent expressly provided to the contrary in this Guaranty).

(b) The obligations of Guarantor under this Guaranty, and the rights of Lender to enforce the same by proceedings, whether by action at law, suit in equity or otherwise, shall not be in any way affected by any of the following:

(i) any insolvency, bankruptcy, liquidation, reorganization, readjustment, composition, dissolution, receivership, conservatorship, winding up or other similar proceeding involving or affecting Borrower, the Property or any part thereof, Guarantor or any other Person;

(ii) any failure by Lender or any other Person, whether or not without fault on its part, to perform or comply with any of the terms of the Loan Agreement, or any other Loan Documents, the Mezzanine Loan Documents or any document or instrument relating to any of the foregoing;

(iii) the sale, transfer or conveyance of the Property or any interest therein to any Person, whether now or hereafter having or acquiring an interest in the Property or any part thereof and whether or not pursuant to any foreclosure, trustee sale or similar proceeding against Borrower or the Property or any interest therein;

(iv) the conveyance to Lender, any Affiliate of Lender or Lender's nominee of the Property or any interest therein by a deed-in-lieu of foreclosure;

(v) the release of Borrower or any other Person from the performance or observance of any of the agreements, covenants, terms or conditions contained in any of the Loan Documents by operation of law or otherwise; or

(vi) the release in whole or in part of any collateral for any or all Guaranteed Obligations or for the Loan or any portion thereof.

(c) Except as otherwise specifically provided in this Guaranty, Guarantor hereby expressly and irrevocably waives all defenses in an action brought by Lender to enforce this Guaranty based on claims of waiver, release, surrender, alteration or compromise and all setoffs, reductions, or impairments, whether arising hereunder or otherwise.

(d) Lender may deal with Borrower and Affiliates of Borrower in the same manner and as freely as if this Guaranty did not exist and shall be entitled, among other things, to grant Borrower or any other Person such extension or extensions of time to perform any act or acts as may be deemed advisable by Lender, at any time and from time to time, without terminating, affecting or impairing the validity of this Guaranty or the obligations of Guarantor hereunder.

(e) No compromise, alteration, amendment, modification, extension, renewal, release or other change of, or waiver, consent, delay, omission, failure to act or other action with respect to, any liability or obligation under or with respect to, or of any of the terms, covenants or conditions of, the Loan Documents shall in any way alter, impair or affect any of the obligations of Guarantor hereunder, and Guarantor agrees that if any Loan Document is modified with Lender's consent, the Guaranteed Obligations shall automatically be deemed modified to include such modifications.

(f) Lender may proceed to protect and enforce any or all of its rights under this Guaranty by suit in equity or action at law, whether for the specific performance of any covenants or agreements contained in this Guaranty or otherwise, or to take any action authorized or permitted under applicable law, and shall be entitled to require and enforce the performance of all acts and things required to be performed hereunder by Guarantor. Each and every remedy of Lender shall, to the extent permitted by law, be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity.

(g) No waiver shall be deemed to have been made by Lender of any rights hereunder unless the same shall be in writing and signed by Lender, and any such waiver shall be a waiver only with respect to the specific matter involved and shall in no way impair the rights of Lender or the obligations of Guarantor to Lender in any other respect or at any other time.

(h) At the option of Lender, Guarantor may be joined in any action or proceeding commenced by Lender against Borrower in connection with or based upon any other Loan Documents and recovery may be had against Guarantor in such action or proceeding or in any independent action or proceeding against Guarantor to the extent of Guarantor's liability hereunder, without any requirement

that Lender first assert, prosecute or exhaust any remedy or claim against Borrower or any other Person, or any security for the obligations of Borrower or any other Person.

(i) Guarantor agrees that this Guaranty shall continue to be effective or shall be reinstated, as the case may be, if at any time any payment is made by Borrower or Guarantor to Lender and such payment is rescinded or must otherwise be returned by Lender (as determined by Lender in its sole and absolute discretion) upon insolvency, bankruptcy, liquidation, reorganization, readjustment, composition, dissolution, receivership, conservatorship, winding up or other similar proceeding involving or affecting Borrower or Guarantor, all as though such payment had not been made.

(j) In the event that Guarantor shall advance or become obligated to pay any sums under this Guaranty or in connection with the Guaranteed Obligations or in the event that for any reason whatsoever Borrower or any subsequent owner of the Property or any part thereof is now, or shall hereafter become, indebted to Guarantor, Guarantor agrees that (i) the amount of such sums and of such indebtedness and all interest thereon shall at all times be subordinate as to lien, the time of payment and in all other respects to all sums, including principal and interest and other amounts, at any time owed to Lender under the Loan Documents, and (ii) Guarantor shall not be entitled to enforce or receive payment thereof until the Debt has been indefeasibly paid in full. Nothing herein contained is intended or shall be construed to give Guarantor any right of subrogation in or under the Loan Documents or any right to participate in any way therein, or in the right, title or interest of Lender in or to any collateral for the Loan, notwithstanding any payments made by Guarantor under this Guaranty, until the actual and irrevocable receipt by Lender of payment in full of all of the Debt. If any amount shall be paid to Guarantor on account of such subrogation rights at any time when any such sums due and owing to Lender shall not have been fully paid, such amount shall be paid by Guarantor to Lender for credit and application against such sums due and owing to Lender.

(k) Guarantor's obligations hereunder shall survive a foreclosure, deed-in-lieu of foreclosure or similar proceeding involving the Property and the exercise by Lender of any or all of its remedies pursuant to the Loan Documents.

**6. <u>Covenants</u>.**

(a) As used in this <u>Section 6</u>, the following terms shall have the respective meanings set forth below:

(i) "***GAAP***" shall mean generally accepted accounting principles, consistently applied.

(ii) "***Liquid Assets***" shall mean the liquid assets of Guarantor in the form of cash, readily marketable securities traded on a national exchange or on the National Association of Securities Dealers Automatic Quotations (NASDAQ), obligations of the United States of America or Canada, or guaranteed by the United States of America or Canada, corporate debt securities traded on a national exchange, Guarantor's cash in partnerships in which Guarantor is a partner (but only to the extent that such cash is available for distribution to Guarantor and unencumbered), the undrawn amount of funds available to be directly borrowed by Guarantor under a line of credit or other credit facility then in effect and provided by a commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia or under the laws of Canada having combined capital and surplus of not less than $1,000,000,000.00, which commercial bank has a rating of at least "AA" or such comparable rating

from S&P or Moody's, respectively, and with respect to which no default or other event or circumstance exists that would cause Guarantor not to be able to borrow such funds on not more five (5) Business Days' notice, and such other investments as may be acceptable to Lender in its sole discretion.

(iii) "***Net Worth***" shall mean, as of a given date, (x) the total assets of Guarantor (excluding the value of Guarantor's direct and indirect interests in Borrower and the Property) as of such date less (y) Guarantor's total liabilities as of such date, determined in accordance with GAAP.

(b) Until all of the Guaranteed Obligations have been paid in full, Guarantor (i) shall maintain an aggregate Net Worth in excess of $225,000,000.00 (the "***Net Worth Covenant***") and shall maintain, in the aggregate, Liquid Assets in excess of $30,000,000.00 (the "***Liquidity Covenant***"; and, collectively with the Net Worth Covenant, the "***Guarantor Financial Covenants***"), and (ii) shall not sell, pledge, mortgage or otherwise transfer any of its assets, or any interest therein, on terms materially less favorable than would be obtained in an arms-length transaction.

(c) Guarantor shall not, at any time while a default in the payment of the Guaranteed Obligations has occurred and is continuing beyond the expiration of any applicable notice and cure periods, either (i) enter into or effectuate any transaction with any Affiliate which would reduce the Net Worth of Guarantor or (ii) sell, pledge, mortgage or otherwise transfer to any Person any of Guarantor's assets, or any interest therein; *provided* that, Guarantor shall be permitted to enter into transactions described in this subclause (ii) for so long as each such transaction (x) is conducted in the ordinary course of Guarantor's business and is on an arms-length basis with a person that is not Affiliated with Guarantor, (y) would not reduce Guarantor's Net Worth or Liquid Assets below the thresholds required pursuant to the Guarantor Financial Covenants, and (z) would not be reasonably expected to have a material adverse effect on Guarantor's ability to satisfy the Guaranteed Obligations.

**7. Entire Agreement/Amendments.** This instrument represents the entire agreement between the parties with respect to the subject matter hereof. The terms of this Guaranty shall not be waived, altered, modified, amended, supplemented or terminated in any manner whatsoever except by written instrument signed by Lender and Guarantor.

**8. Successors and Assigns.** This Guaranty shall be binding upon Guarantor, and Guarantor's estate, heirs, personal representatives, successors and assigns, may not be assigned or delegated by Guarantor and shall inure to the benefit of Lender and its successors and assigns.

**9. Applicable Law and Consent to Jurisdiction.** This Guaranty shall be governed by, and construed and enforced in accordance with, the substantive laws of the State of New York. Guarantor irrevocably (a) agrees that any suit, action or other legal proceeding arising out of or relating to this Guaranty may be brought in a court of record in the City and County of New York or in the Courts of the United States of America located in the Southern District of New York, (b) consents to the jurisdiction of each such court in any such suit, action or proceeding and (c) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in any of such courts and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. Guarantor irrevocably consents to the service of any and all process in any such suit, action or proceeding by service of copies of such process to Guarantor at its address provided in Section 14 hereof. Nothing in this Section 9, however, shall affect the right of Lender to serve legal process in any other manner permitted by law or affect the right of Lender to bring any suit, action or proceeding against Guarantor or its property in the courts of any other jurisdictions.

**10.** **Section Headings.** The headings of the sections and paragraphs of this Guaranty have been inserted for convenience of reference only and shall in no way define, modify, limit or amplify any of the terms or provisions hereof.

**11.** **Severability.** Any provision of this Guaranty which may be determined by any competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, Guarantor hereby waives any provision of law which renders any provision hereof prohibited or unenforceable in any respect.

**12.** **WAIVER OF TRIAL BY JURY.** GUARANTOR HEREBY WAIVES THE RIGHT OF TRIAL BY JURY IN ANY LITIGATION, ACTION OR PROCEEDING ARISING HEREUNDER OR IN CONNECTION HEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR, AND IS INTENDED TO ENCOMPASS EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER OF TRIAL BY JURY BY GUARANTOR.

**13.** **Other Guaranties.** The obligations of Guarantor hereunder are separate and distinct from, and in addition to, the obligations of Guarantor now or hereafter arising under any other guaranties, pursuant to which Guarantor has guaranteed payment and performance of certain other obligations of Borrower described therein.

**14.** **Notices.** All notices, demands, requests, consents, approvals or other communications (collectively called "***Notices***") required or permitted to be given hereunder to Lender or Guarantor or which are given to Lender or Guarantor with respect to this Guaranty shall be given in the same manner as is specified in the Loan Agreement, directed to the party to be so notified and addressed as set forth below.

If to Lender, to:

Natixis, New York Branch
1251 Avenue of the Americas, 5th Floor
New York, New York 10020
Attention: Real Estate Administration
Email: USCIBGlobalFinanceAssetManagementTeam@natixis.com
Phone: (212) 891-6100

with a copy to:

Winston & Strawn LLP
200 Park Avenue
New York, New York 10166
Attention: Michael A. Moser, Esq.
Email: mmoser@winston.com
Telecopier: (212) 294-4700

If to Guarantor, to:

c/o Onni Group
200-1010 Seymour Street
Vancouver, BC, V6B 3M6
Attention: Sam Parrotta
Email: sparrotta@onni.com

with a copy to:

Allen Matkins Leck Gamble Mallory & Natsis LLP
1900 Main Street, 5th Floor
Irvine, California 92614-7321
Attention: Susan E. Graham, Esq.
Email: sgraham@allenmatkins.com
Telecopier: (949) 553-8354.

**15. Guarantor's Receipt of Loan Documents.** Guarantor by its execution hereof acknowledges receipt of true copies of all of the Loan Documents, the terms and conditions of which are hereby incorporated herein by reference.

**16. Interest; Expenses.**

(a) If Guarantor fails to pay all or any sums due hereunder upon demand by Lender, the amount of such sums payable by Guarantor to Lender shall bear interest from the date of demand until paid at the Default Rate in effect from time to time.

(b) Guarantor hereby agrees to pay all actual, out-of-pocket costs, charges and expenses, including reasonable attorneys' fees and disbursements, which may be incurred by Lender in enforcing the covenants, agreements, obligations and liabilities of Guarantor under this Guaranty.

**17. Joint and Several Obligations.** If Guarantor consists of more than one Person, each such Person shall have joint and several liability for the obligations of Guarantor hereunder.

**18. Specific Limitation on Guaranty and Indemnity Obligations.** Guarantor and Lender hereby confirm that it is the intention of Guarantor and Lender that this Guaranty not constitute a fraudulent transfer or fraudulent conveyance (a "***Fraudulent Conveyance***") under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act or any other debtor relief law or insolvency law (whether statutory, common law, case law or otherwise) or any jurisdiction whatsoever (collectively, the "***Bankruptcy Laws***"). To give effect to the foregoing intention of Guarantor and Lender, each of such parties hereby irrevocably agrees that the Guaranteed Obligations shall be limited to (but shall not be less than) such maximum amount as will, after giving effect to the maximum amount of such obligations and all other liabilities (whether contingent or otherwise) of Guarantor that are relevant under such Bankruptcy Laws, result in the Guaranteed Obligations not constituting a Fraudulent Conveyance under the Bankruptcy Laws, as of the date of execution and delivery of this Guaranty.

**19. Counterparts.** This Guaranty may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

**20. State-Specific Provisions.** Solely to the extent that, and despite the express intent of Guarantor and Lender that the laws of the State of New York shall govern this Guaranty, a court of

competent jurisdiction finds that the laws of the State of California apply to this Guaranty, the following provisions shall govern and control in the event of a conflict with any other provision in this Guaranty:

(a) Guarantor expressly waives: (i) any and all rights of subrogation, reimbursement, indemnification and contribution and any other rights and defenses that are or may become available to Guarantor by reason of California Civil Code Sections 2787 to 2855, inclusive; and (ii) any right to require the marshalling of assets, whether under Section 2899 or Section 3433 of the California Civil Code or otherwise.

(b) Guarantor waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a non-judicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

(c) Guarantor hereby waives all rights and defenses that Guarantor may have because Borrower's debt is secured by real property. This means, among other things:

(i) Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower; and

(ii) if Lender forecloses on any real property collateral pledged by Borrower:

1. the amount of the Debt may be reduced only by the price for which such collateral is sold at the foreclosure sale, even if such collateral is worth more than the sale price; and

2. Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower.

This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's debt is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

(d) Guarantor hereby waives any rights under California Code of Civil Procedure Sections 580a and 726(b), which provide, among other things: that a creditor must file a complaint for deficiency within three (3) months of a non-judicial foreclosure sale or judicial foreclosure sale, as applicable; that a fair market value hearing must be held; and that the amount of the deficiency judgment shall be limited to the amount by which the unpaid debt exceeds the fair market value of the security, but not more than the amount by which the unpaid debt exceeds the sale price of the security.

(e) Guarantor acknowledges that, notwithstanding any other provision of this Guaranty or any of the other Loan Documents to the contrary (including without limitation any non-recourse provision under the Loan Documents), the obligations of Guarantor under this Guaranty are unlimited personal obligations of Guarantor which are not secured by the Security Instrument or any other security instrument.

[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date first above written.

**GUARANTOR**:

**PANNI HOLDINGS LTD.**,
a British Columbia corporation

By:______________________________
Name: Sam Parrotta
Title: Authorized Signatory

__________________________________
**ROSSANO DE COTIIS**, a natural person

**EXHIBIT B**
to
Guarantor Demand Letter

Promissory Notes

1. Promissory Note A-1, dated June 17, 2019, executed by Borrower, payable to the order of Original Noteholder, as payee, in the original principal amount of $50,000,000.00;

2. Promissory Note A-2, dated June 17, 2019, executed by Borrower, payable to the order of Original Noteholder, as payee, in the original principal amount of $50,000,000.00;

3. Promissory Note A-3, dated June 17, 2019, executed by Borrower, payable to the order of Original Noteholder, as payee, in the original principal amount of $50,000,000.00;

4. Promissory Note A-4, dated June 17, 2019, executed by Borrower, payable to the order of Original Noteholder, as payee, in the original principal amount of $50,000,000.00;

5. Promissory Note A-5, dated June 17, 2019, executed by Borrower, payable to the order of Original Noteholder, as payee, in the original principal amount of $50,000,000.00;

6. Promissory Note A-6, dated June 17, 2019, executed by Borrower, payable to the order of Original Noteholder, as payee, in the original principal amount of $50,000,000.00;

7. Promissory Note A-7, dated June 17, 2019, executed by Borrower, payable to the order of Original Noteholder, as payee, in the original principal amount of $50,000,000.00;

8. Promissory Note A-8, dated June 17, 2019, executed by Borrower, payable to the order of Original Noteholder, as payee, in the original principal amount of $50,000,000.00;

9. Promissory Note A-9, dated June 17, 2019, executed by Borrower, payable to the order of Original Noteholder, as payee, in the original principal amount of $50,000,000.00; and

10. Promissory Note A-10, dated June 17, 2019, executed by Borrower, payable to the order of Original Noteholder, as payee, in the original principal amount of $20,202,594.00.